IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WALIED SHATER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. _____ |
| | § | |
| | § | |
| SHELL OIL COMPANY | § | |
| | § | |
| Defendant | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Walied Shater ("Plaintiff" or "Shater"), files his Original Complaint against Defendant Shell Oil Company ("Shell" "Defendant," or the "Company").

1.      Shater was denied a promotion because of race and national origin discrimination. Thus, he brings this failure to promote discrimination case under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

2.      Shater is a non-white American citizen of Arab/Middle Eastern (Egyptian and Sudanese) race and national origin.  He is a former Special Agent for the U.S. Secret Service's Presidential Protective Division.  He later went to work for Shell in its Corporate Security Department, where he excelled, and was designated as "Top Talent."

3.      In 2017, Shater applied for the position of Regional Security Manager ("RSM") – Americas in Houston, Texas.   He was amply qualified for the job – indeed, earlier in the year, his manager had identified this exact job position as one he was a  "strong contender" for if and when it opened up (Ex. 5).  The decision-maker for the promotion, Shell's Vice President of Corporate Security, James Hall ("Hall"), is a white person of British national origin living in The Hague, Netherlands.  Earlier in 2017, Hall's overt illegal discrimination caused an embarrassing retaliation

lawsuit to be filed against Shell in Houston, Texas, by Crockett Oaks ("Oaks"), an African-American employee who had previously been the RSM – Americas. *See Crockett Oaks III v. Shell Oil Company*, Case No. 4:17-cv-00979, Docket Entry No. 1 (S.D. Tex. 2017). Specifically, Hall had fired Oaks – a Former FBI Special Agent – in retaliation for Oaks's refusal to accede to Hall's illegal desire to make hiring decisions based on age and sex, which Hall had actually put in writing to Oaks, stating: "[l]et's indeed look to backfill Bob's role with some **younger** external talent." (Ex. 9-2) (bold added).

4.      After that personally bruising and embarrassing experience with Oaks, an African-American who had stood up to him, Hall wanted a malleable white male employee of British national origin, like himself, for the role. So, based on race and national origin, Shell and Hall passed over the supremely qualified non-white, non-British Shater, and selected Wayne Hunt ("Hunt"), a clearly less qualified white male of British national origin also living in The Hague, Netherlands, and moved Hunt to Houston, Texas, to assume the position of RSM – Americas that became open after Hall fired Oaks.

5.      Hall's discriminatory decision is part of a pattern of race and national origin discrimination with Shell's Corporate Security Department. Since joining Shell, Shater has been considered and rejected for the following five Job Group 1 senior positions with the Corporate Security Department:

   a.   RSM – Americas.

   b.   RSM – Middle East & North Africa.

   c.   RSM – Europe, Commonwealth of Independent States and Africa.

   d.   Strategy and Assurance Manager.

   e.   General Manager, Security Nigeria.

6.    Each of these five roles were awarded to white males of British national origin who had less experience than Shater in the private and or public sector.  This is no accident:  Shell's Corporate Security Leadership Team contains zero diversity, and is made up of all white British males with the exception of a white German male.

7.    Shater is a victim of Hall's and Shell's illegal discrimination.  Accordingly, Shater brings this race and national origin discrimination case against Shell under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

## THE PARTIES AND JURISDICTION

8.    The Plaintiff, Shater, is a natural person residing in Dubai. He is a citizen of the United States of America.  But for the illegal discrimination complained of in this lawsuit, he would have been employed by the Defendant in Houston, Texas.  Shater has standing to file this lawsuit under the Title VII.

9.    Shell is headquartered in Houston, Texas, is a citizen of Texas, and may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Suite 2900, Dallas, Texas 75201-4234.

10.    During 2016 and 2017, Shell engaged in an industry affecting commerce and employed 15 or more employees for each working day in each of twenty or more calendar weeks. In fact, during 2016, and 2017, Shell employed 501 or more employees for each working day in each of twenty or more calendar weeks.

11.    The Court has personal jurisdiction over Shell based on both general and specific jurisdiction.  Personal jurisdiction is proper because Shell has continuous and systematic contacts with and in the State of Texas; the events or omissions giving rise to the Plaintiff's claims occurred in part in the State of Texas; and because Shater would have worked in Houston, Texas, but for the alleged unlawful employment practice.

12. Subject matter jurisdiction is proper because Shater brings his claims for discrimination under federal law.

## FACTUAL BACKGROUND

**A.   Shater's Background In The U.S. Secret Service And At ConocoPhillips**

13. Shater is a non-white person of Arab/Middle Eastern (Egyptian and Sudanese) race and national origin. Shater has been a security professional for over 25 years in the public and private sectors. In 1993, Shater obtained a Master of Arts Degree from Rutgers University. In 1995 he went to work as a Special Agent for the U.S. Secret Service (USSS). (Ex. 1). In 2000, Shater was assigned to the Presidential Protective Division ("PPD") as a Special Agent at the White House. Some of his duties and accomplishments as a Special Agent for the USSS were:

   a. Approximately 5 years assigned to the White House on the elite Presidential Protective Division (less than 5% of all USSS agents serve on PPD). Shater provided protective detail for Presidents Bush and Clinton and the First Ladies.

   b. Designated supervisory lead advance agent on PPD.

   c. Lead agent for more presidential visits than any agent since January 2001, including:

      i. One of 6 USSS agents selected to conduct secret Thanksgiving 2003 White House presidential visit to Iraq; and

      ii. 2003 White House presidential visit to Daytona 500; Shater was the lead USSS agent for the trip, accountable for over 400 federal, state, local and military personnel.

      iii. Served in a senior leadership position on PPD as a #1 Whip, responsible for orchestrating protective assets and movements, including emergency relocation of U.S. president while at the White House.

   d. Served as detailee to Department of Homeland Security (DHS), including DHS Energy Infrastructure Department (main U.S. government agency interfacing with U.S. oil sector).

   e. Case agent detailee to FBI on PENTTBOMB investigation following 9/11 attacks; including undercover agent targeting suspected al-Qaeda terrorists (the largest criminal inquiry in the FBI's history).

14.     In 2007, Shater left the Secret Service and accepted employment with ConocoPhillips as a Regional Security Director for Middle East and North Africa Business Unit (Ex. 1).

**B.     Shater's Employment At Shell, And Consistently Outstanding Performance Reviews**

15.     In August 2013, Shater began working for Shell Expatriate Employment US Inc. and Shell Oil Company (jointly "Shell") as a Country Security Manager ("CSM").  Shell is a multinational Company ranked number 3 on the 2019 Fortune 500 List, with recently reported annual revenues of approximately $400 billion, and profits of $23 billion https://fortune.com/global500/2019/royal-dutch-shell/.

16.     Shater was hired by Shell as a Houston-based employee, to work in Dubai, UAE. The CSM (Job Group 3) position reports to the RSM (Job Group 1).  In Shater's case, he reported to the RSM – Middle East & North Africa ("MENA").  Within Shell currently, of the five RSMs in the Company, four of them had been in the CSM role at Shell before becoming an RSM (the only exception is Wayne Hunt, the individual hired over Shater for the at-issue position in this case).  In the CSM role, Shater was responsible for seven countries, more than any other CSM in Shell.  This is unusual, as most other CSMs in Shell only have responsibility for one country.  As such, Shater's CSM role was more similar to a RSM role than a typical CSM role.

17.     Shater performed extremely well in the CSM role, as reflected by his performance reviews for 2014, 2015, and 2016, and his January 30, 2017 Individual Development Plan ("IDP"), all of which are attached as Exhibits 2, 3, 4, and 5.  Based on his reviews, he was considered "Top Talent," an official term used to designate top Shell personnel destined for promotion.

18.     Shater's 2017 performance review, a copy of which had been sent to him by his supervisor, and was finalized in February 2018, states: "Walied has put in a strong performance

during 2017.  Within his cluster of countries, he has continued to provide a high level of support to the various businesses, leadership, country chairs, regional security team and REAP.  GPA targets have been met and additional support provided."  In 2017 Shater received another 1.2 Individual Performance Factor (annual performance rating).  This was the third year in a row that he received an Outstanding performance rating.

19.    Shater's noted performance reviews were higher than about 95% of all Shell (94,000 staff) and the Company's approximately 75-person security skill pool.  He currently maintains a Secret U.S. government (USG) clearance held by DHS and receives more classified briefings from agencies in the U.S. intelligence community (DHS, FBI, DIA, CIA) than anyone else in Shell Corporate Security.  Before joining Shell, while still in the private sector, Shater served as advisor to the U.S. Senate Committee on Homeland Security and Government Affairs.

20.    In January 2017, Shater was identified in his IDP by his supervisor as qualified and competitive for the RSM – Americas role if and when it opened up (Ex. 5).  Specifically, Shater's supervisor stated in writing in his IDP that, "[d]ue to experience, Walied would be a strong contender for both RSM MENA or Americas."  (*Id*.).  Shater's IDP also identifies him as having a Current Employment Potential ("CEP") of Job Group 2 or 1, meaning he was currently assessed by his supervisor, Corporate Security, and Human Resources, as having the competency to perform at these senior job group levels (Ex. 5).  The RSM – Americas position is a Job Group 1.

**C.    James Hall's And Shell's Long-Standing Preference For White, British Employees**

21.    The head of Shell's Corporate Security until 2019 was a Vice-President named James W.D. Hall.  Hall is a person of British national origin working in the Company's Global Headquarters located in The Hague, Netherlands.  Hall is a former British government employee. Hall has hired a lot of British ex-government/military members to work in the Corporate Security

department at Shell. He favors white persons of British national origin, like himself. Among the openings in the Corporate Security Department for Job Grade Level 1 or 2 roles (which are the senior level roles) between 2012 and 2017, white British persons were selected for 75% of the positions (Ex. 6).

22.     In July 20, 2016 Shater was in Houston, Texas, for several days of work, at the request of the then current RSM – Americas, Crockett Oaks. Oaks invited Shater to Houston to meet with him and his security staff. During that visit, Oaks told Shater he saw him as his successor when he eventually moved on from his RSM – Americas position. Oaks invited Shater to Houston to meet his staff, and other Shell business leaders, industry and government peers. Other than Shater, no one else was invited to visit.

23.     During Shater's visit to Houston, two Shell Corporate Security employees he met (Bob Schoen and Andy Thompson), whom he had never met before, asked him "why does Corporate Security hate Americans?" Both Bob Schoen and Andy Thompson are retired veterans of the U.S. military and the Coast Guard with combined military experience of over 30 years.

24.     On November 26, 2016, the Shell Corporate Security Global Threat Analyst, Maria Kuusisto, who was based in The Hague at the time, met Shater in Washington, D.C. for lunch and told Shater that Hunt would be selected for the RSM – Americas position whenever it was posted over the next year. Ms. Kuusisto cited Hunt's close relationship with Hall, and the fact that "the Brit boys stick together." Ms. Kuusisto thought Shater was best qualified for the job.

**D.      James Hall's Termination Of Crockett Oaks, The Then RSM – Americas, For Refusing To Accede To Hall's Desire To Hire Based On Age And Sex, In Violation Of U.S. Law, And Oaks's Subsequent EEOC Charge And Lawsuit Alleging Illegal Retaliation Against Hall And Shell**

25.     The Fifth Circuit has stated: "[j]ust as '[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, . . . similarly, a discrimination analysis

must concentrate not on individual incidents, but on the overall scenario.'" *Donaldson v. CDB Inc.*, 335 Fed. Appx. 494, 503 (5th Cir. 2009) (citations omitted). Hall's prior situation with Oaks is critical to the discrimination analysis in this case.

26.    In December 2016, Hall fired Oaks, the above-referenced RSM – Americas for Shell, who was a former FBI Special Agent before he joined Shell. Oaks is not white, or of British national origin. He is an African-American. He was the only minority on the Shell Corporate Security Leadership Team ("CSLT"). Later in December 2016, through his legal counsel, Oaks asserted that Hall fired him because Oaks refused to make hiring decisions based on age and gender, in violation of U.S. laws, as Hall wanted him to do. In January 2017, Oaks filed a Charge of Discrimination with the EEOC's Houston office, making the same allegations (Ex. 7). Oaks had several unusually potent e-mails from Hall to prove his allegations. *See, e.g.*, Exs. 9-2, 9-3, and 9-4.

**E.    Hall's And Shell's Predetermined Decision To Give Oaks's Old Job As RSM – Americas To A White British Person, Wayne Hunt, And To Manipulate The Process In Hunt's Favor**

27.    In January 2017, Shell posted the opening for Oaks's old job as RSM – Americas. A job description for that position is attached (Ex. 8). Oaks had worked out of Houston, Texas, as would his replacement. As mentioned, it is normal for RSM openings to be filled by an individual who has successfully performed the CSM role. The most recently promoted three RSMs (the Asia/Pacific, RSM, Europe, CIS and Africa RSM, and Middle East & North Africa RSM), had all been promoted while they were CSMs. Indeed, in 2016, Oaks had told Shater that he saw him as his successor whenever he moved out of the role, as indicated above. Shater was completely qualified for the job, and his direct supervisor, Robert Buss ("Buss"), the RSM – Middle East & North Africa, had told him that during performance reviews. In fact, as mentioned above, Shater was identified in his IDP by Buss as qualified and competitive for the RSM – Americas role (Ex.

5).  Specifically, Buss had stated in writing in his IDP that, "[d]ue to experience, Walied would be a strong contender for both RSM MENA or Americas."  (*Id*.).  The RSM – Americas position would have been a promotion to Job Grade 1, and would have entailed a raise and better benefits.  So, Shater applied for the job.

28.    Also, shortly after the RSM – Americas position was posted for potential applicants to apply, in approximately mid-January, something suspicious occurred.   Specifically, on November 17, 2016, the invitation for the Americas Security team meeting to occur on February 14, 2017 was sent out.  Wayne Hunt, a white, British Security Program Manager in The Hague, Netherlands, was not originally invited because he was not part of the Americas Security team and had never before attended this annual meeting.  But, on January 30, 2017, approximately two weeks after the RSM – Americas job opening was posted, Hunt's name was added to the invitation list.   Hunt accepted the invitation on February 2, 2017, and attended the meeting in Houston, Texas, along with the rest of the Americas Security team.  In hindsight, this suggests that Hall had preselected Hunt for the RSM – Americas job from the start and wanted him to travel to Houston to slowly introduce him to the Americas Security team weeks before the new RSM – Americas was announced, and before any interviews for the position had even taken place.

29.    Also around this time, there was an announcement from Corporate Security that Hunt would be managing three new direct reports.  This suggests an attempt to increase the number of direct reports before the RSM – Americas job posting in order for Hunt to appear he has more significant management responsibilities than he really had (and thus was more qualified for the job than he actually was).

30.    On January 31, 2017, Hall was in Dubai, and he stopped by and talked to Shater.  Hall told Shater that he knew that he had applied for the RSM - Americas position, and said that

Shater should have a "Plan B." Hall said that Shater was so good in his current role that Hall did not want to lose him. Hall also said and that there was no replacement for Shater. This was untrue, as Shater's supervisor, Buss, had already identified another CSM (of Saudi Arabia), Andrew Boult, a white British male, to likely replace him if Shater was promoted to RSM – Americas. When Shater told Buss what Hall had told him about there not being a replacement, Buss said this was not true and that Hall knew Andrew Boult had previously been identified as Shater's likely replacement during succession planning sessions that Hall participated in.

31.     Based on what Hall told Shater about needing a "Plan B," Shater withdrew his application. Shortly thereafter, Hall asked Shater why he had done so, and Shater told him that he had done so based on his comments, as it appeared to Shater, Hall had already made a selection. Hall told Shater that he had not. Despite not believing him, Shater knew he was clearly the most qualified for the position and he reapplied.

32.     On February 8, 2017, Shater was notified that he was going to be interviewed for the RSM – Americas position. Shater was interviewed over the phone by Hall, an HR Manager, Andrew Maynor, and an External Relations Manager, Barbara Blakely. The interview took place on a Friday, Shater's weekend, as Shell offices in the Middle East are closed on Friday and Saturday. Shater conducted the interview from his home. Brian Butcher, an American and current Shell employee employed in Governmental Relations in Washington, D.C., and Wayne Hunt, also received interviews. Shater performed extremely well in his interview.

33.     One of the interviewers on the panel, the HR Manager, Andrew Maynor, responded to Oaks's EEOC Charge, which was pending at the very time of Shater's interview (Ex. 7 and Ex. 19 at 32). And, Maynor himself admitted in a deposition in another discrimination case against Shell that it is not typical for HR – meaning him – to be in interviews (Ex. 19 at 30).

34.     In March 2017, while Shater was awaiting a decision on whether he would be awarded the RSM – Americas position, his supervisor, Buss, contacted him about a possible position within the Business Integrity Division ("BID") in Houston, Texas.   Shater was not interested.   Despite this, Buss approached him four or five more times and told him that he and Hall had a conference call with the head of BID to discuss Shater's qualifications and that she was interested in him applying.   It is unusual and suspicious for Shell to have hounded Shater so relentlessly for a job that Shater told Buss from the very start he was not interested in.

35.     On March 23, 2017, the intra-Shell rumors were so strong that Hall had already preselected Hunt for the RSM – Americas position that Hall felt compelled to issue a note to all Corporate Security staff that read in relevant part, "...and I look forward to announcing a new RSM for the Americas.   We are a small community in security and I know there has been speculation that a final decision has already been made.   I can assure you that it has not, but will advise you as soon as we are ready to move forward."

36.     On March 30, 2017, Oaks filed a lawsuit in Houston (Ex. 9), and attached the emails in which Hall expressed a desire for him to make hiring decisions based on age and sex, in violation of U.S. law, such as saying, stating, "[l]et's indeed look to backfill Bob's role with some **younger** external talent."  (Ex. 9-2) (bold added).  On April 10, 2017, Oaks and Shell jointly asked the Court to dismiss Oaks's case because it had been resolved.   On April 11, 2017, the Court granted the joint motion (Ex. 10).

37.     Hall already had a preference for white persons of British national origin.  The Oaks situation showed him that he could not count on a minority non-British person – especially former federal agents such as Oaks and Shater – to blindly and without any questions carry out his wishes. And, in the case of Oaks, the whole situation had blown up into a public lawsuit.   With the Oaks

case now behind him, Hall wanted someone he could trust completely, no matter what. From all the circumstances, it is clear that Hall wanted a fellow white persons of British national origin, like Hunt, that he could send to Houston, Texas to be the RSM – Americas, despite the fact that Hunt did not meet the basic qualifications for the position, and, on the other hand, Shater not only satisfied the basic qualifications for the position, but far exceeded them, and had already been designated as ready to assume that exact position (Ex. 5).

38.     Sure enough, on May 1, 2017, Hall called Shater on the phone and told him that he was second for the RSM – Americas role, and that another candidate was selected. At that time, Hall did not provide a name of the candidate, citing HR formalities until there was an official announcement. Shater asked why he was not selected and Hall said that the other candidate answered a question about leadership better than Shater did (which Shater disputes). Shater had significant leadership experience in the public and private sectors and had also successfully completed an Executive Education Leadership Program at the Kellogg School of Management at Northwestern University in March 2017 that Shell approved him to attend and paid for. Shater told Hall that if he went through all the listed competencies for the job from the job description, he is objectively qualified for them, and Hunt – who Shater suspected he had selected for the job – is not. Hall did not acknowledge Hunt was selected but said that "sometimes we can't go by competencies." With Hunt's selection into the role, all of the RSMs within Shell at the time were white male non-Americans.

39.     A comparative analysis of Shater's current job versus Hunt's job as Security Program Manager before he was given the RSM – Americas role is attached as Exhibit 11. As it reflects, the RSM role and Shater's CSM role are almost identical, and Hunt's job as Security Program Manager was not.

40.     Also, the RSM – Americas role includes responsibility for several High Threat countries, such as Colombia, Trinidad & Tobago, Venezuela, Brazil and Mexico.  As a CSM, Shater managed a large region with multiple countries within Shell as indicated in the job posting, including many High threat countries, including Jordan, Yemen, Algeria, Syria, Lebanon and Israel. Shater managed High threat countries so well since joining Shell that he was assigned Israel, Lebanon, Jordan, Algeria and Morocco, which were not part of his countries of responsibility when he was first hired.  In contrast, Hunt was based in The Hague, never managed any countries or regions, and his primary job was to write technical security specifications for Shell on armored cars, fences, alarms, CCTV, etc.  Hunt had no experience at all managing High threat countries within Shell.

41.     Shater continuously engaged with multiple Shell country heads of business units, governments and internal and external stakeholders, as required on the RSM – Americas job description.  Shater gathered and disseminated intelligence to the business, managed security incidents and gave more than three dozen security awareness briefings to hundreds of staff.  Shater also produced a Situational Awareness video that has had more than 4,000 unique views by Shell staff, making it one of the most viewed security communications ever issued by Shell Corporate Security.  In contrast, in his role with Shell, Hunt did not engage continuously, if ever, with any Shell country heads of business units, governments or public security as required on the RSM – Americas job description. Hunt never gathered and disseminated intelligence to the business, never managed security incidents and never provided security awareness briefings to any staff.

42.     According to the RSM job posting, the following competencies were required at the Mastery level:

    a.   Manages Security Risks – Mastery;

b.  Manages the Intelligence Process – Mastery;

c.  Managers Security Incident & Crises – Mastery;

d.  Manages Security Compliance & Integration – Mastery;

e.  Carry out Health, Safety, Security and Environment & Social Performance Assurance – Mastery; and

f.  Stakeholder Sensing, Engagement & Relationship Building - Mastery

43.    Shater had all these competencies by virtue of his job as a CSM.  All of them are the same competencies for any RSM position.   In contrast, Hunt did not even meet the Skill level, never mind Mastery for the competencies identified in "b," "c," and "e" above, because he never performed these roles in his most recent position.  A detailed comparison of Shater's qualifications for the job, and Hunt's lack of qualifications, is attached hereto (Ex. 13).

44.    It is especially bizarre that Hunt was selected for the RSM – Americas job because over 80% of Shell assets in the U.S. are regulated by the U.S. Government ("USG"), including U.S. Coast Guard and DHS. Threat information is routinely shared by the USG with Shell and others in the extractives industry. Briefings are also held by members of the U.S. intelligence community (IC) with the private sector on threats to critical and energy infrastructure.  To attend these briefings invited attendees must have an active USG security clearance.  Non-Americans are not typically eligible for U.S. security clearances and cannot attend the briefings.  This mandates the need for RSMs to be Americans and have access to classified threat reporting, as all previous RSM – Americas had.   This makes it especially inexplicable that Hunt who does not hold a USG security clearance would be hired for the role over Shater who holds a USG security clearance. The only explanation is Hall's desire for a fellow white British national he could send to America and trust to follow his desires – in contrast to the prior, non-white, non-British, RSM – Americas, Oaks, and to the non-white, non-British Shater.

45.     Additionally, there was no requirement in the RSM – Americas job posting for the need to have, or be able to obtain, a USG government clearance, although such a requirement was mandated for a much junior Security Advisor position in Houston that was posted in 2016 (Ex. 12 at 3).  Given the interface with the U.S. Government, as indicated in the job posting, it would be natural and extremely advantageous for the position to include a USG security clearance.  Upon information and belief, this was not included because Hall knew that Hunt, a British national, does not have a USG security clearance.  Other positions under the RSM – Americas role such as the CSM Americas, Regional Threat Analyst Americas and Security Advisor Americas, all have a USG security clearance.  It is illogical that all the positions under the RSM – Americas can obtain classified information but cannot disseminate or discuss with the RSM – Americas, their ultimate superior.  Furthermore, under certain rules of the Maritime Security Act of 2002, company information about critical national infrastructure cannot be shared with non-Americans, which again renders Hunt's selection for the role unexplainable on legitimate, non-discriminatory, grounds.

46.     Another telling fact is that Spanish was listed as a preferred qualification for the RSM – Americas position (Ex. 8).  This is because Hunt speaks Spanish and Hall inserted this to make Hunt appear more qualified since he lacked so many of the Core Security Competencies listed in the RSM – Americas job posting.  This further demonstrates that Hall had preselected Hunt for the RSM – Americas job from the start.  There has never before been an RSM positon posted in Shell in which a language requirement was listed.  This includes the most recent RSM positions posted for:

    a. RSM Asia-Pacific; covers all Asian countries and no language listed in job posting.

    b. RSM Europe & Russia/Caspian; covers all Europe/Russian/Caspian and no language listed in job posting.

    c.  RSM Middle East & North Africa; covers all Middle East and North Africa and no language listed in job posting.

47.     Further, Oaks, the immediately prior RSM – Americas, did not speak Spanish, and neither did his predecessor, Rob Ream.  And, the most senior executive vice president at the time for all Shell Americas did not speak Spanish, and he meets with South American senior government reps frequently.  In fact, a CSM position based in Iraq and posted in December 2018 did not include Arabic as a job requirement, despite the World Economic Forum listing Iraq as having one of the lowest English proficiencies of any country in the Middle East. A white British male was selected for the CSM Iraq position.  Additionally, the business language of Shell is officially English.

48.     As indicated on his RSM – Americas application, Shater had significant experience managing risks and threats in South/Latin ("S/L") America.  Examples he cited on his application were as follows:

    a.  Conducted several White House presidential advances in S/L America as a senior U.S. Secret Service agent.

    b.  Participated in several White House visits to S/L America as a junior U.S. Secret Service agent.

    c.  Conducted investigations as a U.S. Secret Service agent into counterfeit US currency originating in S. America ("Super note" case) financial fraud case with U.S. national security implications involving state and non-state actors.

49.     On May 18, 2017, Shater's immediate manager, Buss, said to a coworker that Wayne Hunt "should be embarrassed for getting that position."  That same day, during a meeting with Shater in the Dubai office, Buss told him that he was the most qualified candidate for the RSM – Americas position given a number of factors.  Buss told a coworker, however, that if Shater

was preparing an appeal, James Hall had properly documented his selection of Hunt and covered his tracks.

50. Also, after Shater was not selected, Andrew Boult, the previously mentioned CSM of Saudi Arabia, complained to Buss (who is also his supervisor) that selecting Hunt over Shater was unfair and that Hunt did not have the qualification to be an RSM, because he had never been a CSM, and lacked certain competencies needed for the RSM role. Boult repeated these claims during a Shell People Survey Results conference call on November 2, 2017, that was heard by several others. Boult again repeated this claim directly to Hall during a Regional Workshop in Dubai on November 26, 2017. Others from Corporate Security also complained about Hall's selection of Hunt as RSM – Americas, including, but not limited to, Dominic Taylor and Andrew Choong. They all cited favoritism towards British nationals and questioned Hunt's qualifications for the RSM position given that he was never a CSM, like the other individuals in RSMs roles had been, and had never lived or worked in the United States.

51. In addition, following Hunt being appointed RSM – Americas, Maria Kuusisto was very vocal to other Shell staff that Shater never had a chance for the position and it was destined for Hunt all along *because of his British nationality*.

52. In June 2017, another member of the Corporate Security team based in The Hague, Jo Gacheru, told Shater that it was known Hunt would be appointed RSM – Americas as he had lobbied for the job and had a close relationship with Hall and James Lorge, deputy VP of Corporate Security, and also a British national. Marga Mulder, another member of the Corporate Security team based in The Hague had told Shater the same thing in April 2017.

**F.**     **Hall's And Shell's Pattern of Discrimination, and Shater's Complaint To Shell HR in Houston, Texas, Which Was Swept Under The Rug**

    **1.**     **Hall's And Shell's Pattern Of Discrimination**

53.     In early 2013, before Shater joined Shell, Shell posted an external position for the RSM – Middle East & North Africa.  This position was posted on the Shell external website.  Previously, Shell had attempted to recruit internally for the position but no candidates were deemed qualified, and the company went to the outside to find a qualified applicant.  Shater applied for the position and received confirmation that his application had been received.  He met or exceeded all the position's qualifications.  Shater was: (a) already living and working in Middle East for ConocoPhillips, another large oil company, as a Regional Security Director for Middle East and North Africa Business Unit; (b) managing a region very similar or the same countries as the Shell positon; (c) had the same Regional Security title and had qualifications not in the Shell RSM posting, such as Arabic language, a college degree and a master's degree; and (d) maintained extensive contacts throughout the Middle East region.  Shortly after applying, Shater received notice that his application had been withdrawn, and no reason was given. The position was later given to a British white male Shell staff member who had been with Shell for only approximately 10 months, had no prior private sector experience, no previous oil and gas experience, no local language and no college degree.   Hall was the hiring manager.

54.     In May 2014, while working for Shell, Shater applied for the RSM – Europe and Russia/Caspian.  He met all the qualifications, had covered Russia/Caspian for three years with his previous employer, ConocoPhillips, traveled to multiple countries in the region more than twenty times, and spoke basic Russian.  The position was given to a white British male, and ex-British government member, who had been with Shell for only 8 months, had no prior private sector experience, no previous oil and gas experience, no local language and only four to five years'

experience in the UK government, in a similar UK government agency where Hall had previously worked before joining Shell.  Hall was the hiring manager.

55.     In May 2015, Corporate Security announced a position for Iraq Country Security Manager.  The posting identified a "Preferred Candidate", meaning there was already a selected candidate, dissuading Shater and others from applying.  The position was subsequently given to a British white male.  A Deputy Country Security Manager position was also posted.  The position was subsequently given to a British white male.  Both positions had previously been held by British white males.  All the senior and mid-level Shell Iraq security positions are held by British white males, almost all of whom have served together in the British military.   The same is true from senior Corporate Security staff in Shell Nigeria.

56.     In September 2016, while working for Shell, Shater applied for the RSM equivalent position of Strategy and Assurance Manager based in The Hague.  He met all the qualifications. In his Individual Development Plan (attached as Ex. 5) Shater's supervisor had noted he would be a strong candidate for the position.  At the time, Shater had conducted more security assurance activities (conducting Security Risk Assessments, writing Country Security Plans, writing Facility Security Plans, writing Country Security Threat Assessments) than all the RSMs combined (note: Wayne Hunt has never conducted one of these assurance activities).  Despite this, Shater was not even selected for an interview. The position was given to a British white male with less experience than Shater in the private sector, government sector and oil and gas industry.  Hall was the hiring manager.

57.     In September 2016, a senior security position (Job Group 1), General Manager, Nigeria was opened. The job was not posted for staff to apply. Instead, Hall selected 3 candidates, all British males, to be considered for the position.  Shater had: (a) covered Nigeria previously for

ConocoPhillips; (b) traveled to Nigeria, including the oil capital of Nigeria, Port Harcourt, and to the dangerous Niger Delta frequently for 3 continuous years; (c) worked with the Nigerian military battling local militants; and (d) understood the security dynamic of the country very well. Yet, he was not even selected to be considered or interviewed for the position. Instead, Shell gave it to a British white male.

58.     In September 2017, Shell announced it would exit the Majnoon project in Iraq. Following that announcement, a meeting was held in Shater's office in Dubai to discuss how to handle any protests by staff in Iraq or Dubai, as all Iraq expatriate staff reside in Dubai and work in the Shell Dubai office. Hall participated in the meeting, as well as Shater's supervisor, Buss, a British male. Also in attendance were two managers from the Shell Iraq team, both British males. In addition, two other members of the Corporate Security team, Dan Jones, based in London, and Simon Cutler, based in The Hague, were invited. Both are British males. Jones and Cutler had been with the company less time than Shater. Neither Jones nor Cutler had ever been to Shell Dubai, to Shell Iraq, or to any Shell location in the Middle East. Neither speaks Arabic or has any familiarity with Dubai or Iraq based Shell staff. Although Shater was based in the office which would be impacted by any protest activity (Shell Iraq expatriate staff are based in Dubai in his office), he spoke Arabic, and had been to Iraq more than twenty times in his career, he was not invited to the meeting. Further, Shater had managed a similar asset sale in Jordan where Shell staff were let go and managed this difficult situation which included protests outside the Shell office, Jordan parliament members protesting, and media coverage including Aljazeera. Despite this, Shater's two Europe-based British counterparts were selected to handle the Majnoon exist assignment instead of him.

59.     In September 2017, Corporate Security created the first ever Regional Security Advisor position. The position was a job group 2, one higher than Shater's job group 3. The position was based in London, the most stable region (Europe) with the least High Threat countries of any region. The position was given to a white male British national who had approximately 2 years with the company, and who had no previous oil and gas experience.

60.     There is a Staff Announcements page kept by Corporate Security that goes back to 2012. During that time period, approximately 95% of all the promotions to job group 1 or 2 were awarded to white male persons, approximately 75% white males of British national origin. The current CSLT is made of up 100% white male persons.

      **2.**      **Shater's Complaint To Shell HR in Houston, Texas, About James Hall, Which Was Swept Under The Rug By Shell HR And By Sonja Gonzales, Who Has A History Of Saying Illogical And Unbelievable Things Just To Try Protet Hall**

61.     After Shater did not get the RSM – Americas (the fifth Corporate Security job Shater was not selected for) job he filed a complaint with Shell's HR Department on May 1, 2017 in Houston, Texas, and sent them a lot of information. In fact, he told HR in writing that Wayne Hunt would be selected for the RSM – Americas position before his selection was formally announced on May 4, 2017.

62.     Sonja Gonzales, HR Manager for the Global Functions Group, allegedly reviewed Shater's complaint. She told him an investigation would be conducted which would take two weeks. Erin Lattin from HR was assigned Shater's case. At one point, Ms. Lattin told Shater that he had supplied a lot of evidence in support of his claim. After that, Ms. Lattin was removed from Shater's case and replaced by Katherine Le Denmat from HR. Shater continued to supply evidence demonstrating discrimination towards him, including discriminatory and anti-Arab comments made by security staff, as well as favoritism towards British nationals. Shater was informed by

phone on July 7, 2017, that no further action would be taken on his complaint.  In the end, Gonzales and Shell did nothing.

63.    It is not surprising that Gonzales did nothing.  She has a history of working very hard to cover up Hall's discrimination and retaliation.  For example, as previously noted, Hall had sent a facially discriminatory email to Oaks, about an opening on Oaks's organization, stating, "[l]et's indeed look to backfill Bob's role with some younger external talent."  (Email from Hall to Oaks of 07/07/16, Ex. 9-1) (bold added).").   Later, after Hall fired Oaks for refusing to unlawfully discriminate, an older candidate for the opening, Michael Oliveri, was rejected for the at-issue job, and Oliveri sued Shell for age discrimination in Houston federal court.  *See Oliveri v. Shell Oil Company*, Civil Action No. 4:17-CV-01971 (S.D. Tex.).

64.    In discovery in the *Oliveri v. Shell* case, Gonzales actually swore under oath that Hall's intent in sending the facially discriminatory email was "to reiterate to Oaks in his email Shell's commitment to seeking and retaining a diverse and inclusive workforce, subject to Shell's guiding principle to hire the most qualified applicant for every position."  (Shell's Answers to Interrogatories in the Oliveri Case, Ex. 20 at No. 3).  Gonzales's explanation is facially absurd.  It is also puzzling how Gonzales could have reached this sworn conclusion about Hall's intent concerning the email, because Hall testified in his deposition that he had no recollection of ever talking to her about the email (Hall Dep., Ex. 21 at 35-42).   Despite Gonzales's deceptive attempt to whitewash Hall's facially ageist email, the U.S. District Court Judge assigned to the *Oliveri* case relied on it in denying Shell's Motion for Summary Judgment against Oliveri's age discrimination claim (Opinion and Order of 01/16/19, Ex. 22 at pp. 4-5).

65.    Hunt began working in his role in Houston, Texas, as the RSM – Americas in August 2017.

**G.**     **Shater Filed A Timely Charge Of Discrimination With The EEOC**

66.     On February 1, 2018, Shater filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") in Houston, Texas, alleging race and national origin discrimination (Ex. 14). This Charge was timely under Title VII, because it was filed within 300 days of the date (May 1, 2017), the date that Shater learned he was not selected for the RSM – Americas position.

**H.**     **In Its Response To Shater's EEOC Charge, Shell Changed Its Story About Why Hunt Was Selected Over Shater For The RSM – Americas Position, And Peddled Factually Incorrect Information To The EEOC**

67.     On April 30, 2018, Shell submitted its response to Shater's Charge of Discrimination (Ex. 15). Recall that when Shater asked Hall why he was not selected for the RSM – Americas position on May 1, 2017, Hall said that the other candidate (who turned out to be Hunt) answered a question about leadership better than Shater did (which Shater disputes). Shater told Hall that if he went through all the listed competencies for the job from the job description, he was objectively qualified for them, and Hunt – who Shater suspected he had selected for the job – was not. Hall did not acknowledge Hunt was selected but said that "sometimes we can't go by competencies." Hall did not try to argue that Hunt was better qualified.

68.     But in its Position Statement to the EEOC, apparently realizing that Hall's explanation of May 1, 2017, is utterly unpersuasive, Shell argued what Hall did not – that Hunt really was better qualified than Shater. Shell's *post hoc* argument fails miserably. On page four of its Position Statement, Shell states that the interview team discussed areas of focus for the "ideal candidate" and that three areas were identified:

      a.   Experience building and managing a security team;

      b.   Experience and understanding of security issues in Central and South America; and

      c.   Connectivity to U.S. Security Agencies.

69.     According to Shell's Position Statement, one of the most important criteria for selecting Hunt over Shater for the RSM – Americas job was Hunt's leadership experience: "[t]he panel determined that Hunt's leadership experience and style were both preferable for this role." Shell argued that Hunt had more relevant leadership experience than Shater and highlighted a position Hunt allegedly held in Mexico as a "Liaison Manager."  However, as of July 8, 2018, Hunt's public resume posted by him on LinkedIn, the world's largest professional network, does not include any reference or experience as a "Liaison Manager" (Ex. 16).  This seems odd, if, indeed, this was such a critical role Hunt ever actually held.

70.     Hunt's LinkedIn resume does state that he was a "Director" for Harberton Risk Management Ltd. From September 2010 to March 2012 (1 year and 7 months) in Mexico City and Amsterdam Area, Netherlands (Ex. 16).  A query of UK business records online for Harberton Risk Management Ltd. reveals a certification of incorporation issued to Harberton Risk Management Ltd on 15 July 2010 (Ex. 17). The company has one employee, a Director, Hunt himself.  According to UK business records online records, the company was dissolved on 10/02/2015 (Ex. 18).

71.     From the foregoing, it is clear that Shell tendered to the EEOC a phantom position of "Liaison Manager" that is not even listed by Hunt himself on his own public resume, for a company, Harberton Risk Management Ltd. that was owned by Hunt with only one employee (Hunt himself), that was dissolved years ago (Exs. 16-18).  Consequently, Shell's entire case for justifying Hunt's supposedly superior leadership experience is built on fraud and deception, not facts.

72.     By contrast, Shater was Regional Security Manager with ConocoPhillips, a large company in the same industry as Shell, and lead a regional team with direct reports. Additionally,

Shater was one of a few selected U.S. Secret Service agents to lead security advance teams for the protection of the President of the United States. Also, as indicated on Shater's resume and Charge statement to the EEOC, Shater has led more U.S. Secret Service Presidential teams than any other agent going back to 2001. Shater has had significant documented and proven leadership experience in the public sector with the U.S. Secret Service and the private sector with ConocoPhillips. Lastly, Shater was the only member of the Shell Corporate Security team selected to attend the Executive Education Leadership Program at the Kellogg School of Management at Northwestern University in March 2017, paid for by Shell. Shell cannot seriously claim that Hunt's bogus position with his one-man company (now dissolved) in any way stacks up against Shater's leadership experience. Indeed, even if Hunt had all the experience Shell alleges, it still would not be a close call.

73.     In its Position Statement to the EEOC, Shell also downplayed Shater's experience as a U.S. Secret Service agent traveling with and coordinating security for the President of the United States in Latin and South America. Shell deems these assignments, among the most challenging, rigorous and demanding security responsibilities in the world, with one of the most elite and prestigious security services in the world, the Presidential Protection Division of the U.S. Secret Service, as "scouting locations." This is consistent with the way in which Shell treats minorities like Shater – downplay their experience, while exaggerating or outright fabricating the experience of white-male British nationals. It is also worth noting that although Shell now claims Hunt worked as a "Liaison Officer" in Mexico, this is not included in Hunt's public resume (Ex. 16), and Shater questions the veracity of this experience given previous fictitious experiences listed on Hunt's resume. Even if true, this is not a security position, but as the job title suggests, a position in which one conducts junior level liaison activities between the UK Embassy and another

party. There is almost no security or intelligence experience responsibilities of a Liaison Officer. Shell also did not, and could not, dispute that Hunt has never managed intelligence within Shell, never engaged with the business on intelligence matters within Shell, never met with oil industry peers on intelligence matters, and never met with any national or international security agency concerning intelligence matter during his time at Shell, consistent with the competencies sought for the RSM – Americas position. Hunt has also never written a single intelligence report or managed a single threat during his time with Shell. By contrast, Shater has accomplished all these things and has written over a hundred intelligence reports and managed threats to Shell staff and business based on intelligence cultivated from various sources. Because of this experience, Shater has actual experience in understanding and managing the security challenges in the Latin and South America region. Hunt does not.

74. Shell asserted that because Hunt may have lived in Mexico over 10 years ago, this "allowed him to gain a unique understanding of the security challenges in this area." First, if Hunt did live in Mexico at all (it is not mentioned on his resume), it would have been a minimum of 10 years ago. Second, Hunt has no experience in Shell managing security risks for the business in Mexico, or otherwise. Rather, Hunt wrote technical security specifications for Shell on armored cars, security windows and doors, etc. Hence, that Hunt allegedly lived in Mexico at least 10 years ago adds nothing to his qualifications for the RSM – Americas position. Third, as outlined, in contrast to Hunt, Shater has experience managing security in all environments for Shell, and, prior to the interview, Shater extensively discussed the security challenges in each of the countries where Shell does business in North and South America with the Regional Threat Analyst covering the region. Fourth, the same regional analyst issues a weekly Security Information Bulleting for his region, and Shater receives this document and has been reviewing the threats specific to Latin and

South America on a weekly basis for over 6 months and had an excellent and up to date understanding of the security challenges facing the region. Lastly, in its own job description for the RSM – Americas position Shell lists a core competency as "Manages the Intelligence Process" and wants this competency at the "Mastery" level, the highest competency level. Hunt had absolutely zero competency in this area. Shell did not, and could not, dispute this fact in its Position Statement.

75.     In its Position Statement, Shell went on to cite Hunt's alleged experience in dealing with senior business leaders, and provides one example to support this claim: specifically, that Hunt's experience included "engaging with a Country Chair while completing a scope of work in Venezuela." Shell could only cite one example of Hunt dealing with the country chair (the head of a business in a country). Shater, by contrast, managed several countries, each with a country chair, and has dealt with them hundreds of times over 5 years on business, security, staffing, HR, emergency response, liaison, safety, intelligence, CEO and Executive Committee visit and day to day operational requirements. Hunt oversaw a technical security division within Shell and had no engagement with senior business leaders. The sole example Shell cited is one dealing in Venezuela with a senior business leader. Shell did not volunteer that this was a weeklong assignment for Hunt in Venezuela that was outside Hunt's job scope and that he was selected for this assignment by Hall in order for Hunt to appear more competitive for the future RSM – Americas role.

76.     It should be noted that a requirement for the RSM – Americas position as outlined in the job posting requires engagement with senior Shell business leaders, as listed: "[h]as the professional and personal stature and credibility to interface and influence a wide variety of stakeholders, including senior Shell business leaders" "to build credibility with senior

stakeholders." (Ex. 8).  Hunt simply did not have this experience.  Shater had extensive experience in dealing with very senior Shell leaders.

77.     In its Position Statement, Shell attempted to downplay the need for a U.S. security clearance for the RSM – Americas role, although in their rebuttal to the EEOC Shell states that "primary areas of experience that the panel asked the candidates about included: "Connectivity to US Security Agencies."   As outlined in Shater's original charge, dealing with U.S. security agencies on a classified level requires a security clearance and is why every previous RSM – Americas, the Regional Security Analyst, Country Security Manager and Security Advisor has had USG security clearances. It is irrational to believe that all of these persons would have a clearance and be able to obtain sensitive information but not be able to pass it to their boss, the RSM – Americas, who would have the ultimate authority on decisions impacting Shell staff and assets.

78.     The bottom line is that Shater was clearly better qualified than Hunt for the RSM – Americas position, and Shell's (new) given reasons in its Position Statement to the EEOC for selecting Hunt over Shater are unpersuasive and pretextual.

79.     On February 5, 2020, the EEOC issued a Dismissal and Notice of Rights letter to Shater, giving him ninety days from his receipt of the letter to file a lawsuit under Title VII.

## RACE  AND NATIONAL ORIGIN DISCRIMINATION CLAIMS UNDER TITLE VII

### A.     Law

80.     Title VII prohibits race discrimination and national origin discrimination in employment.  Under Title VII, race or national origin discrimination can be established through direct or circumstantial evidence. *Laxton v. Gap Inc*., 333 F.3d 572, 578 (5th Cir. 2003).  To qualify as direct evidence of race or national origin discrimination, a statement must be (1) race or national origin related; (2) proximate in time to the at-issue employment decision; (3) made by an individual with authority over the at-issue employment decision; and (4) related to the employment decision.

*See, e.g., Palasota v. Haggar Clothing Co*., 342 F.3d 569 (5th Cir. 2003). Thus, "statements or documents which show on its face that an improper criterion served as a basis – not necessarily the sole basis, but a basis – for the adverse employment action are direct evidence of discrimination." *Jones v. Robinson Prop. Group, L.P.*, 427 F.3d 987, 993 (5th Cir. 2005).

81. Where the plaintiff has not presented direct summary judgment evidence of discrimination, courts apply the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). Under the framework, to establish a *prima facie* case of race discrimination, a plaintiff must show that: "(1) the plaintiff is a member of a protected group; (2) the plaintiff was qualified for the job that was held; (3) the plaintiff was discharged; and (4) after the employer discharged the plaintiff, the employer filled the position with a person who is not a member of a protected group." *Black v. Pan Am. Labs., LLC*, 646 F.3d 254, 259 (5th Cir. 2011) (quoting *Valdez v. San Antonio Chamber of Commerce*, 974 F.2d 592, 596 (5th Cir. 1992)). After the plaintiff establishes a *prima facie* case, the burden shifts to the employer to show a legitimate, nondiscriminatory reason for the adverse employment action. *Id*; *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). The employer's burden is one of production, not persuasion, and does not involve a credibility assessment. *Id*. at 559.

82. The burden then shifts back to the plaintiff to show either: "(1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motive[s] alternative)." *Black*, 646 F.3d at 259 (quoting *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)) (alteration in original). Under the pretext alternative, the plaintiff "bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory . . .

purpose. To carry this burden, the plaintiff must rebut each nondiscriminatory . . . reason articulated by the employer." *Id.* (quoting *McCoy*, 492 F.3d at 557). Under the mixed-motive alternative, if the plaintiff shows that the plaintiff's protected characteristic was a motivating factor, then the burden shifts to the employer to show that the adverse employment decision would have been made regardless of the characteristic. *Id.* (quoting *Rachid*, 376 F.3d at 312).

## B.  Analysis

### 1.  Shater Makes Out A *Prima Facie* Case Of Race And National Origin Discrimination

83.     Shater easily establishes a *prima facie* case of racial and national origin discrimination under Title VII. He is a non-white person of Arab/Middle Eastern (Egyptian and Sudanese) race and national origin. He was passed over for the at-issue promotion to RSM – Americas in favor of Wayne Hunt, a white person of British national origin. That is sufficient to establish a *prima facie* case of race and national origin discrimination under Title VII.

### 2.  Shater Has Substantial Evidence Of Pretext And Discrimination

84.     The burden now shifts to Shell to articulate a legitimate, nondiscriminatory reason for selecting Hunt for the job opening, instead of him. As noted, on May 1, 2017, Shater asked why he was not selected, and Hall said that the other candidate answered a question about leadership better than Shater did (which Shater disputes). Shater told Hall that if he went through all the listed competencies for the job from the job description, he is objectively qualified for them, and Hunt – who Shater suspected he had selected for the job – is not. Hall did not acknowledge Hunt was selected but said that "sometimes we can't go by competencies." Hence, the sole "reason" Hall gave for selecting Hunt over Shater is that Hall allegedly answered a question about leadership better than Shater did. This "reason" is so farcical and meaningless that it does not actually constitute a legitimate, nondiscriminatory reason for selecting Hunt for the job opening,

instead of Shater. *Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004) (holding that hiring official's statement that individual was not hired because they would not "fit in" or was "not sufficiently suited" for job is at least as consistent with discriminatory intent as it is with nondiscriminatory intent, and thus failed to carry defendant's burden; employer just might have found candidate "not sufficiently suited" because of protected trait such as age, sex, race, or engaging in protected activity).

### a) Shell Changed Its Story

85.     Even if Hall's explanation was deemed sufficient to carry Shell's burden to articulate a legitimate, nondiscriminatory reason for selecting Hunt for the job opening, instead of Shater, there is substantial proof of pretext. First, pretext is evident by the fact that Shell changed its story in its Position Statement to the EEOC from the one Hall gave Shater on May 1, 2017. Specifically, when Shater asked James Hall why he was not selected for the RSM – Americas position on May 1, 2017, Hall said that the other candidate (who turned out to be Hunt) answered a question about leadership better than Shater did (which Shater disputes). Shater told Hall that if he went through all the listed competencies for the job from the job description, he was objectively qualified for them, and Hunt – who Shater suspected he had selected for the job – was not. Hall then said that "sometimes we can't go by competencies." Hall did not try to argue that Hunt was better qualified. But, in its Position Statement to the EEOC, apparently realizing that Hall's explanation of May 1, 2017, is utterly unpersuasive, Shell argued what Hall did not – that Hunt really was better qualified than Shater. Shell's *post hoc* argument fails miserably, and, the shifting explanations are, in themselves, evidence of pretext. *See e.g.*, *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017) (reversing summary judgment for the employer in discrimination case, and stating that, "[a]n employer's inconsistent explanations for an employment decision "cast doubt" on the truthfulness of those explanations."); *Nasti v. CIBA Specialty Chemicals Corp.*, 492

F.3d 589, 594 (5th Cir. 2007) ("A court may infer pretext where a defendant has provided inconsistent or conflicting explanations for its conduct."); *see also Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408 (5th Cir. 2007) (shifting explanations can be evidence of pretext); *Gee v. Principi*, 289 F.3d 342 (5th Cir. 2002) (same).

### b)    Shater Is Clearly Better Qualified Than Wayne Hunt

86.    Second, pretext is evident from the fact that Shater's qualifications for the RSM – Americas job are so far superior to Hunt's that no reasonable person could have concluded that Hunt was better qualified than Shater.  In other words, as detailed herein, and in, *inter alia*, Exhibits 1, 11, and 13, Shater was clearly better qualified for the job than Hunt.  This is strong proof of pretext and discrimination *vel non*.  *Burrell*, 482 F.3d at 412 n. 11 ("[A] showing that a plaintiff is 'clearly better qualified' is one way of demonstrating . . . pretext"); *Davis v. AMPCO Sys. Parking*, 748 F. Supp. 2d 683, 698-99 (S.D. Tex. 2010) (genuine issue of material fact existed as to whether plaintiff was clearly better qualified precluded summary judgment for employer on Title VII discrimination claim).

### c)    Witnesses From Within Shell's Corporate Security Department Have Stated That Shater Is Far Better Qualified Than Wayne Hunt, And That Hunt Was Selected Because Of His British National Origin

87.    Third, bolstering the prior point, the fact that numerous individuals employed by Shell in the Corporate Security department opined that Shater was clearly better qualified than Hunt for the role, and/or that Hunt was selected because of his national origin, further demonstrates pretext and discrimination *vel non*.  For example:

   a. On May 18, 2017, Shater's immediate manager, Buss, said to a coworker that Wayne Hunt "should be embarrassed for getting that position."  That same day, Buss told Shater that he was the most qualified candidate for the RSM – Americas position given a number of factors.

b.  Andrew Boult, the CSM of Saudi Arabia, complained to Buss (who is also his supervisor) that selecting Hunt over Shater was unfair and that Hunt did not have the qualification to be an RSM.

c.  Others from Corporate Security also complained about Hall's selection of Hunt as RSM – Americas, including, but not limited to, Dominic Taylor and Andrew Choong. They all cited favoritism towards British nationals and questioned Hunt's qualifications for the RSM position given that he was never a CSM, like the other individuals in RSMs roles had been, and never lived or worked in the United States.

d.  Following Hunt being appointed RSM – Americas, Maria Kuusisto, Corporate Security Global Threat Analyst, was very vocal to other Shell staff that Shater never had a chance for the position and it was destined for Hunt all along *because of his British nationality*.

88.     Under Fifth Circuit precedent, this is additional strong proof of pretext and discrimination *vel non*.  For example, in *Hansard v. Pepsi–Cola Metropolitan Bottling Co.*, a coworker, Miller, testified that the plaintiff was not rehired because of his age. 865 F.2d 1461 (5th Cir.1989).  Miller had no first-hand knowledge regarding the disputed employment decision, but he was familiar with the defendant's "hiring policy and its general corporate youth movement...." *Id*. at 1465–66.  The Fifth Circuit observed that "[c]ourts often have permitted lay witnesses to express opinions about the motivation or intent of a particular person if the witness has an adequate opportunity to observe the underlying circumstances." *Id*. at 1466.  As such, the Fifth Circuit found no abuse of discretion in allowing the testimony. *Id*. at 1467.  Similarly, in *Haun v. Ideal Industries Inc.*, the Fifth Circuit affirmed the district court's decision to allow lay testimony that the employer was "phasing out older workers." 81 F .3d 541, 548 (5th Cir. 1996). The coworker's testimony stood because it was "based on his perception [drawn from personal observations] and helped the jury determine whether [the employer] discriminated." *Id*.

### d)     Shell Provided The EEOC With Factually Incorrect Information In Its Position Statement

89.     Fourth, that, as explained above, Shell submitted factually incorrect information to the EEOC in an effort to exaggerate and inflate Hunt's qualifications, and minimize Shater's

qualifications, also provides proof of pretext and discrimination *vel non*. *See Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 239-40 (5th Cir. 2015) (holding that a jury may view "erroneous statements in [an] EEOC position statement" as "circumstantial evidence of discrimination."); *Miller v. Raytheon Co.*, 716 F.3d 138, 144 (5th Cir. 2013) (affirming a jury verdict in an age discrimination case partially because "[a]t trial, Miller presented undisputed evidence that Raytheon made erroneous statements in its EEOC position statement.").

### e) Statistics Show Hall's Preference For White, British Persons, Like Wayne Hunt

90.     Fifth, the statistical showing set forth herein and in Exhibit 6 reflecting Hall's and Shell's consistent and overwhelming preference for white British persons in the Corporate Security department provides more proof of pretext and discrimination *vel non*. *Decorte v. Jordan*, 497 F.3d 433, 439 (5th Cir. 2007) (affirming jury verdict for the plaintiffs in a discrimination case, and stating, "Plaintiffs presented statistical data from which the jury could have further based its finding that race was a motivating factor in Jordan's staffing decisions.") (citing *Plemer v. Parsons-Gilbane*, 713 F.2d 1127, 1137 (5th Cir. 1983) ("An employee may use statistics to show that an employer's justification for a discriminatory act is pretext."); *Walther v. Lone Star Gas Co.*, 977 F.2d 161, 162 (5th Cir. 1992) (per curiam) ("We have recognized that gross statistical disparities ... may be probative of discriminatory intent, motive or purpose").

### f) The "Overall Scenario" And "Big Picture" Support The Conclusion That That Hall Wanted A White Brit Like Wayne Hunt To Replace Oaks As RSM – Americas, Not A Non-white, Non-Brit, Like Shater

91.     Sixth, the "overall scenario" and "big picture" further bolster the evidence of pretext. As noted, in *Donaldson*, the Fifth Circuit has stated: "[j]ust as '[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, . . . similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.'"

*Donaldson*, 335 Fed. Appx. at 503 (citations omitted). In line with *Donaldson*, in *Starnes v. Wallace*, 849 F.3d 627, 634 (5th Cir. 2017), the Fifth Circuit encouraged courts to focus on the "big picture" in determining whether there was sufficient evidence of pretext to send a case to a jury. There is here. *See supra*. Part of that "overall scenario" and "big picture" is that Hall had just been (in his mind) "burned" by Oaks, a minority, non-white, non-Brit RSM – Americas. *See supra*. Given Hall's perception that Oaks had betrayed and embarrassed him with his public lawsuit, it made sense from his perspective that Hall would go out of his way to select a fellow white Brit to replace Oaks – a "mate" he believed he could trust, unlike Oaks – and so, regardless of his clearly inferior qualifications, he selected Hunt, and excluded Shater, because Shater was not white or of British national origin. This too is proof of pretext and discrimination *vel non*. This point about the "overall scenario" and "big picture" is also supported by the fact that one of the interviewers on the panel, the HR Manager, Andrew Maynor, responded to Oaks's EEOC Charge, which was pending at the very time of Shater's interview (Ex. 7 and Ex. 19 at 32). And, even more suspiciously, Maynor himself admitted that it is not typical for HR – meaning him – to be in interviews (Ex. 19 at 30). Yet, inexplicably, here he was in Hall's interview of Shater.

> **g)** **There Is Evidence That Hall And Shell Secretly Preselected Hunt, And Manipulated The Process To Try To Falsely Make Hunt Appear Qualified For The RSM – Americas Position**

92. Seventh, consistent with the above point about the "overall scenario" and "big picture," as detailed herein, there is evidence that in order to hire a white, British, candidate, Hall and Shell intentionally and secretly preselected Hunt for the RSM – Americas position shortly after Hall fired Oaks in December 2016, and then: (a) manipulated the preferred qualifications on the job description (such as adding the Spanish language preference) they posted for the role in January 2017 in order to try to falsely make Hunt appear qualified for the position; (b) added direct reports to Hunt in an effort to make him appear qualified for the position; and (c) before

35

announcing that Hunt was awarded the job, sought to convince Shater to accept a role in BID that he had clearly indicated that he had no interest in, so that he could not claim discrimination when he was denied the RSM – Americas role, as Hall and Shell knew that he would be all along. Indeed, consistent with this evidence, Shater's immediate manager, Buss, told a coworker that if Shater was preparing an appeal of the decision, Hall had "covered his tracks."

93. While evidence of preselection alone is not proof of pretext, evidence of preselection is proof of pretext where there is indicia of unlawful discrimination attached to the preselection. For example, "[a]n employer's preselection of a job candidate, in violation of its own procedures requiring fair consideration of qualified applicants, is "undeniably relevant to the question of discriminatory intent,'" *Krodel v. Young*, 748 F.2d 701, 709 (D.C. Cir. 1984), and "operates to discredit the employer's proffered explanation for its employment decision,'" *Goostree v. State of Tenn*., 796 F.2d 854, 861 (6th Cir. 1986). Such is the case here. *See supra*. Accordingly, the evidence that Hall and Shell preselected Hunt for the position based on race and national origin, and then manipulated the job posting and entire process in his favor, powerfully demonstrates pretext and discrimination *vel non*. *See, e.g., Edwards v. Oklahoma ex rel. Bureau of Narcotics and Dangerous Drugs Control*, 233 F. Supp.3d 1228, 1234 (W.D. Okla. 2017) (denying employer's motion for summary judgment in a Title VII failure to promote discrimination case in part because of evidence of preselection and suspicious procedural practices).

94. The evidence of Hall's and Shell's preselection and manipulation is especially compelling proof of pretext here because it reveals that Shell's fundamental assertion – that it in good faith simply followed its standard, neutral policies and practices, which led them to select Hunt for the job – is false and unworthy of credence. Under Fifth Circuit precedent, proof that the employer's given explanation for its decision is false or unworthy of credence is strong evidence

of pretext and discrimination *vel non*. *See Haire v. Board of Sup'rs of La. State Univ. Agricultural & Mech. Coll.*, 719 F.3d 356, 365 n. 10 (5th Cir. 2013) (reversing summary judgment for the employer in a discrimination case, and holding that, "[e]vidence demonstrating that the employer's explanation is false or unworthy of credence . . . is likely to support an inference of discrimination *even without further evidence of defendant's true motive*.") (italics in original).

## C. Damages

95.    Shater has and will continue to suffer compensable economic damages, including lost back-pay. The purpose of back pay is to "make whole the injured party by placing that individual in the position he or she would have been in but for the discrimination." *Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1136 (5th Cir. 1988).

96.    Shater is entitled to be placed into the RSM – Americas position, or front pay. "Front pay is usually invoked when reinstatement is impracticable and is calculated from the date of judgment to age 70, or the normal retirement age, and should reflect earnings in mitigation of damages." *Patterson v. P.H.P. Healthcare Corp.,* 90 F.3d 927, 936 n. 8 (5th Cir. 1996).

97.    Shater has also suffered compensable noneconomic injuries, lost benefits, out-of-pocket expenses, and emotional harm as a result of being discriminated against based on race and national origin. *See, e.g.*, *Salinas v. O'Neill*, 286 F.3d 827, 833 (5th Cir. 2002) (affirming compensatory damages award where the plaintiff did not receive a position because of his race).

98.    Shell acted with malice and reckless indifference to Shater's federally protected rights in discriminating against him because of his race and national origin. As such, Shater is entitled to punitive damages. *See, e.g.*, *Abner v. Kansas City Southern Railroad Co.*, 513 F.3d 154, 164 (5th Cir. 2008) (affirming punitive damages awards to plaintiffs).

99.    Shater also seeks attorneys' fees, costs, and pre and post-judgment interest, all of which are available for claims under Title VII. *Lewallen v. City of Beaumont,* 394 Fed. Appx. 38,

46 (5th Cir. 2010) (affirming an award of attorneys' fees of $428,421.75 to the plaintiff in a single-plaintiff failure to promote case).

## EXHAUSTION UNDER TITLE VII

100.    Shater exhausted his administrative remedies under Title VII before bringing this lawsuit.  Specifically, Shater: (a) filed his EEOC Charge within 300 days of being informed that he was denied the promotion to RSM – Americas; and (b) filed this lawsuit within 90 days of receiving the EEOC issued a Dismissal and Notice of Rights letter.

## JURY DEMAND

101.    Shater demands a jury trial.

## PRAYER

Shater asks that the Court issue citations for Defendant to appear and answer, and that Shater be awarded a judgment against Defendant for the following:

   a.    Actual damages, including but not limited to back-pay and either being placed into the RSM – Americas position, or front-pay;

   b.    Compensatory damages, including damages for mental anguish and emotional harm;

   c.    Punitive damages;

   d.    Court costs;

   e.    Attorneys' fees; and

   f.    All other relief to which Shater is entitled.

Respectfully submitted,

OBERTI SULLIVAN LLP

By: s/ Mark J. Oberti

   Mark J. Oberti
   Texas Bar No. 00789951
   Southern District ID. No. 17918
   712 Main Street, Suite 900
   Houston, Texas 77002
   (713) 401-3555 – Telephone
   (713) 401-3547 – Facsimile

   ATTORNEY-IN-CHARGE FOR PLAINTIFF

OF COUNSEL:

Edwin Sullivan
State Bar No. 24003024
S.D. Texas No. 24524
OBERTI SULLIVAN LLP
712 Main Street, Suite 900
Houston, TX 77002
(713) 401-3555 – Telephone
(713) 401-3547 – Facsimile
ed@osattorneys.com – Email

ATTORNEYS FOR PLAINTIFF

| DESCRIPTION OF EXHIBITS TO ORIGINAL COMPLAINT | EXHIBIT |
|---|---|
| Walied Shater professional resume | 1 |
| Shater Performance Review 2014 | 2 |
| Shater Performance Review 2015 | 3 |
| Shater Performance Review 2016 | 4 |
| Individual Development Plan of January 30, 2017 | 5 |
| 2012-2017 Corporate Security Job Appointments (Senior Staff) | 6 |
| Crockett Oaks Charge of Discrimination with the EEOC (without attached letter) | 7 |
| RSM – Americas job description posted January 2017 | 8 |
| Crockett Oaks lawsuit against Shell for retaliation filed on March 30, 2017 | 9 |
| Shell Code of Conduct Excerpts | 9-1 |
| Emails between Crockett Oaks and James Hall of July 6, 2016 | 9-2 |
| Email chain between Crockett Oaks, James Hall, and Dana Croft of September 9, 2016 and September 14, 2016 | 9-3 |
| Email chain between Crockett Oaks and Dana Croft of September 14, 2016 | 9-4 |
| Conflict of Interest URID-000142369 Submitted by Crockett Oaks | 9-5 |
| Emails from Crockett Oaks to Jasper Smidtman of November 4, 7, 8, and 10, 2016 | 9-6 |
| Joint Motion and Order in *Crockett Oaks v. Shell* Case | 10 |
| Comparative Analysis for RSM – Americas role:  Wayne Hunt role vs. Walied Shater Based on Current Job Descriptions | 11 |
| US Security Advisor job description | 12 |
| Walied Shater functional competencies as required in RSM – Americas job description | 13 |
| Shell's Response to Shater's EEOC Charge of April 30, 2018 (without the attached exhibits) | 15 |

| | |
|---|---|
| Wayne Hunt's Linked In Profile as of July 8, 2018 | 16 |
| Certification of Incorporation Issued to Harberton Risk Management Ltd on 15 July 2010 | 17 |
| Proof of Dissolution of Harberton Risk Management Ltd Effective 10/02/2015 | 18 |
| Andrew Maynor's Deposition Transcript | 19 |
| Shell's Answers to Interrogatories in the *Oliveri v. Shell* Case | 20 |
| Excerpts of James Hall's Deposition in the *Oliveri v. Shell* Case | 21 |
| Court Opinion and Order of 01/16/19 in the *Oliveri v. Shell* Case | 22 |