# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CROCKETT OAKS III, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. _____ |
| | § | |
| SHELL OIL COMPANY, | § | |
| | § | |
| Defendant | § | |

## PLAINTIFF'S SWORN ORIGINAL COMPLAINT

Plaintiff Crockett Oaks III ("Mr. Oaks" or "Plaintiff"), files his Sworn Original Complaint against Shell Oil Company ("Shell," "the Company," or "Defendant"), showing as follows:

## SUMMARY

1.       This is a case of willful retaliation under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* Mr. Oaks is a former Special Agent for the Federal Bureau of Investigation ("FBI"). In 2003, Shell hired him from the FBI. Mr. Oaks was promoted many times. In August 2013, Mr. Oaks became the Regional Security Manager – Americas for Shell, a job that paid more than $300,000.00 per year. He reported to James W.D. Hall, a British citizen working in the Company's Global Headquarters located in The Hague, Netherlands. Mr. Oaks' disciplinary record was spotless and he had received uniformly positive reviews.

2.       In August 2016, an opening was posted in Mr. Oaks' organization in Houston, Texas. The opening was the result of a subordinate named Bob Schoen being reassigned to a position of greater authority. Mr. Schoen is in his fifties. Around the time Mr. Schoen was reassigned, Mr. Hall sent Mr. Oaks an e-mail stating, "[l]et's indeed look to backfill Bob's role with some **younger** external talent." (Ex. 2) (bold added). Mr. Hall also preferred a female to fill the opening.


EXHIBIT 9

3.    In September 2016, Mr. Oaks instead recommended that a male applicant over the age of 50 be hired, because he was the best qualified applicant for the opening as determined by a group of individuals who vetted the applicants, including but not limited to Mr. Oaks.  Mr. Hall objected to Mr. Oaks' recommendation, stating in an e-mail on September 14, 2016, that: (a) he had wanted someone "with the potential for a longer career in Shell"; and (b) wanted Mr. Oaks to "to look particularly at female candidates."  (Ex. 3 at p. 3).   Mr. Hall then spoke to Dana Croft, Shell Policy Team Lead Domestic – U.S. HR about Mr. Oaks' recommendation to hire an older male, and, according to an e-mail Ms. Croft's sent Mr. Oaks, Mr. Hall, "**mentioned his concerns (female talent and early career)** . . . ."  (Ex. 4) (bold added).

4.    Mr. Oaks refused to hire based on age and sex, and instead continued to recommend hiring the best qualified applicant for the job, who, as mentioned above, happened to be a male over 50 years old.  In other words, Mr. Oaks' opposed Mr. Hall's illegal discriminatory desires for him to hire based on age and sex.  Very shortly thereafter, on December 6, 2016, Shell fired Mr. Oaks in retaliation for his legally protected oppositional conduct, based on the preposterously pretextual false allegation that he had a conflict of interest that required his termination after more than thirteen years of spotless employment.

5.    In sum, Shell fired Mr. Oaks in retaliation for his opposition to Mr. Hall's desire to illegally hire using age and sex as selection criteria.  This violates the ADEA's anti-retaliation provision, 29 U.S.C. § 623(d).  It also violates the anti-retaliation provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000*e et seq.*, and the Texas Commission on Human Rights Act ("TCHRA"), TEX. LAB. CODE ANN. § 21.001 *et seq*.   Mr. Oaks has exhausted his administrative remedies under the ADEA, but not Title VII or the TCHRA.  Thus, he brings this suit only under the ADEA at this time.  Once he has exhausted his administrative remedies under

Title VII and the TCHRA, he will amend this lawsuit to assert claims under the anti-retaliation provisions of those two laws.

## THE PARTIES, JURISDICTION, AND VENUE

6.      The Plaintiff, Mr. Oaks, is a natural person residing in Spring, Texas.  He was employed by Shell located at One Shell Plaza, 910 Louisiana Street, Houston, Texas 77002.  Mr. Oaks has standing to file this lawsuit under the ADEA.

7.      Shell is headquartered at One Shell Plaza, 910 Louisiana Street, Houston, Texas 77002, is a citizen of Texas, and may be served with process through its registered agent, C T Corporation System, 350 N. St. Paul St., Suite 2900, Dallas, Texas 75201-4234.  During both 2015 and 2016, Shell engaged in an industry affecting commerce and employed twenty or more employees for each working day in each of twenty or more calendar weeks.   In fact, during both 2015 and 2016, Shell employed 500 or more employees for each working day in each of twenty or more calendar weeks.

8.      The Court has personal jurisdiction over Shell based on both general and specific jurisdiction.  Personal jurisdiction is proper because Shell has continuous and systematic contacts with and in the State of Texas, and the events or omissions giving rise to the Plaintiff's claims occurred in the State of Texas.

9.      Subject matter jurisdiction is proper because Mr. Oaks brings a claim for retaliation under a federal law (the ADEA).

10.      Venue is proper in this Court because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in the Southern District of Texas, and the unlawful employment practices alleged in this case occurred in the Southern District of Texas.

## FACTUAL BACKGROUND[1]

**A.** **Mr. Oaks Is A Former FBI Special Agent And Twenty-Seven Year Service Member Of The U.S. Army Reserve, Who Had An Impeccable Work Record At Shell**

11.     In 2003, Shell hired Mr. Oaks from the Federal Bureau of Investigation, where he was employed as a Special Agent.  Mr. Oaks has also served in the U.S. Army Reserve for approximately twenty-seven years.  This was widely known at Shell, and, consistent with Shell's Conflicts of Interest Policy in its Code of Conduct, Mr. Oaks formally reported his military status on Shell's official Conflict of Interest Disclosure Register (Ex. 1 at page 31).  Mr. Oaks' current rank is Lieutenant Colonel (he was promoted to that rank in April 2012), and, as he declared in the January 2016 Shell Code of Conduct Register, he is the Deputy Emergency Preparedness Liaison Officer for Texas.  Mr. Oaks earns approximately $23,000.00 a year as a U.S. Army Reserve Officer.

12.     Since 2015, Mr. Oaks has been retirement eligible, meaning that he could retire at any time and receive his full military pension starting at the age of sixty.  If Mr. Oaks was promoted to full Colonel he would earn approximately $3,000.00 more per year, and his monthly pension would likely increase by approximately $400.00 a month.  As these numbers reflect, Mr. Oaks does not serve in the U.S. Army Reserve for the money.  He does it for the love of country.

**B.** **Mr. Oaks And Michael Oliveri Were In The Same U.S. Army Reserve Unit, And That Was Made Well Known To Shell, And To Mr. Oaks' Manager In The Hague, James W.D. Hall**

13.     Mr. Oaks began working for Shell as a Security Generalist.  He excelled in this role, and was promoted multiple times over the years.  In 2013, Mr. Oaks was promoted to the position of Regional Security Manager – Americas.  His supervisor in that role was James W.D. Hall, Vice

---

[1] Because the factual allegations set forth in this section are sworn to under oath, Plaintiff's Sworn Original Complaint is admissible evidence.  *See King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994).

President of Corporate Security, in Royal Dutch Shell plc's Global Headquarters located in The Hague, Netherlands. Mr. Hall is a managerial agent of Shell, with the power to hire and fire employees.

14.     Mr. Hall received Mr. Oaks' aforementioned January 2016 Shell Code of Conduct Register in which Mr. Oaks declared that he was the Deputy Emergency Preparedness Liaison Officer for Texas. Mr. Oaks continued to consistently perform well in the position of Regional Security Manager – Americas for Shell, as is reflected by his uniformly positive evaluations and appraisals. Shell benefited from Mr. Oaks' military connectivity because, among other reasons, Mr. Oaks had a Top Secret U.S. Government Security Clearance through the military that afforded him the opportunity to attend classified U.S. federal governmental security briefings for the private sector that he otherwise would not have been able to attend.

15.     In 2013 and 2014, Michael Oliveri applied for jobs at Shell for which he was not hired for. Mr. Oliveri is a retired U.S. Probations Officer – Manager who worked at the federal courthouse located at 515 Rusk, in downtown Houston. He is also a Colonel in the U.S. Army Reserve. As such, Mr. Oaks has known Mr. Oliveri for many years due to his also being in the U.S. Army Reserve. As for the 2014 application, Mr. Oaks was the hiring decision manager, and he declined to hire Mr. Oliveri because he believed another applicant was better qualified.

16.     On August 31, 2015, Michael Oliveri went to work for G4S, the world's leading international security solutions group, with more than 50,000 employees in the United States. G4S provides security services to, among other companies, Shell. Mr. Oaks referred Mr. Oliveri to the G4S role. Several emails between Mr. Oaks and the hiring manager at G4S, Mike Dixon, Director of Strategic Accounts, confirm that Mr. Oaks was interested in reviewing all of the potential applicants for this role at G4S, given that the role would be supporting Shell's Corporate Security

function.  Mr. Dixon verbally indicated to Mr. Oaks that G4S was not interested in vetting more applicants given Mr. Oliveri's excellent qualifications and performance during the face-to-face interview.  On August 4, 2015, Mr. Oaks informed Dana Croft, Shell Policy Team Lead Domestic – U.S. HR, that he was comfortable with the candidate G4S selected (Mr. Oliveri) because the two of them "served in the Army together."  Ms. Croft e-mailed Mr. Oaks back that there were "no issues from [her] perspective," and that he was "following the standard process for contractor selection . . . ."  As a result, as noted, on August 31, 2015, Mr. Oliveri was hired by G4S to provide security services for Shell executive protection and special events.

17.     When Mr. Oliveri began in his role with G4S, Mr. Oaks sent out a widely distributed e-mail within Shell, and its Global Corporate Security Organization, announcing his position and expressly noting that Mr. Oliveri is a Colonel in the U.S. Army Reserve, with his current title being Emergency Preparedness Liaison Officer for the state of Texas.  Over the next eleven months, Mr. Oliveri performed in an outstanding fashion for G4S, and his performance and behaviors were uniformly excellent.

18.     On December 5, 2015, a Shell manager, Billy Powell, spoke as a guest at the U.S. Army Reserve Region VI Emergency Preparedness Liaison Officer Workshop.  Mr. Powell's job title is Manager Shell Americas Emergency Management.  Mr. Oaks and Mr. Oliveri had arranged for Mr. Powell to speak at this workshop.  Mr. Oaks and Mr. Oliveri had nothing to hide regarding their military affiliation and obligations.  As such, during the workshop, both Mr. Oaks and Mr. Oliveri were dressed in their Army ACUs which reflected their respective ranks (and thus indicated Mr. Oliveri outranked Mr. Oaks), and at the end of the presentation Mr. Oliveri presented Mr. Powell of Shell with a "Commander's Challenge Coin" to thank him for his outstanding presentation.

19.     The next day, December 6, 2015, both Mr. Oaks and Mr. Oliveri transparently circulated e-mails about this workshop, which, among other things, indicated that they they were both in the same U.S. Army Reserve Unit, to a wide group of individuals at Shell, specifically including Mr. Hall (Ex. 6 at pp. 5-6).  Thus, Mr. Hall and others at Shell, including Mr. Smith, were made aware by both Mr. Oaks and Mr. Oliveri that the two of them were in the same U.S. Army Reserve Unit.  No one at Shell registered any objection.  To the contrary, Phil Smith, Shell's GM – Emergency Management & Deepwater Regulatory, who was also copied on the e-mails, responded, stating: "I do consider the military and corporate security as key partners – all one family in working to minimize impacts."  (*Id*. at 6).  Mr. Hall was copied on that e-mail too (*Id*.).

20.     In February 2016, Mr. Oaks and Mr. Oliveri facilitated getting a written proposal to Shell management for veterans employed by Shell to receive free training and education from the Center for Brain Health.  It was plain from the proposal that both Mr. Oaks and Mr. Oliveri were in the military and that Mr. Oliveri was a Colonel.

**C.     In September 2016, Mr. Hall Made It Clear That He Wanted Mr. Oaks To Select Someone To Fill The Open Position of Security Advisor U.S. Based On Age And Sex, And Mr. Oaks Opposed Mr. Hall's Discriminatory Desires And Refused To Do So**

21.     In early 2016, Shell gave Mr. Oaks a "Current Estimated Potential" rating of a letter category "A/B."  This meant that Shell, and Mr. Hall, believed at the time that Mr. Oaks had the potential to one day hold a job grade of an "A/B."  Mr. Hall's job was a "B" graded job and, thus, the "Current Estimated Potential" rating essentially meant that Shell and Mr. Hall believed at that time that Mr. Oaks had the potential to take Mr. Hall's role or the same equivalent role within Shell one day.

22.   In August 2016, Shell posted an opening for Security Advisor U.S., which was a role previously occupied by Bob Schoen,[2] before he was reassigned to Country Security Manager, U.S.  Mr. Oliveri applied for the opening, along with many other individuals.  At the time Mr. Oliveri applied, he and Mr. Oaks had no direct reporting relationship to one another in the U.S. Army Reserve.

23.   Mr. Oaks did not improperly influence the hiring process for the Security Advisor U.S. position.  Rather, three individuals, Mr. Oaks, Mr. Schoen, and Pete Lininger (Downstream Security Manager Americas), vetted the applicants and ultimately interviewed four of them.  Mr. Lininger was only used for the oral presentation part of the interviews.  Mr. Oaks and Mr. Schoen scored the structured interview process.  Mr. Lininger and Mr. Schoen scored the oral presentation. All three men concluded that Mr. Oliveri was the best applicant for the job.  Mr. Schoen and Mr. Oaks presented their reasoning and conclusion to Dana Croft, Shell Policy Team Lead Domestic – U.S. HR.  Ms. Croft ratified the process that they followed and their ultimate decision that Mr. Oliveri was the best applicant for the position, and to recommend him to the ultimate decision-maker, James W.D. Hall.   On September 9, 2016, Mr. Oaks sent Mr. Hall an e-mail reflecting the collective recommendation (Ex. 3 at pp. 5-6).

24.   Mr. Hall resisted hiring Mr.  Oliveri.  Mr. Hall's problem with Mr.  Oliveri was his age (Mr. Oliveri was 53 years-old) and his sex.  Mr. Hall made no secret of that.  On July 7, 2016, even before the position was formally posted, Mr. Hall sent Mr. Oaks an e-mail stating, "[l]et's indeed look to backfill Bob's role with some **younger** external talent."  (Ex. 2) (bold added).   Bob Schoen is in his 50s.  Ms. Croft was copied on that e-mail (*Id.*).  After Mr. Oaks let Mr. Hall know

---

[2] The job description for this particular role combined two other roles that were eliminated within the Corporate Security Americas - U.S. Team; Regulatory Assurance Manager and Security Manager – US.

that he was recommending Mr. Oliveri for the position on September 9, 2016, Mr. Hall asked him

how old Mr. Oliveri was, and Mr. Oaks told him that he was approximately 51-years old.

      25.     Mr. Hall was frustrated and unhappy that Mr. Oaks had recommended someone

older for the job despite his clear instructions on July 7, 2016, to "look to backfill Bob's role with

some **younger** external talent." (Ex. 2) (bold added). Consequently, Mr. Hall e-mailed Mr. Oaks

on September 14, 2016, at 9:29 a.m., objected to the hiring of Mr. Oliveri, and reminded Mr. Oaks

he had let him know even before the position was posted that: (a) he had wanted someone "with

the **potential for a longer career** in Shell"; and (b) wanted him to "to look particularly at **female**

candidates." (Ex. 3 at page 3 (bold added)). Specifically, Mr. Hall wrote:

> Crockett,
>
> I must be honest, I still don't feel comfortable about this decision. The principle I apply is that my direct reports should be free to chose their own staff, provided they take into account of steer I have provided in discussions about broader issues like diversity, talent management, career progression and succession planning.
>
> In this case you consulted me about the CSM role. I agree to support Bob's [Schoen's] appointment so long as we took the opportunity to backfill for Bob by going to the market and **hiring someone with potential for a longer career** at Shell who could potentially move through a series of appointments and be future RSM material. **We have also discussed (in the context of other appointments) prioritizing the hiring of female staff.** The profile we discussed was ex-government agency, **still early in career** and (based on previous conversations) **you know I would want you to look particularly at female candidates**.
>
> I have only seen the shortlist and your final recommendation. I have nothing against the individual, but I struggle to see how your proposed candidate brings fresh perspectives or diversity to your team. In short, I am concerned that we are guilty of a lack of imagination in looking for candidates and have opted for a safe option, at risk of failure to bring some fresh and different talent into Shell.
>
> So before we go ahead, I would like to discuss our options with Dana and Klara. Can you set something up for us please? Friday is a good day for me if that works for others.

(Ex. 3 at pp. 2-3) (bold added).

26.     Mr. Oaks continued to support the recommendation to hire Mr. Oliveri, based on

merit (Ex. 3 at pp. 1-2).  In subsequent e-mails later that same day, September 14, 2016, Mr. Hall

continued to suggest that Mr. Oliveri was too old and/or the wrong sex for the job (*Id*. at 1).   For

example, Mr. Hall wrote, in relevant part:

> Mike may enable us to close today's gap.  But we also need to consider whether we
> can use opportunities like this to hire and develop our future security leadership.
> On diversity, for different reasons, we have lost several women from our ranks over
> the last year or so and when we have an opportunity like this I would like to see
> what options we have to replace them.

(Ex. 3 at 1).

27.     Given Mr. Hall's reaction to the recommendation to hire Mr. Oliveri, Mr. Oaks was

concerned about potential retaliation by Mr. Hall, so that same day he forwarded Mr. Hall's 9:29

a.m. e-mail to Dana Croft at 11:05 a.m. with a note, "Confidential Do Not Forward."  (Ex. 4).

Apparently, Mr. Hall had also communicated with Ms. Croft separately, and then Ms. Croft sent

Mr. Oaks an e-mail back at 11:15 a.m. that day in which she stated that Mr. Hall had e-mailed her

and "**mentioned his concerns (female talent and early career[3])** . . . ." (Ex. 4) (bold added).  Mr.

Oaks was not copied on that e-mail from Mr. Hall to Ms. Croft.  Shell, obviously, had an obligation

to preserve it as evidence in this case.

28.     Mr. Hall's discriminatory conduct and statements in these e-mails is not isolated.

Rather, Mr. Hall said on numerous occasions that he wanted the Corporate Security Leadership

Team to focus on hiring women and to think about succession – particularly focusing on younger

workers – when hiring.  Mr. Hall also said on numerous occasions that he wanted his managers to

"identify young talent," within the organization, meaning talent that could hold a series of jobs in

---

[3] "Early career" was one way Mr. Hall expressed a preference for younger workers (e.g., those "early in their career" rather than later in their career).   This is evident, for example, by comparing Mr. Halls own e-mails of July 7, 2016 and September 14, 2016, which use specifically the word "younger" and the phrase "early in career" to mean the same thing, *i.e*., find a younger worker to backfill for Bob Schoen's old position (compare Ex. 2 to Ex. 3 at 3).

the security function over a number of years and ultimately become leaders in the department. Mr. Hall essentially admitted to these prior statements in his e-mail to Mr. Oaks of September 14, 2016, at 9:29 a.m., in which Mr. Hall references such prior discussions along those same lines and takes Mr. Oaks to task for deviating from them in his recommendation to hire Mr. Oliveri (Ex. 3 at pp. 2-3). Consistent with his statements, Mr. Hall has facilitated putting in place younger individuals in the Corporate Security organization.

29. Mr. Hall's own e-mails and statements clearly prove that he violated Section 3.4 of Shell's Code of Conduct, which states, in relevant part, that "[w]hen making employment decisions, including hiring, evaluation, promotion, training, development, discipline, compensation and termination, you must base them solely on objective factors, including merit, qualifications, performance and business considerations. . . . [Y]ou should understand the value of diversity and must not discriminate in any way based on race, colour, religion, age, gender, sexual orientation, gender identity, marital status, disability, ethnic origin or nationality." (Ex. 1 at page 14).

30. Upon information and belief, Mr. Hall's discriminatory directives to Mr. Oaks were not solely products of his own mind, but rather part of a systemic pattern and practice of intended discrimination at Shell and its parent company, Royal Dutch Shell plc that is headaquarted in The Hague, including Mr. Hall's immediate supervisor, Ronan Cassidy, Chief Human Resources & Corporate Officer of Royal Dutch Shell plc.

31. Mr. Oaks respected Mr. Hall as his supervisor. But, he respects American federal and Texas state law even more. When his supervisor's instructions conflicted with federal and state law, Mr. Oaks was sworn to uphold, and comply with, the law. That is his duty as a military officer, as a Shell employee, and as an American citizen residing in the State of Texas.

32.    On September 19, 2016, a teleconference was held with Mr. Oaks, Mr. Hall, Dana Croft, and Klara Smits (HR Account Manager for ER, ICNCS). During the call, Mr. Oaks told Mr. Hall that a criterion he wanted to use to screen applicants, age, could not be used in the U.S., because it was against the law. Mr. Oaks explained that a candidate's age was not even revealed on applications or resumes. Mr. Hall suggested that perhaps they could infer an applicant's age by other indicators, and then use that to screen. Ms. Croft then said that could not be done. At that point, Mr. Hall began stating that more females were needed in the Corporate Security Department, and, shortly thereafter, two external candidate females (Veronica Washington and Susan Pletz) were interviewed for the Security Advisor U.S. position.

33.    On September 27, 2016, Mr. Oaks and Mr. Hall were on a business trip in Trinidad and discussed the situation concerning the hiring of someone to fill the position of Security Advisor U.S. By this point, all the individuals involved in the selection process had made it clear that in their judgment Mr. Oliveri was the best qualified applicant. It was also made clear to Mr. Hall by Mr. Oaks that he was not going to simply go along with Mr. Hall's desire to hire someone for the position based on age (younger) and/or gender (female). Accordingly, Mr. Hall publicly purported to relent from his previously announced illegal position, and sent an e-mail stating, "[A]ll, Crockett and I have discussed. Support for the decision to proceed." As a result, Shell began to move forward with the hiring process to hire Mr. Oliveri for the position. Yet, upon information and belief, Mr. Hall remained upset and unhappy with Mr. Oaks – his subordinate had disobeyed him and called him out for his discriminatory hiring desires in front of others.

34.    During their conversation that day in Trinidad, Mr. Oaks expressly reminded Mr. Hall that both he and Mr. Oliveri were in the same U.S. Army Reserve Unit, and he used this as a basis to bolster his conclusion that Mr. Oliveri had the best qualifications, *i.e.* the right behaviors,

work ethic, competence etc. In response, Mr. Hall made an unnuendo suggesting that unidentified people thought that Mr. Oaks was just "hiring his old Army buddy," *i.e.*, Mr. Oliveri. Mr. Hall provided no support at all for the comment, and Mr. Oaks verbally refuted it so thoroughly – including accurately pointing out that he had declined to hire Mr. Oliveri when he had applied for a Shell role before when he did not believe him to be the best qualified applicant – that Mr. Hall backed down from the contention, and agreed to approve the decision to hire Mr. Oliveri.

35.     Mr. Oaks nevertheless remained troubled by Mr. Hall's comment about just "hiring his old Army buddy." Shell's Code of Conduct's "Conflicts of Interest" policy suggests filing a disclosure with the Code of Conduct Register if there is a perceived conflict, so as to "protect yourself from any suspicion of misconduct . . . ." (Ex. 1 at page 31). In compliance with this provision, and to avoid even the possible appearance of impropriety, the next day, September 28, 2016, Mr. Oaks voluntarily, of his own initiative, formally filed a Conflict of Interest Disclosure with the Code of Conduct Register concerning his relationship with Mr. Oliveri, including an accurate description of their military service and military and social relationship just as he had told Mr. Hall the previous day (Ex. 5). That disclosure was routed, as a matter of course, to, among others, Mr. Hall. Mr. Hall made no mention to Mr. Oaks about it, presumably because, as noted above, he was already well aware that Mr. Oaks and Mr. Oliveri both served in the U.S. Army Reserve, and in the same Reserve Unit. Mr. Oaks spoke with Mr. Hall and told him that he had declared the matter in the Company's Code of Conduct Register. To Mr. Oaks, it seemed that Mr. Hall was not very happy about that.

**D.     On December 6, 2016, In Retaliation For Refusing To Accede To Mr. Hall's Discriminatory Desires, Shell Fired Mr. Oaks On False Charges**

36.     Well in the midst of the hiring process for Mr. Oliveri, and before Mr. Oliveri was actually hired on at Shell, approximately a month later, on October 28, 2016, Mr. Oaks was sent a

meeting invitation from Jasper Smidtman for a meeting on November 3, 2016. Mr. Smidtman is employed as an Investigator in the Business Integrity Department in Royal Dutch Shell plc's Global Headquarters in The Hague, Netherlands. For the purposes of this investigation, he reported to the Head of Shell's Business Integrity Department, Allison McNeil, also in The Hague, acting as the case manager.

37. Shell's policy provides that investigations "usually involve a suitability-trained investigator from the country to which the report refers, who has local expertise." Shell has a Business Integrity Department in the United States of America. But, instead of using one of those American investigators, or an external consultant who is familiar with the workings of the Uniformed Armed Service components operate, Shell assigned Mr. Smidtman to the investigation, a non-American, who was not "suitably trained," knew nothing of the American military, and worked in the same location as Mr. Hall.

38. Paranthetically, regarding the Business Integrity Department, in early 2016, Bruce Culpepper, Shell's US Country Chairman and Shell Oil Company President, told Mr. Oaks that the department, "could not investigate their way out of a wet paper bag," "they cannot investigate worth a shit," and that he "did not want those fuckers involved," in a specific situation.

39. Mr. Smidtman flew from The Hague to America and, on November 3, 2016, Mr. Smidtman informed Mr. Oaks that he was under investigation for allegedly hiding a Conflict of Interest relative to Mr. Oliveri which impacted the hiring process. Mr. Oaks was stunned. There was no conflict, and, in any event, he had not hidden his relationship with Mr. Oliveri from Shell. *See supra*. Mr. Oaks explained all that to Mr. Smidtman. Mr. Oaks also informed Mr. Smidtman that, for several years, he had included Army Reserve training within his annual Goals, Performance, and Achievement ("GPAs") for Shell, which were signed off on by Mr. Hall. This

– and an avalanche of other evidence – clearly illustrates Mr. Oaks' transparency concerning the relationship between Shell and the military as it related to him.  If Mr. Hall wanted to know more about the military side, then he had ample opportunity to engage Mr. Oaks on the topic.  Mr. Smidtman blew off this significant point, as well as all of the other substantial exculpatory information Mr. Oaks provided to him.

40.      Mr. Smidtman audio recorded the interview.  Erica Slain, a HR Manager sat in on the interview.  Mr. Oaks asked Mr. Smidtman for a copy of the recording, but was refused.  During the interview, Mr. Smidtman told Mr. Oaks, *inter alia,* that Mr. Hall had asserted that he had no knowledge that both Mr. Oaks and Mr. Oliveri were in the same U.S. Army Reserve Unit or that they had known each other for several years (Ex. 5 at page 1).  This, of course, is totally false, and Mr. Oaks let him know that.  *See supra*.  During the interview, Mr. Oaks, feeling very uncomfortable, expressly told Mr. Smidtman that he believed Mr. Hall was retaliating against him because he had refused to accede to his desire to hire a younger and/or female applicant for the position of Security Advisor U.S.  Mr. Smidtman did nothing to protect Mr. Oaks' from his well-founded and prescient concern about retaliation.

41.      A few days after the face-to-face interview, Mr. Oaks provided Mr. Smidtman with a copy of U.S. Army Policy AR 600-20, which sets forth guidance to the effect that a working relationship at Shell between Mr. Oaks and Mr. Oliveri would not constitute a conflict for the U.S. Army Reserve.[4]  Mr. Oaks also sent Mr. Smidtman several e-mails demonstrating his innocence and willingness to cooperate.  Mr. Oaks' e-mails to Mr. Smidtman also reflected Mr. Hall's longstanding knowledge of the military relationship between Mr. Oaks and Mr. Oliveri (Ex. 6). Specifically, Mr. Oaks sent Mr. Smidtman the aforementioned e-mail chain from December 6,

---

[4] Soldiers working with and in some instances for, each other in a civilian capacity is not unique within the Army Reserves given that soldiers tend to have similar civilian professions based on skill sets obtained within the military.

2015, that indicates that Mr. Oaks and Mr. Oliveri were in the same U.S. Army Reserve Unit –

and that Mr. Hall was copied on by both Mr. Oaks and Mr. Oliveri in December 2015 (*Id*.). The

context of those e-mails was that Mr. Oaks and Mr. Oliveri had arranged for Billy Powell, Manager

of Shell Americas Emergency Management and former member of the U.S. Coast Guard, to come

speak as a guest at the U.S. Army Reserve Region VI Emergency Preparedness Liaison Officer

Workshop that took place on December 5, 2016 – something neither of them would have done if

either of them was trying to hide from Shell the fact that they both were in the same U.S. Army

Reserve unit, or had a reporting line. During the workshop, both Mr. Oaks and Mr. Oliveri were

dressed in their Army uniforms, which reflected their respective ranks, and at the end of the

presentation Mr. Oliveri presented Mr. Powell with a "Commander's Challenge Coin" to thank

him for his outstanding presentation. The day after the workshop, December 6, 2015, both Mr.

Oaks and Mr. Oliveri circulated e-mails about this workshop – indicating they they were both in

the same U.S. Army Reserve Unit – to a wide group of individuals, including Mr. Hall and Phil

Smith, Shell's GM, Emergency Management & Deepwater Regulatory (Ex. 6 at pp. 5-6).

42.  Mr. Oaks further sent Mr. Smidtman an e-mail explaining that his predecessor in

his job as Regional Security Manager – Americas, Rob Ream, was a U.S. Coast Guard Reservist

who hired Bob Schoen who was a U.S. Coast Guard Reservist Commander while they served in

the same reservist unit and Mr. Ream reported to Mr. Schoen and vice-versa (Ex. 6). Initially, Mr.

Ream hired Mr. Schoen as a contract security consultant to Shell (and supervised him), and later

he interviewed and participated in hiring him as a direct Shell employee. This all occurred while

Mr. Ream reported to Mr. Hall, yet Mr. Hall apparently made no issue of it and Mr. Ream was not

disciplined or discharged because of the relationship (*Id*.).[5]  Mr. Oaks never received any response

---

[5] Mr. Oaks knew about this while he worked at Shell. As such, it further reasonably caused him to believe that there was no issue with the fact that both he and Mr. Oliveri were in the same U.S. Army Reserve Unit.

or rebuttal to this point, or to his proof that, contrary to his claim, Mr. Hall was actually made well aware that both he and Mr. Oliveri were in the same U.S. Army Reserve Unit.

43.     In addition, along these same lines, most if not all of the Shell Iraq security team consists of former U.K. Special Forces members from the same unit.  Mr. Hall was well aware of these relationships and has encouraged such arrangements.  Indeed, several of Mr. Hall's direct reports are working with or for each other, after having served together in the U.K. Military, and Mr. Hall never claimed there was any conflict.

44.     In addition, it was documented that Mr. Oliveri had applied for jobs at Shell in 2013 and 2014 that he was not hired for and, as to the 2014 application, Mr. Oaks was the hiring decision manager, and he declined to hire Mr. Oliveri because he believed another applicant was better qualified.  This plainly refutes any notion of favoritism.  Along those same lines, even as to 2016 opening for the Security Advisor U.S. position, Mr. Oaks actually invited Justin Lamb, a colleague on the Corporate Security Team that reports to Maria Kuusito in The Hague, to apply for the role. Mr. Oaks thought that Justin Lamb would be a great fit and the role would have represented a raise for him.  However, Mr. Lamb did ask Ms. Kuusito about his potential candidacy but was refused the opportunity to apply due to his relative newness in his current role.

45.     As part of his supposed investigation, Mr. Smidtman would have reviewed Mr. Oaks' e-mails and seen the e-mails reflecting that Mr. Hall wanted Mr. Oaks to hire based on age and gender, and Mr. Oaks opposed his discriminatory desires, and refused to do so (Exs. 2-4). Yet, Mr. Smidtman actually defended Mr. Hall's discriminatory desires and recited Mr. Hall's position to Mr. Oaks.  Specifically, according to Mr. Smidtman, Mr. Hall did not want a younger person for the Security Advisor U.S. role, and could not possibly have sought such a person, because the experiential requirements of the position itself would have required someone who was

in their forties.  This retort – which Mr. Smidtman could only have gotten from Mr. Hall himself – is patently false.  Mr. Hall's own e-mails demonstrate that he wanted a "younger" person for the role (Exs. 2-4).  Further, the experiential requirements of the position could have been satisfied by someone on their early to mid thirties.  This specific point was communicated to Mr. Smidtman by Mr. Oaks during the interview.  In fact, Mr. Oaks used himself as an example – noting that he had satisfied the experiential requirements for the Security Advisor U.S. job by the time he was 32 years old.

46.      On December 6, 2016, Mr. Oaks was in his office at One Shell Plaza in downtown Houston, Texas.  Suddenly, he was called into a meeting with Scott Ballard, Vice President, Human Resources, U.S. Operations.  At that point, Mr. Hall's face popped on a digital screen.  He was in The Hague.  Mr. Hall then told Mr. Oaks that he had committed an actual conflict of interest involving the military relationship between himself and Mr. Oliveri, and failed to report it.  Mr. Hall went on to say that this should have prompted Mr. Oaks to recuse himself from the hiring process involving Mr. Oliveri.  Mr. Hall declared that this purported violation of the Company's Code of Conduct warranted termination, but that Shell would give Mr. Oaks a chance to leave "with his head held high."  Mr. Oaks refuted the false charges against him, but Mr. Hall and Shell remained resolute – that Mr. Oaks would have to leave the Company.  Three days later, December 9, 2016, Mr. Hall sent a widely distributed e-mail to the security function globally announcing that Mr. Oaks was leaving the Company at the end of the month.

47.      As for Mr. Oliveri, upon information and belief, Shell told him that that he was not, in fact, being hired for the Security Advisor U.S. position, and that the position would be reposted and he could reapply for the job.

**E.   Shell Strategically Tried To Bury Its Retaliatory Firing Of Mr. Oaks, So That It Would Never Be Held Accountable**

48.   Mr. Oaks was devastated by Shell's illegal termination. His seventy-one-year-old father had a stroke the week after Thanksgiving.  Now, Mr. Oaks had been terminated from his job he loved just before Christmas.   Mr. Oaks was forced to clean out his office over the holidays. He was humiliated in front of his coworkers and family, and predictably suffered depression.

49.   Although Shell claimed that Mr. Oaks had committed a serious violation of Company policy, it unilaterally offered him $281,816.36 in return for a release of all claims against Shell (including claims of retaliation), and Mr. Hall repeatedly called him obviously for the purpose of nudging him into signing the release.  This suggests that Shell knew that Mr. Oaks had committed no wrong to justify his termination.

50.   Additionally, Mr. Hall told several of Mr. Oaks' direct reports that Mr. Oaks "had not been terminated" during one-on-one calls that Mr. Hall organized in an effort to put a false spin on the illegal decision to fire Mr. Oaks from Shell.   This too suggests that Shell knew that Mr. Oaks had committed no wrong to justify his termination.  If he had, Shell would not have told his direct reports that Mr. Oaks "had not been terminated," but instead would have explained to them what he had done so horribly wrong so as to deserve to be terminated after approximately thirteen years of outstanding performance at Shell.

51.   Mr. Hall also told Mr. Oaks that he wanted him to work with him to create a story to tell potential employers about why he was not longer employed by Shell.  Mr. Hall knew that Mr. Oaks' 71-year old father had a stroke the week after Thanksgiving 2016.  Thus, Mr. Hall slyly suggested to Mr. Oaks that he tell potential employers that he decided to resign from Shell to attend to his sick father who had just suffered a stroke, and once he had done so, was seeking to get back

into the job market. Mr. Hall offered to assist Mr. Oaks with his resume and with potential employment opportunities.

**F.      Ten Days After Firing Mr. Oaks, Mr. Hall Announced Shell's Continuing Commitment To Discriminate In Hiring**

52.      On Friday, December 16, 2016, Mr. Hall held a conference with the security function Company-wide and announced that one of his top priorities for Shell's Corporate Security Department in 2017 was hiring more women.

53.      At the same time, Mr. Hall continued to call Mr. Oaks from overseas in hopes of convincing him to sign the release that Shell had offered him, and give up all his rights under the laws of America and Texas. Mr. Hall made such pressuring calls under the pretext of checking up on Mr. Oaks' welfare – as if there were any question that he was not doing well, specifically because Mr. Hall had just unlawfully fired him after well more than a decade of devoted and dedicated service to Shell.

**G.      Meanwhile, Many Other Employees Who, Unlike Mr. Oaks, Actually Committed Wrongdoing, Or Hired Based On A Prior Military Affiliation, Were Not Terminated[6]**

54.      ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[6] Oaks' counsel sent a draft of this federal complaint to Shell's counsel with Section "G" in it. In response, Shell filed a state court lawsuit against Oaks on March 29, 2017, to enjoin him from including the allegations in Section "G" in his federal complaint, and to recover alleged damages for Oaks telling his lawyers and a local mediator (Susan Soussan) about said allegations. A state court judge granted Shell's requested TRO today, which is why Oaks has filed this complaint without the allegations in Section G.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████    ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

55.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

56.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

57.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

58. ███████████████████████████████████████

59. ███████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████

60.     ████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████     ██████████████████████████
████████████████████████████████████████████████████████
█████████████████████████     ████████████████████████████
██████████████████████████

61.     ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

62.     ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

63. ████████████████████

64. ████████████████████

65. ████████████████████████████████████████████

**RETALIATION CLAIM UNDER THE ADEA**

**A.**     **Law**

66.     The ADEA's anti-retaliation provision prohibits an employer from discriminating against an employee for opposing an unlawful practice or asserting a charge, testifying, assisting, or participating in an ADEA proceeding or investigation. 29 U.S.C. § 623(d). "The analytical framework for a retaliation claim is the same as that used in the employment discrimination context." *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001).

-25-

67.     The well-known *McDonnell Douglas/Burdine* evidentiary framework applies to ADEA, Title VII, and TCHRA retaliation claims brought under a pretext theory.  *See Septimus v. University of Houston*, 399 F.3d 601, 607 (5th Cir. 2005).  Under that evidentiary framework, a plaintiff must first establish a *prima facie* case of retaliation.  *See Baker v. American Airlines, Inc.,* 430 F.3d 750, 754 (5th Cir. 2005); *Haynes v. Pennzoil Co.*, 207 F.3d 296, 299 (5th Cir. 2000).  To establish a *prima facie* retaliation case, a plaintiff must show that "(1) he engaged in protected activity; (2) he suffered an adverse employment decision; and (3) a causal link exists between the protected activity and the adverse employment decision." *Id*.  The same elements for a *prima facie* retaliation case apply under Title VII and the TCHRA.  *See Banks v. East Baton Rouge Parish School Bd.*, 320 F.3d 570, 575 (5th Cir. 2003); *Zaffuto v. City of Hammond*, 308 F.3d 485, 492 (5th Cir. 2002).

68.     If the plaintiff makes out a *prima facie* case of retaliation, then the defendant must articulate a legitimate non-retaliatory reason for the adverse employment decision.  *See Baker,* 430 F.3d at 754-55. After the employer does so, "any presumption of retaliation drops from the case" and the burden shifts back to the employee to establish that the employer's "stated reason is actually a pretext for retaliation."  *Baker*, 430 F.3d at 755 (quoting *Septimus*, 399 F.3d at 610-11); *Pineda v. United Parcel Service, Inc.*, 360 F.3d 483, 487 (5th Cir. 2004).

## B.     Analysis

### 1.     Mr. Oaks Easily Makes Out A *Prima Facie* Case Of Retaliation

69.     In this case, Mr. Oaks easily makes out a *prima facie* case.  Regarding the first element, it is clear based on U.S. Supreme Court precedent that Mr. Oaks' refusal to submit to, or participate in, Mr. Hall's plan to hire a younger and/or female individual for the position of Security Advisor U.S. constitutes protected oppositional activity under the ADEA, Title VII, and the TCHRA. *See Crawford v. Metro. Gov't of Nashville and Davidson Cnty.*, 555 U.S. 271, 277,

129 S. Ct. 846, 871 (2009) ("And we would call it "opposition" if an employee took a stand against

an employer's discriminatory practices not by "instigating" action, but by standing pat, say, by

refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons."); *see*

*also Patterson v. P.H.P. Healthcare Corp.,* 90 F.3d 927, 942 (5th Cir. 1996) (plaintiff's refusal to

carry out supervisor's instructions not to hire individuals of a certain protected class was protected

activity under the law that supported a retaliation claim); *Moyo v. Gomez*, 32 F.3d 1382, 1385 (9th

Cir. 1994) *amended*, 40 F.3d 982, 985 (9th Cir. 1994) (an assertion that the plaintiff refused to

carry out or otherwise protested the defendants' alleged policy of discriminating against a

protected class was sufficient to withstand summary judgment on a retaliation claim.).

70.     Regarding the second element, Mr. Oaks was fired – which is no doubt an adverse

employment action.  *See Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir.

2013) ("It is clear that an adverse employment action occurred here—Royal was fired.").

71.     Regarding the third element, the Fifth Circuit reviews three factors to determine if

a casual link exists: (1) the employee's disciplinary record prior to their protected activity; (2)

whether the employer followed its typical policy and procedures in terminating the employee; and

(3) the temporal proximity between the employee's protected activity and termination.  *See Nowlin*

*v. Resolution Trust Corp.*, 33 F.3d 498, 508 (5th Cir. 1994).  All three of these factors strongly

militate in Mr. Oaks' favor.   Specifically: (1) Mr. Oaks' disciplinary record was spotless before

he engaged in protected activity by opposing Mr. Hall's illegal discrimination under the ADEA,

Title VII, and the TCHRA; (2) Shell did not follow its typical policy and procedures in terminating

Mr. Oaks – indeed, as noted above (and in other ways), it deviated from them in significant and

telling ways; and (3) the temporal proximity between Mr. Oaks' protected activity beginning in

mid-September 2016, and his termination less than three months later, on December 6, 2016, is so

close as to suggest causation by itself.  *See Heggemeier v. Caldwell Cty.*, 826 F.3d 861, 870 (5th Cir. 2016) ("Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a *prima facie* case of retaliation.") (quoting *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997) (emphasis omitted)); *see also Cantu v. Vitol, Inc.*, Civil Action No. H-09-0576, 2011 WL 486289, at *10 (S.D. Tex. Feb. 7, 2011) (Rosenthal, J.) (noting that "the Fifth Circuit has found temporal proximity of up to four months sufficient to show a causal link."); *Richard v. Cingular Wireless LLC*, 233 Fed. Appx. 334, 338 (5th Cir. Apr. 13, 2007) (concluding that two-and-one-half months is short enough to support an inference of a causal link); *Evans v. City of Houston*, 246 F.3d 344, 355 (5th Cir. 2001) (observing that "a time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes") (internal citations omitted).

### 2.    Mr. Oaks Has Substantial Proof Of Pretext And "But For" Causation

72.    Where, as here, the plaintiff makes out a *prima facie* case of retaliation, the defendant must articulate a legitimate non-retaliatory reason for the adverse employment decision. *See Baker,* 430 F.3d at 754-55. After the employer does so, "any presumption of retaliation drops from the case" and the burden shifts back to the employee to establish that the employer's "stated reason is actually a pretext for retaliation."  *Baker*, 430 F.3d at 755 (quoting *Septimus*, 399 F.3d at 610-11).

73.    In this case, Shell claimed Mr. Oaks was terminated for violating its Conflicts of Interest policy through an actual conflict of interest involving the military relationship between himself and Mr. Oliveri, and failing to report it.  Mr. Oaks can demonstrate that this given reason for his termination is a pretext for retaliation.

### a)   Shell's Reason For Terminating Mr. Oaks Is False

74.    First, Mr. Hall's and Shell's given reason for termination is false.  It is simply not true that, as Mr. Hall claimed in firing Mr. Oaks, that Mr. Oaks committed an actual conflict of interest involving the military relationship between himself and Mr. Oliveri, and failed to report it.  To the contrary, there was no conflict as set forth in Shell's "Conflicts of Interest" policy (Ex. 1), and, even if one wrongly assumed there was, Mr. Oaks both informally and formally reported it in compliance with Shell policy (*see, e.g., supra* and Exs. 5, 6).  Nor, as noted above, is it true that, as Mr. Hall told Mr. Smidtman, he had no knowledge that both Mr. Oaks and Mr. Oliveri were in the same U.S. Army Reserve Unit – Mr. Oaks had informed Mr. Hall of that repeatedly before Mr. Hall purported to approve the decision to hire Mr. Oliveri (*see supra* and Ex. 6 at pp. 1, 5-6).  The substantial evidence of falsity in Mr. Hall's and Shell's given reason for firing Mr. Oaks amply proves pretext, and retaliation *vel non*.  *See, e.g., Haire v. Board of Sup'rs of La. State Univ. Agricultural & Mech. Coll*., 719 F.3d 356, 365 n. 10 (5th Cir. 2013) (reversing summary judgment for the employer in a discrimination case, and holding that, "[e]vidence demonstrating that the employer's explanation is false or unworthy of credence . . . is likely to support an inference of discrimination *even without further evidence of defendant's true motive*.") (italics in original).

75.    Along these lines, it is significant that Shell's "Conflict of Interest" policy does not address military relationships between its employees at all – in fact, no Shell policy does – and according to U.S. Army Policy AR 600-20, a working relationship at Shell between Mr. Oaks and Mr. Oliveri would not constitute a conflict for military purposes.  The absence of any such specific Shell policy even addressing – much less prohibiting – outside military relationships further demonstrates the falsity of Shell's given reason for termination, and retaliation *vel non. See, e.g., Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 314 (5th Cir. 2004) (fact question as to whether

there was even a company policy prohibiting the plaintiff's alleged misconduct consequently required the reversal of summary judgment for the employer in an age discrimination case); *see also Fisher v. Lufkin Industries*, 847 F.3d 752, 757 n.5 (5th Cir. 2017) (ruling in the plaintiff's favor in a retaliation case, and implicitly observing that the fact that the employer could not identify a company policy or rule that clearly prohibited the conduct for which the plaintiff was allegedly fired suggested that the employer's given reason for termination was a pretext for retaliation).

### b) Shell's "Investigation" Was A Pretextual Sham

76.     Second, the Fifth Circuit has observed that when an investigation is as deeply flawed and one-sided as this one was, a reasonable jury can infer that it was not truly a search for the truth, but instead a retaliatory witch hunt designed to reach a predetermined conclusion. *See, e.g.*, *Ion v. Chevron*, 731 F.3d 379, 395 (5th Cir. 2013) (reversing summary judgment for employer in a FMLA retaliation case where the employer's investigation was so one-sided that a reasonable jury could have concluded that it was not done in good faith, but rather was designed to conceal the employer's retaliation). This is the case here, as reflected by numerous pieces of evidence. *See supra*.

77.     Shell's policy provides that investigations "usually involve a suitability-trained investigator from the country to which the report refers, who has local expertise." Shell has a Business Integrity Department in the United States of America. But, instead of using one of those American investigators, or an external consultant who is familiar with the workings of the Uniformed Armed Service components operate, Shell assigned Mr. Smidtman to the investigation, a non-American, who was not "suitably trained," knew nothing of the American military, and worked in the same location as Mr. Hall. This is suspicious.

78.     During his interview of Mr. Oaks, Mr. Smidtman told Mr. Oaks, *inter alia,* that Mr. Hall had asserted that he had no knowledge that both Mr. Oaks and Mr. Oliveri were in the same

U.S. Army Reserve Unit or that they had known each other for several years (Ex. 6 at page 1). Mr. Oaks denied that and sent Mr. Smidtman e-mails demonstrating his innocence as well as Mr. Hall's longstanding knowledge of the military relationship between Mr. Oaks and Mr. Oliveri (Ex. 6), and yet they were blown off and never responded to, and Mr. Hall simply torpedoed forward with his planned termination of Mr. Oaks.

79.     In addition, it was documented that Mr. Oliveri had applied for jobs at Shell in 2013 and 2014 that he was not hired for and, as to the 2014 application, Mr. Oaks was the hiring decision manager, and he declined to hire Mr. Oliveri because he believed another applicant was better qualified. This and other evidence (*e.g.*, Mr. Oaks' invitation to Justin Lamb to apply for the job) along the same lines plainly refutes any notion of favoritism – but, yet again, Mr. Smidtman simply ignored this powerful evidence, and all other exculpatory evidence – and proceeded with the predetermined result designed to lead to Mr. Oaks' termination.

80.     Also, as noted, Mr. Oaks sent Mr. Smidtman an e-mail explaining that his predecessor in his job as Regional Security Manager – Americas, Rob Ream, was a U.S. Coast Guard Reservist who hired Bob Schoen who was a U.S. Coast Guard Reservist Commander while they served in the same reservist unit and Mr. Ream reported to Mr. Schoen and vice-versa (Ex. 6). Initially, Mr. Ream hired Mr. Schoen as a contract security consultant to Shell (and supervised him), and later he interviewed and particapted in hiring him as a direct Shell employee. This all occurred while Mr. Ream reported to Mr. Hall, yet Mr. Hall apparently made no issue of it and Mr. Ream was not disciplined or discharged because of the relationship (*Id.*). Mr. Oaks never received any response or rebuttal to this point either.

81.     Furthermore, as part of his supposed investigation, Mr. Smidtman would have reviewed Mr. Oaks' e-mails and seen the e-mails reflecting that Mr. Hall wanted Mr. Oaks to hire

based on age and gender, and that Mr. Oaks opposed his discriminatory desires, and refused to do so (Exs. 2-4). Mr. Oaks told Mr. Smidtman that he believed Mr. Hall was retaliating against him for this, and yet Mr. Smidtman did nothing to protect Mr. Oaks. Rather, Mr. Smidtman actually defended Mr. Hall's discriminatory desires and recited Mr. Hall's position to Mr. Oaks. Specifically, according to Mr. Smidtman, Mr. Hall did not want a younger person for the Security Advisor U.S. role, and could not possibly have sought such a person, because the experiential requirements of the position itself would have required someone who was in their forties. This retort – which Mr. Smidtman could only have gotten from Mr. Hall himself – is patently false, and Mr. Oaks told him so. Indeed, Mr. Hall's own e-mails plainly demonstrate that wanted a "younger" person for the role (Exs. 2-4). That Mr. Smidtman vigorously defended Mr. Hall, and parroted his false defense to Mr. Oaks, proves what is obvious anyway: that Mr. Hall tainted and controlled Mr. Smidtman's "investigation," and its outcome.

82.    As in *Ion*, all this proof demonstrates that the truth did not matter in the investigation. What mattered was simply creating a bogus cover for Mr. Hall and Shell to pretextually fire Mr. Oaks in retaliation for his protected activity – activity that Mr. Smidtman was well aware of because: (a) Mr. Oaks had told him about it, and about his fears of retaliation; and (b) Mr. Smidtman had reviewed Mr. Oaks' e-mails as part of his "investigation," and would have seen the very e-mails in which Mr. Hall expressed his desires for Mr. Oaks to hire based on age and gender, and Mr. Oaks opposed his discriminatory desires, and refused to do so (Exs. 2-4).

83.    In addition to *Ion*, another case along these lines is *Rachid*, 376 F.3d 305. In that case, a HR manager investigated the plaintiff for altering time-cards. She found that he had done so. Therefore, "without further investigation," the plaintiff was fired. *Id.* at 308. Rachid sued for age discrimination, claiming that his time card "alterations" were merely his good faith attempts

to correctly submit payroll by deleting incorrect and inflated time entries.  In reversing a summary judgment that had been entered for the employer, the Fifth Circuit seemed to find it suspicious that the employer "did not make any investigation to determine whether those deletions [by Rachid] were accurate."  *Id.* at 314 n. 13.  In other words, by failing to fully investigate, a jury could reasonably conclude that the company was just "looking for a reason" to fire Rachid, no matter how trivial it might have been.  *Id*. at 315-16.  This was especially the case because Rachid's manager had been calling him "too old" in the months before his termination.  Similarly, here, Mr. Smidtman's "rush to judgment" investigation, combined with Mr. Hall's close in time facially discriminatory e-mails and illegal instructions that Mr. Oaks refused to follow, is sufficient to permit a reasonable jury to conclude that the alleged investigation was a sham designed to lead to a predetermined decision, *i.e.*, the termination of Mr. Oaks for refusing to accede to Mr. Hall's illegal desires to hire a younger and/or female candidate, rather than an older male like Mr. Oliveri.

### c)    Mr. Oaks Has Compelling Proof of Disparate Treatment

84.    Third, significantly, there is proof that Mr. Hall and Shell knew of a prior situation that was the same as this one, but did not consider it a Conflict of Interest, and did not fire anyone over it (Ex. 6 at page 1).  This is sufficient to establish pretext, as demonstrated by the recent Fifth Circuit case of *Wheat v. Florida Parish Juvenile Justice Comm*., 811 F.3d 702 (5th Cir. 2016).  In *Wheat*, the plaintiff was a juvenile detention officer.  In 2005 she was disciplined for using excessive force on a juvenile.  In 2009 Wheat took FMLA leave and was terminated for failing to return to work after her leave expired.  Wheat sued and the case was settled.  As part of the settlement, Wheat was returned to work in March 2011.

85.    In November 2011, Wheat alleged that a twelve-year old female inmate made inappropriate sexual advances towards her.  In January 2012, Wheat used excessive force on another inmate and had to be physically restrained twice from attacking the inmate.  Wheat also

threatened to "whip that bitch's ass."  Wheat was fired after this incident.  Wheat sued, and alleged retaliation for her FMLA suit and for her complaint about the twelve-year old allegedly sexually harassing her.  The district court threw Wheat's case out on summary judgment, but the Fifth Circuit reversed because there was evidence that, while some other JDS officers were terminated for excessive force, others were not.  *Id.* at 711.   The Court held that, "the Commission's inconsistent treatment of Wheat raises disputed issues of material fact as to whether:  but for exercising her rights she would have been discharged." *Id.*

86.    *Wheat* is directly on point here. Mr. Oaks' predecessor in his job as Regional Security Manager – Americas, Rob Ream, was a U.S. Coast Guard Reservist who hired Bob Schoen who was a U.S. Coast Guard Reservist Commander while they served in the same reservist unit and Mr. Ream reported to Mr. Schoen and vice-versa (Ex. 6).  Initially, Mr. Ream hired Mr. Schoen as a contract security consultant to Shell (and supervised him), and later he interviewed and participated in hiring him as a direct Shell employee.  This all occurred while Mr. Ream reported to Mr. Hall, yet Mr. Hall apparently made no issue of it and Mr. Ream was not disciplined or discharged because of the relationship (*Id.*).  As in *Wheat*, this evidence of disparate treatment demonstrates pretext and "but for" causation sufficient to find for Mr. Oaks on his retaliation claims.

87.    In addition, as set forth in Section G of the "Factual Background" section of this Complaint, there are numerous other persons who, unlike Mr. Oaks, have committed actual Conflicts of Interest, or other substantially similar offenses, that they were not terminated for, thus providing further evidence of disparate treatment.  *See, e.g.*, *Ramirez v. Landry's Seafood Inn & Oyster Bar*, 280 F.3d 576, 578 (5th Cir. 2002) (reversing a summary judgment in a Title VII

discrimination case where employee in non-protected class allegedly committed an offense of same policy that was just as bad, if not worse, than plaintiff did, and was not fired).

88.     Similarly, there is overwhelming proof – from his own e-mails – that Mr. Hall violated Section 3.4 of Shell's Code of Conduct, which states, in relevant part, that "[w]hen making employment decisions, including hiring, evaluation, promotion, training, development, discipline, compensation and termination, you must base them solely on objective factors, including merit, qualifications, performance and business considerations. . . . [Y]ou should understand the value of diversity and must not discriminate in any way based on race, colour, religion, age, gender, sexual orientation, gender identity, marital status, disability, ethnic origin or nationality." (Ex. 1 at page 14). Yet, Mr. Hall was not terminated, while Mr. Oaks, an innocent man who violated no policy, was fired. This disparate treatment further supports a finding in Mr. Oaks' favor under *Wheat* and cases like it. *See also Ramirez*, 280 F.3d at 578 (reversing summary judgment because the evidence of disparate treatment was sufficient to establish a discrimination case).

### d)     Shell's Severance Offer And Mr. Hall's Efforts To Get Mr. Oaks to Sign It Also Point To Pretext

89.     Fourth, if, as Mr. Hall claimed, Mr. Oaks committed such an egregious and obvious violation of Company policy, then why did Shell offer Mr. Oaks severance, and why did Mr. Hall call Mr. Oaks repeatedly for the obvious purpose of pushing him into signing the agreement and also offer to review Mr. Oaks' resume for potential employment assistance? A reasonable jury could conclude that the answer is because Mr. Hall knew he was acting illegally and hoped to obtain a cheap and quick release of claims, thus immunizing him, and Shell, from any liability for their illegal retaliation. *See Lloyd v. Georgia Gulf Corp.*, 961 F.2d 1190, 1195 (5th Cir. 1992) (affirming a jury verdict against the employer in an age discrimination case, and stating "[f]inally, Georgia Gulf's demand that, as part of the retirement package, Lloyd sign a waiver promising not

to sue Georgia Gulf could also have raised some doubt in the minds of the jury about the proffered reasons for Lloyd's termination.").

**e)**        **Shell's Basis For Termination Is Not Just Factually False, But Also Entirely Illogical**

90.      Fifth, it is not believable that Mr. Oaks would ever do anything improper to jeopardize his $325,000+ a year job with Shell in order to further his military career. Mr. Oaks earns approximately $23,000.00 a year as a U.S. Army Reserve Officer. Since 2015, Mr. Oaks has been retirement eligible, meaning that he could retire at any time and receive his full military pension starting at the age of sixty. If Mr. Oaks was promoted to full Colonel – something Mr. Oliveri had no control over as of 2016 because by then the two men had no reporting relationship in the military – he would earn approximately $3,000.00 more per year, and his monthly pension would likely increase by approximately $400.00 a month. None of this would justify putting his $325,000+ a year Shell job at risk by engaging in a Conflict of Interest – which is why he would not, and did not, do such a thing. Shell knows this. Shell also knows that, contrary to a true conflict of interest situation, in this case: (a) Mr. Hall neither received nor was explicity or implicity promised anything from Mr. Oliveri; and (b) Mr. Oliveri neither received nor was explicity or implicity promised anything from Mr. Oaks. Shell's supposed "conflict of interest" amounts to two honorable military men serving their country and doing their jobs. That is not a conflict. It is something to be commended.

**f)**        **Shell's Position Smacks of *Post-Hoc* Hyprocrisy**

91.      Sixth, Mr. Hall's and Shell's position here is hypocrisy that smacks of retaliation. Mr. Hall, and Shell, benefited from Mr. Oaks' military connectivity because, among other reasons, Mr. Oaks had a Top Secret Government Security Clearance through the military that afforded him the opportunity to attend classified U.S. federal governmental security briefings, for the private

-36-

sector, that he otherwise would not have been able to attend. Mr. Hall knew this, as Mr. Oaks provided him with insights he obtained from these briefings and told him where the perspectives came from. Mr. Hall never claimed any conflict then. Rather, he gladly benefited from the access Mr. Oaks had because of his military related security clearance. That Mr. Hall raised a supposed conflict claim only on the heels of Mr. Oaks' refusal to submit to his illegal desire to hire based on age and/or gender smacks of retaliation. *See Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 43 (5th Cir. 1992) (stating, in affirming a jury verdict for the plaintiff in a retaliation case, "[w]e find it surprising that suddenly, after Shirley filed her EEOC complaint, problems with her work surfaced.").

g) **Mr. Hall Purported To Approve The Hiring of Mr. Oliveri After Being Unequivocally Informed That Mr. Oaks and Mr. Oliveri Were In The Same Army Reserve Unit, Which Provides Further Evidence of Pretext**

92.     Seventh, it is important to remember that on September 27, 2016, Mr. Oaks expressly reminded Mr. Hall that both he and Mr. Oliveri were in the same U.S. Army Reserve Unit, and he used this as a basis to bolster his conclusion that Mr. Oliveri had the best qualifications, *i.e.* the right behaviors, work ethic, competence etc. In response, Mr. Hall publicly purported to relent from his previously announced illegal position, and sent an e-mail stating, "[A]ll, Crockett and I have discussed. Support for the decision to proceed." As such, Mr. Hall approved of Mr. Oaks' decision with full knowledge of his military relationship with Mr. Oliveri (query why then was Mr. Hall not also fired?). This demonstrates that, contrary to the Company's claim, Mr. Hall knew about the material aspects of Mr. Oaks' military relationship with Mr. Oliveri – and had the opportunity to ask any further questions about that had he wanted to – and he nevertheless gave Mr. Oaks express permission to proceed with the very course of action for which he was later fired. This too supports a finding of pretext and retaliation *vel non*. *See, e.g., Heinsohn*

*v. Carabin & Shaw, P.C.*, 832 F.3d 224, 239 n. 60) (5th Cir. 2016) (citing *Haire*, 719 F.3d at 365) (noting that when an employee has "complied with her superior's directives" a genuine issue of material fact exists as to whether the employee has "committed any official wrongdoing")); *Hospital Cristo Redentor, Inc. v. N.L.R.B.*, 488 F.3d 513, 522-23 (1st Cir. 2007) (finding evidence of pretext based on the fact that the employer alleged that the employee was terminated for leaving work without permission, but the employee's superior had actually spoken to the employee and had permitted the employee to leave work in order to attend to a family emergency).

### h) Shell's Decision To Go Directly To Termination Is Further Proof of Pretext

93.    Eighth, Shell's decision to terminate Mr. Oaks in these circumstances is not consistent with its typical practices.  Mr. Oaks was a long-term employee with a spotless employment record.  He was considered to be someone of high potential.  He did not violate any Company policy, and he did not improperly influence the decision to recommend Mr. Oliveri for hiring.  For Shell to go directly to immediate termination in these circumstances is not consistent with its typical process, and further proves pretext.  *See EEOC v. Chevron Phillips Chemical Co.*, LP, 570 F.3d 606, 623-24 (5th Cir. 2009) (reversing summary judgment for employer in part because the fact that the employer went to immediate termination, rather than adhering to its normal progressive disciplinary policy, suggested pretext); *see also Fisher*, 847 F.3d at 756 n.4 (ruling in the plaintiff's favor in a retaliation case and noting that the company's deviation from its normal progressive disciplinary policy suggested pretext).

### i) Shell's Conflicting Explanations For Mr. Oaks' Departure From The Company Also Suggest Pretext

94.    Mr. Hall told several of Mr. Oaks' direct reports that Mr. Oaks "had not been terminated" during one-on-one calls that Mr. Hall organized in an effort to put a false spin on the illegal decision to fire Mr. Oaks from Shell.  This too suggests that Shell knew that Mr. Oaks had

committed no wrong to justify his termination.  If he had, Shell would not have told his direct reports that Mr. Oaks "had not been terminated," but instead would have explained to them what he had done so horribly wrong so as to deserve to be terminated after approximately thirteen years of outstanding performance at Shell.   Furthermore, the fact that Shell told Mr. Oaks one thing (he was terminated), but told others another (he was not terminated) further suggests pretext.  *See, e.g.*, *Nasti v. CIBA Specialty Chem. Corp.*, 492 F.3d 589, 594 (5th Cir. 2007) ("A court may infer pretext where a defendant has provided inconsistent or conflicting explanations for its conduct."); *Burrell v. Dr. Pepper/Seven Up Bottling Grp, Inc.*, 482 F.3d 408 (5th Cir. 2007) (shifting explanations can be evidence of pretext); *Gee v. Principi*, 289 F.3d 342 (5th Cir. 2002) (same).

### j)  The Big Picture Proves Pretext

95.     The Fifth Circuit has stated: "[j]ust as "'[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, . . . similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Donaldson v. CDB Inc.*, 335 Fed. Appx. 494, 503 (5th Cir. 2009).  *See also Starnes v. Wallace*, 849 F.3d 627, 635 (5th Cir. 2017) (reversing summary judgment for the employer in a retaliation case and emphasizing the importance of looking at the "big picture" in analyzing whether there is sufficient evidence of pretext to find for the plaintiff).

96.     The big picture context and scenario here speaks volumes: a long-term Plaintiff with a spotless A+ employment record who opposed his supervisor's illegal discriminatory desires in September 2016, then was suddenly fired on the flimsiest and most illogical of grounds less than three months later, in December 2016 – in contrast to numerous employees who have committed actual wrongoing (including Mr. Hall himself) and were not terminated.  *See supra*.

C.      **Damages**

97.     The damages under the ADEA consist of back-pay, front-pay (or reinstatement), liquidated damages, attorneys' fees, and costs. Each component is explained below.

98.     Back-pay. Prevailing claimants under the ADEA may recover lost back-pay and benefits. *See Miller*, 716 F.3d at 146. The purpose of back pay is to "make whole the injured party by placing that individual in the position he or she would have been in but for the discrimination." *Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1136 (5th Cir. 1988). Mr. Oaks' total annualized cash compensation at Shell was approximately $325,000.00.

99.     Mr. Oaks received annual Shell shares pursuant to a Performance Share Plan. The shares vested over a three-year schedule. The annual loss to Mr. Oaks is approximately as follows: (a) 2014 shares that would have vested in 2017 = $57,640.00; (b) 2015 shares that would have vested in 2018 = $40,655.00; and (c) 2016 shares that would have vested in 2019 = $74,197.00. This totals another $172,493.00 in monetary damages that are recoverable in this case (plus similar damages for future years). *Cf. Greene v. Safeway Stores, Inc.*, 210 F.3d 1237, 1243-44 (10th Cir. 2000) (wrongfully discharged executive entitled to damages for unrealized stock option appreciation); *Harding v. Cianbro Corp.*, 498 F. Supp. 2d 344, 360 (D. Me. 2007) (awarding plaintiff who was illegally fired based on his disability the value of unvested stock that would have vested but for his wrongful termination); *Knox v. Microsoft Corp.*, 92 Wash.App. 204, 962 P.2d 839, 841-43 (1998) (employee wrongly terminated in breach of employment contract entitled to damages for cancellation of unvested stock option), *review denied*, 137 Wash.2d 1022, 980 P.2d 1280 (1999).

100.    Front-pay. "Front pay refers to future lost earnings." *Wal-Mart Stores v. Davis*, 979 S.W.2d 30, 45 (Tex. App.–Austin 1998, pet. denied). The law allows a plaintiff to recover front pay when a plaintiff shows that reinstatement is not feasible. TEX. PATTERN JURY

INSTRUCTIONS § 110.30, Comment, Front Pay (2003 ed.) (citing federal law); *cf. Brunnemann v. Terra Int'l Inc.*, 975 F.2d 175, 180 (5th Cir. 1992) (ADEA case).  Generally, reinstatement is the preferred equitable remedy for a discriminatory discharge.  *Julian v. City of Houston, Tex.*, 314 F.3d 721, 729 (5th Cir. 2002).  However, if reinstatement is not feasible, front-pay will be awarded if it is consistent with the remedial purposes of the law.  *Brunnemann*, 975 F.2d at 180. "[R]einstatement is not preferred over front pay when there is no vacancy in the desired position." *Mitchell v. Sisters of Charity of Incarnate Word*, 924 F. Supp. 793 (S.D. Tex. 1996) (quoting *Shore v. Federal Express Corp.*, 777 F.2d 1155 (6th Cir. 1985)).  In other words, if reinstatement would require displacing or bumping an innocent employee from their job, then it is considered to be infeasible, and front-pay may be awarded instead of reinstatement.  *See Ray v. Iuka Special Mun. Separate Sch. Dist.*, 51 F.3d 1246, 1254 (5th Cir. 1995).

101.     In this case, front-pay, rather than reinstatement, would presumably be awarded, because Mr. Oaks' job has already been filled.  Regarding the calculation of front-pay, the Fifth Circuit has stated that "[f]ront pay is usually invoked when reinstatement is impracticable and is calculated from the date of judgment to age 70, or the normal retirement age, and should reflect earnings in mitigation of damages."  *Patterson*, 90 F.3d at 936 n. 8 (citing J. Hardin Marion, Legal and Equitable Remedies Under the Age Discrimination in Employment Act, 45 MD.L.REV. 298, 330–334 (1986)). *See also Blum v. Witco Chem. Corp.*, 829 F.2d 367, 374 (3d Cir. 1987) ("In calculating a front pay award, the jury must consider the expected future damages caused by defendant's wrongful conduct from the date of judgment to retirement.").

102.     Mr. Oaks was 46-years old when Shell terminated him.  He had planned to work until he was 60-years old, at which time he would fully vest in Shell's lucrative pension plan – thus justifying a significant seven-figure front-pay award.  *See, e.g.*, *Jackson*, 2011 WL 2119644,

at *8-9 (Fifth Circuit decision affirming five-year front-pay award in an age discrimination case);
*Mota v. University of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 527 (5th Cir. 2001) (affirming
front-pay award of approximately ten years); *Donlin v. Philips Lighting North Am. Corp.*, 581 F.3d
73, 88 (3rd Cir. 2009) (holding that district court did not abuse its discretion in awarding plaintiff
front-pay for ten years); *Meacham v. Knolls Atomic Power Lab.*, 381 F.3d 56, 79 (2d Cir. 2004)
(affirming front-pay awards of nine to twelve and one-half years), *vacated on other grounds sub
nom KAPL, Inc. v. Meacham*, 544 U.S. 957 (2005); *Gotthardt v. National R.R. Passenger Corp.*,
191 F.3d 1148 (9th Cir. 1999) (affirming an eleven-year front pay award); *Pierce v. Atchison,
Topeka & Santa Fe Ry. Co.*, 65 F.3d 562, 574 (7th Cir. 1995) (holding that ten-year front-pay
award did not constitute an abuse of discretion); *Hukkanen v. International Union of Operating
Eng'rs, Hoisting & Portable Local No. 101*, 3 F.3d 281, 286 (8th Cir. 1993) (holding that a ten
year front-pay award did not constitute an abuse of discretion).

103.   Along those same lines, the termination of Mr. Oaks at age 46 also prevented his
pension from being as large as it would have been had he worked to age 60.  Separate damages for
the loss of additional pension accrual are also recoverable under the ADEA.  *See Miller*, 716 F.3d
at 146 (ADEA case where a jury properly awarded the plaintiff $227,000 for an enhancement to
his ultimate pension benefits that would have vested between the time of his termination in March
2008 and when his pension would have otherwise vested in 2010).

104.   Similarly, along those lines, any front-pay award should take into the account the
high likelihood that Mr. Oaks would have been promoted and thus received a substantial increase
in his compensation.  Recall that in early 2016, Shell gave Mr. Oaks a "Current Estimated
Potential" rating of an "A" or "B," which essentially meant that Shell and Mr. Hall believed at that
time that Mr. Oaks had the potential to take Mr. Hall's job position (a grade "B" position) one day.

105.    <u>Liquidated Damages</u>.    Claimants under the ADEA are also entitled to liquidated damages – a doubling of the back-pay award – where a violation is determined to be willful.  *See Miller*, 716 F.3d at 145.  "A violation of the ADEA is willful if the employer knew or showed reckless disregard for whether its conduct was prohibited by the ADEA." *Smith v. Berry Co.*, 165 F.3d 390, 395 (5th Cir. 1999) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128 (1985).  Shell's violation in this case was willful.  *See Miller*, 716 F.3d at 145 (evidence supported jury's finding of a willful violation of the ADEA by Raytheon even though it was "undisputed that Raytheon had to undertake a reduction in force and that it instituted facially age-neutral policies and processes according to which a nondiscriminatory basis for Miller's termination could be justified."); *Palasota*, 499 F.3d at 481-82 (evidence supported finding of a willful violation of the ADEA, thus justifying award of liquidated damages); *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 391-92 (5th Cir. 2003) (same); *Tyler v. Union Oil Co.*, 304 F.3d 379, 398-99, 401 (5th Cir. 2002) (same, and stating that "[w]e hold that the plain language of the statutes requires the interpretation that liquidated damages in an amount equal to the back pay award are mandatory upon a finding of willfulness."); *Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 256-57 (5th Cir. 1996) (same).

106.    <u>Attorneys' fees</u>.    Attorneys' fees are recoverable to a prevailing plaintiff under the ADEA.  *See Miller*, 716 F.3d at 149 (affirming an award of attorneys' fees of $488,437.08 to the plaintiff in a single-plaintiff ADEA/TCHRA discrimination case that arose in Dallas); *Lewallen v. City of Beaumont,* 394 Fed. Appx. 38, 46 (5th Cir. 2010) (affirming an award of attorneys' fees of $428,421.75 to the plaintiff in a single-plaintiff discrimination failure to promote case); *Watkins v. Input/Output, Inc.*, 531 F. Supp. 2d 777, 789 (S.D. Tex. 2007) (awarding prevailing plaintiff in a single-plaintiff ADEA case tried in Houston $336,010.50 in attorneys' fees).

### D. Exhaustion of Mr. Oaks' ADEA Retaliation Claim

107. On January 27, 2017, Mr. Oaks timely filed a Charge of Discrimination alleging

age discrimination with the EEOC and the Texas Workforce Commission – Civil Rights Division

("TWC-CRD"). As of the filing of this lawsuit, sixty days have passed since Mr. Oaks filed that

Charge of Discrimination. Accordingly, Mr. Oaks has exhausted his administrative remedies

under the ADEA. This is so because, in order to comply with the exhaustion requirement under

the ADEA, "[f]or cases arising in Texas, a complainant [simply] must file [an EEOC charge]

within 300 days of the last act of discrimination" and "then wait sixty days before filing a civil

action." *See Julian v. City of Houston*, 314 F.3d 721, 726 (5th Cir. 2002). Under 29 U.S.C. §

626(d), "the claimant's independent right to sue arises automatically upon the expiration of sixty

days after filing of the charge with the EEOC." *Id.* (footnote omitted). As the Fifth Circuit

explained in *Julian*:

> But there are preconditions to bringing suit under the ADEA. Title 29 U.S.C. §
> 626(d) provides: "No civil action may be commenced by an individual under this
> section until 60 days after a charge alleging unlawful discrimination has been filed
> with the Equal Employment Opportunity Commission." Thus, a person seeking
> relief under the ADEA must first file an administrative charge with the EEOC. And
> § 626(d) establishes time limits for filing the EEOC charge. For cases arising in
> Texas, a complainant must file within 300 days of the last act of discrimination.
> After timely filing the EEOC charge, the complainant must then wait sixty days
> before filing a civil action. Under the plain language of § 626(d), "the claimant's
> independent right to sue arises automatically upon the expiration of sixty days after
> filing of the charge with the EEOC." Accordingly, a complainant who timely files
> the EEOC charge and then observes the sixty-day waiting period has satisfied the
> statutory preconditions to filing suit.

*Id.* at 725-26 (footnotes omitted).

### JURY DEMAND

108. Mr. Oaks demands a jury trial.

# **PRAYER**

Mr. Oaks asks that the court issue summons for Shell to appear and answer, and that he be awarded a judgment against Shell for the following:

a.   Actual damages including but not limited to pecuniary losses, non-pecuniary losses, back-pay, and front-pay (or reinstatement);

b.   Liquidated damages;

c.   Prejudgment and post-judgment interest;

d.   Attorneys' fees and court costs; and

e.   All other relief to which Plaintiff is entitled.

Respectfully submitted,

OBERTI SULLIVAN LLP

By:   s/ Mark J. Oberti_____
Mark J. Oberti
State Bar No. 00789951
S.D. Texas No. 17918
712 Main Street, Suite 900
Houston, TX 77002
(713) 401-3555 – Telephone
(713) 401-3547 – Facsimile
mark@osattorneys.com – Email

ATTORNEY-IN-CHARGE FOR PLAINTIFF

OF COUNSEL:

Edwin Sullivan
State Bar No. 24003024
S.D. Texas No. 24524
OBERTI SULLIVAN LLP
712 Main Street, Suite 900
Houston, TX 77002
(713) 401-3555 – Telephone
(713) 401-3547 – Facsimile
ed@osattorneys.com – Email

ATTORNEYS FOR PLAINTIFF

| DESCRIPTION OF EXHIBITS TO ORIGINAL COMPLAINT | EXHIBIT |
|---|---|
| Shell Code of Conduct Excerpts | 1 |
| E-mails between Crockett Oaks III and James Hall of 07/06/16 and 07/07/16 | 2 |
| E-mail chain between Crockett Oaks III, James Hall, and Dana Croft of 09/09/16 and 09/14/16 | 3 |
| E-mail chain between Crockett Oaks III and Dana Croft of 09/14/16, and other e-mails | 4 |
| Conflict of Interest URID-000142369 submitted by Crockett Oaks | 5 |
| E-mails from Crockett Oaks to Jasper Smidtman of November 4, 7, 8, 10, 2016 | 6 |

## AFFIDAVIT OF CROCKETT OAKS

STATE OF T E X A S     §
                          §
COUNTY OF HARRIS     §

On this day, Crockett Oaks appeared before me, the undersigned authority, who upon his

oath, deposes and states:

1.     I am over the age of 21, competent to make this affidavit, and have personal knowledge that everything stated herein is true and correct. I have read Plaintiff's Sworn Original Complaint in this case. Unless otherwise indicated as being on "information and belief," the statements under the heading "Factual Background" in Plaintiff's Sworn Original Complaint in Sections A through F in this case are all true and correct on my personal knowledge. I also have personal knowledge of much, but not all, of the information set forth in Section G of Plaintiff's Sworn Original Complaint.

2.     The exhibits attached to Plaintiff's Sworn Original Complaint are true and correct copies of the originals. Further, Affiant sayeth naught.

CROCKETT OAKS

SUBSCRIBED AND SWORN TO before me on this the 27th day of March 2017, certify which witness my hand and seal of office.

ANGELA S. CLARK
NOTARY PUBLIC-STATE OF TEXAS
COMM. EXP. 05-20-2019
NOTARY ID 1007604-4

Notary Public in and for
The State of TEXAS
Printed name: Angela S. Clark

-47-

Case 4:17-cv-00979 Document 1-1 Filed in TXSD on 03/30/17 Page 1 of 81

# EXHIBIT 1

# OUR CODE
# OF CONDUCT

MAKING THE RIGHT DECISIONS





EXHIBIT

1

Case 4:20-cv-00665 Document 191 Filed on 03/30/27 Page 51 of 81

**3.0 OUR BEHAVIOURS, PEOPLE AND CULTURE**

## 3.4 EQUAL OPPORTUNITY

At Shell, we offer equal opportunities to everyone. This helps us ensure we always draw on the widest possible talent pool and attract the very best people. We rely on everyone at Shell to continue our record on equal opportunity.

Sometimes people can breach equal opportunity policies without even realising it – for example, if they are unconsciously biased towards recruiting people like themselves. Therefore you should always strive to be objective and ensure your personal feelings, prejudices and preferences are not influencing your employment-related decisions. You also need to be aware of local legislation that may impact employment decisions.

**YOUR RESPONSIBILITIES**

- When making employment decisions, including hiring, evaluation, promotion, training, development, discipline, compensation and termination, you must base them solely on objective factors, including merit, qualifications, performance and business considerations.

- You should understand the value of diversity and must not discriminate in any way based on race, colour, religion, age, gender, sexual orientation, gender identity, marital status, disability, ethnic origin or nationality.

---

**INFORMATION POINT** 

You can find more information on unconscious bias at http://swww.shell.com/ ethicsandcompliance/eo

---

Report a concern – Global Helpline (https://shell.alertline.eu/)

14

## 5.3 CONFLICTS OF INTEREST



**Q**

My uncle is the Deputy Minister of Energy in my country. Do I need to declare this in the Code of Conduct Register?

**A**

This could be a potential, actual or perceived conflict of interest, depending on your role, Shell's business in that country and other conditions. In all cases, you should declare it in the Code of Conduct Register. Your line manager can then discuss with you whether or not any mitigation steps are required in order to protect you, Shell and your uncle.





**Conflicts of Interest (COIs) may arise when your personal relationships, participation in external activities or an interest in another venture, could influence or be perceived by others to influence your business decisions for Shell. An actual, potential or perceived COI may jeopardise your reputation as well as Shell's. You must avoid actual, potential or perceived COIs if possible.**

If you have an actual, potential or perceived COI, you must protect yourself from any suspicion of misconduct by being transparent and entering the details in Shell's Code of Conduct Register. This only takes a few minutes, and could save you from a time-consuming investigation.

Provided that no actual, potential or perceived COI would result, you may acquire interests in other businesses and perform external professional activities in your own time. You are also entitled to be active in your own time in community, government, educational and

other non-profit organisations. However, in any such case, you must comply with all relevant laws, regulations and Shell policies. If there is any doubt, you must raise your concern with your line manager or the Shell Ethics & Compliance Office before you start a new activity.

**YOUR RESPONSIBILITIES**

- You must not let any decisions you make at Shell be influenced by personal considerations such as relationships or outside interests of yourself, family or friends.

- You must register all actual, potential or perceived COIs in the Code of Conduct Register, whether or not you think it will actually influence your decision.

- If you are not sure whether such a conflict exists, you must consult your line manager, the Shell Ethics & Compliance Office or Shell Legal.

- Withdraw from decision-making that creates an actual, potential or perceived COI, or could be perceived as creating one.

---

**INFORMATION POINT** 

You can find COI examples, ABC and AML Manual, Code of Conduct Register, ABC Contacts and more details about the ABC Programme at
http://sww.shell.com/
ethicsandcompliance/coi

---

Report a concern – Global Helpline
(https://shell.alertline.eu/)

---

31

# EXHIBIT 2

Oaks, Crockett W SHLOIL-CSA

From:           Hall, James WD RDS-CS
Sent:           Thursday, July 07, 2016 1:39 AM
To:             Oaks, Crockett W SHLOIL-CSA
Cc:             Croft, Dana B SOPUS-HRN/AG
Subject:        RE: CSM - US Selection

Thanks Crockett. Let's indeed look to backfill Bob's role with some younger external talent.

James WD Hall
VP Corporate Security

Shell International B.V.
PO Box 162, 2501 AN The Hague, The Netherlands
Tel: +3170377 1431
Mob: +316 296 24 326
Email: James.WD.Hall@shell.com
Internet: http://www.shell.com

---

From: Oaks, Crockett W SHLOIL-CSA
Sent: woensdag 6 juli 2016 23:11
To: Hall, James WD RDS-CS
Cc: Croft, Dana B SOPUS-HRN/AG
Subject: CSM - US Selection

Confidential

Hello James,

As agreed, I wanted to follow up with you to confirm that Dana and I had the opportunity this afternoon to discuss the captioned subject. I did share with Dana our thoughts based on the discussion this morning. This note just serves to confirm our intent to offer Bob Schoen the CSM – US role, with Dana's concurrence as well. Dana advised that there is not a specific requirement that would compel us to interview the other candidates, unless we are suggesting that there is a "close candidate" both from a technical and behavioral perspective. Based on this point, I agree that we would be best served not to conduct interviews in an effort to 1) manage time more appropriately; and 2) not create 'false hope' for any candidate. I would like to break the news to Bob tomorrow, as well to send a note of regret to the other candidates.

As it relates to a backfill for Bob's role, I will be crafting a job description which will seek to combine elements of the Regulatory Assurance Manager and Security Advisor role at a JG-4. I anticipate getting this accomplished within the next couple of days in the hopes of posting this position externally within the next week. Many thanks for the support in this effort!

Kind regards,

*Crockett Oaks III*
Regional Security Manager - Americas
Shell Oil Company
910 Louisiana

1



Houston, Texas 77002

Tel: +1713-241-1629
Mobile: +1281-610-3521
Fax: +1 713-241-0078
Email: crockett.oaks@shell.com
Internet: www.shell.com

2

# EXHIBIT 3

Oaks, Crockett W SHLOIL-CSA

| | |
|---|---|
| From: | Hall, James WD RDS-CS |
| Sent: | Wednesday, September 14, 2016 12:02 PM |
| To: | Oaks, Crockett W SHLOIL-CSA |
| Subject: | Re: U.S. Security Advisor - Update |

Crockett, thanks. Just two points in response:

I absolutely want you to be part of the discussion with Dana and Klara. You remain in the lead on this decision. The issue has nothing to do with my view of your judgement or integrity. It is about different (regional and global) perspectives on skillpool management and a potential compromise between immediate and long term business requirements.

Mike may enable us to close today's gap. But we also need to consider whether we can use opportunities like this one to hire and develop our future security leadership. On diversity, for different reasons we have lost several women from our ranks over the last year or so and when we have an opportunity like this I would like to see what options we have to replace them.

Suggest we hold the debate here and discuss further on Friday. But do call if the above is not clear.

Thanks and Regards.

James

Sent from my iPhone

On 14 Sep 2016, at 18:01, Oaks, Crockett W SHLOIL-CSA <Crockett.Oaks@shell.com> wrote:

Hello James,

I will be glad to set something up with Dana and Klara. Please confirm if you would like for me to be a part of the discussion or not.

I do appreciate you sharing your concerns with me, in fact based on your prolonged silence, I did sense that something was amiss. Based on your shared concerns, I do feel like a bit awkward in that I am now left feeling like I need to defend my principles; primarily my sense of judgment and to a lesser extent integrity. You entrusted me to facilitate a process to select a US Security advisor, I then empowered Bob to proceed with the selection process, noting the core points highlighted below, i.e. diversity and experience. James, based on various discussions throughout the screening process with Bob and HR, I am sure that we were inclusive in both diversity and requisite experience of applicants. James I know that you are well-verse in your understanding of the laws governing employment rights in the U.S. The relevant law that suggest essentially, "individuals can choose to work for as long as they are able (physically, mentally and willing) to" is the one at play here when considering whether a candidate is "still early in career". The candidate that we have selected fits all of criteria that was previous agreed and is in keeping with the perimeters set forth by matters of employment law. Mike Oliveri brings a diverse background to our CS-USA organization. We have never hired a security professional from the U.S. Courts (Federal), nor have we viewed a decorated U.S. Army Veteran - Colonel (2 tours in Afghanistan – Bronze Star Recipient) serving in the reserves, as qualifying experience for such a role - US

1


EXHIBIT
3

Security Advisor. I do feel strongly that this candidate has the pedigree to move throughout this Global organization, caveated that he is left to be measured by his sole abilities and behaviors.

Additionally, I believe that the way in which we viewed Mike's yearlong contract assignment with the Team, was nothing short of innovative. This allowed the Team to have the first hand opportunity to vet something that we rarely have the ability to scrutinize, prior to hiring a candidate externally, their behaviors. The thing that I appreciated the most about this process is that for the first time, key players on this Team felt empowered to comment on Mike's witnessed behaviors over the last year. Moreover that, I take·personal pride in the fact that I have led this Team to a point of realizing (and appreciating) that personal behaviors and conduct do matter, irrespective of how 'good' an individual may be perceived...

James I really do not want to make this issue about me per se, it is really about the Team and its dynamics. Bob was selected as the US – CSM because he was the right person for the job at the right time in this department's history. He was already doing 50% of the role, etc. There are several things that you are not aware of when it comes to the various "value drivers" that informed my decision to support Bob in this CSM endeavor; your trust in me is best illustrated when you are empowering for these types of issues.

James it does feel a bit like my judgment and to a lesser extent, my integrity, is under seize with this decision. I support and agree with the selection, but if you cannot offer your support at this time, I will need to work to rectify the situation... Ironically, a variety of things have dramatically improved in the Americas Region. One of the most notable improvements have been the quality and caliber of staff and their trust in Leadership (PULSE 83%). I will stop here, but I do welcome your follow up discussion.

Kind regards,

*Crockett Oaks III*
Regional Security Manager · Americas
Shell Oil Company
910 Louisiana
Houston, Texas 77002

Tel: +1713-241-1629
Mobile: +1281-610-3521
Fax: +1 713-241-0078
Email: crockett.oaks@shell.com
Internet: www.shell.com

---

**From:** Hall, James WD RDS-CS
**Sent:** Wednesday, September 14, 2016 9:29 AM
**To:** Oaks, Crockett W SHLOIL-CSA
**Subject:** RE: U.S. Security Advisor - Update

Crockett,

I must be honest, I still don't feel comfortable about this decision. The principle I apply is that my direct reports should be free to choose their own staff, provided they take account of steer I have provided in discussion about broader issues like diversity, talent development, career progression and succession planning.

2

In this case you consulted me about the CSM role. I agreed to support Bob's appointment so long as we took the opportunity to backfill for Bob by going to the market and hiring someone with the potential for a longer career in Shell who could potentially move through a series of appointments and be future RSM material. We have also discussed (in the context of other appointments) prioritizing the hiring of female staff. The profile we discussed was ex-government agency, still early career and (based on previous conversations) you knew I would want you to look particularly at female candidates.

I have only seen the shortlist and your final recommendation. I have nothing against the individual, but I struggle to see how your proposed candidate brings fresh perspectives or diversity to your team. In short, I am concerned that we are guilty of a lack of imagination in looking for candidates and have opted for a safe option, at risk of failure to bring some fresh and different talent into Shell.

So before we go ahead, I would like to discuss our options with Dana and Klara. Can you set something up for us please? Friday is a good day for me if that works for others.

Thanks and Regards

James

James WD Hall
VP Corporate Security

Shell International B.V.
PO Box 162, 2501 AN The Hague, The Netherlands
Tel: +3170377 1431
Mob: +316 296 24 326
Email: James.WD.Hall@shell.com
Internet: http://www.shell.com

---

**From:** Oaks, Crockett W SHLOIL-CSA
**Sent:** woensdag 14 september 2016 12:29
**To:** Hall, James WD RDS-CS
**Subject:** FW: U.S. Security Advisor - Update

Hello James,

I am encouraged to proceed on the below, but given that I did not hear directly from you, I would like to have your concurrence/support. Please note that the lead times for these things can be up to 4 weeks before HR clears their screenings etc. we are trying to commence with this role on Oct. 1... Please let me know if you have any more questions.

Kind regards,
CO

---

**From:** Oaks, Crockett W SHLOIL-CSA
**Sent:** Tuesday, September 13, 2016 8:32 AM
**To:** Croft, Dana B SOPUS-HRN/AG
**Cc:** Hall, James WD RDS-CS; Smits, Klara M SI-HRGF/C
**Subject:** Re: U.S. Security Advisor - Update

All - based on the various thoughts/guidance shared, I am comfortable that we have vetted this candidate, via the recognized processes, to the extent that we can. Are we clear to proceed with the hire process?

3

Kind regards,
CO

Sent from my iPhone

On Sep 12, 2016, at 2:44 PM, Croft, Dana B SOPUS-HRN/AG <dana.croft@shell.com> wrote:

> James,
> While I can appreciate the desire to factor in longer term potential for this role I'm afraid we are beyond the point at which we can do that. The steer I am getting from Recruitment is that we shouldn't be doing a headroom assessment for a JG4 individual contributor role as it would be a clear step out in the US.
>
> With Michael being a contractor within the team currently, we could do a "mock" CEP assessment using the matrix based on performance/behavioral data seen to date but I wouldn't consider it a formal assessment. If we were to complete a headroom assessment on Michael, we would also need to complete on the other 3 applicants to ensure all candidates were assessed similarly.
>
> I am sensitive to your preference here but given US employment guidelines we need to ensure candidates are vetted through the XP hire process for JG4 and the selected candidate is chosen based on job qualifications as described in the job posting.
>
> Regards,
> Dana
>
> ---
>
> **From:** Hall, James WD RDS-CS
> **Sent:** Monday, September 12, 2016 10:18 AM
> **To:** Croft, Dana B SOPUS-HRN/AG
> **Cc:** Oaks, Crockett W SHLOIL-CSA; Smits, Klara M SI-HRGF/C
> **Subject:** RE: U.S. Security Advisor - Update
>
> Dana,
>
> OK, thanks. It is just that Crockett and I had talked about using this position as an opportunity to bring some talent into the organization which could, with development, be credible for senior roles including the RSM Americas. Is there some alternative means to determine his potential?
>
> Regards
>
> James
>
> James WD Hall
> VP Corporate Security
>
> Shell International B.V.
> PO Box 162, 2501 AN The Hague, The Netherlands
> Tel: +3170377 1431
> Mob: +316 296 24 326
> Email: James.WD.Hall@shell.com
> Internet: http://www.shell.com

**From:** Croft, Dana B SOPUS-HRN/AG
**Sent:** maandag 12 september 2016 16:34
**To:** Hall, James WD RDS-CS
**Cc:** Oaks, Crockett W SHLOIL-CSA
**Subject:** RE: U.S. Security Advisor - Update

Hi James,

The headroom assessment is an exercise that we do for roles requiring no less than LC or SEG potential for JG2 and above roles. There have been exceptions for JG3 roles/candidates who will be hired as a JG2 or promoted very soon after hire. Completing a headroom assessment for a JG4 role/candidate would be a deviation from policy. Additionally we would be asking Michael to complete an assessment that no other JG4s have been asked to complete. Regardless of the outcome, I would be concerned with treating Michael differently from others at the same job grade level and would not support a headroom assessment.

Regards,
Dana

**From:** Hall, James WD RDS-CS
**Sent:** Monday, September 12, 2016 9:12 AM
**To:** Oaks, Crockett W SHLOIL-CSA
**Cc:** Croft, Dana B SOPUS-HRN/AG
**Subject:** RE: U.S. Security Advisor - Update

Crockett,

Thanks for taking the time to brief me on the background to your thinking.

Dana: before we proceed, is there an opportunity to give Michael a headroom interview? I have found them to be a valuable validation of individuals and a good source of developmental feedback. Please let me know.

Thanks and Regards

James

James WD Hall
VP Corporate Security

Shell International B.V.
PO Box 162, 2501 AN The Hague, The Netherlands
Tel: +3170377 1431
Mob: +316 296 24 326
Email: James.WD.Hall@shell.com
Internet: http://www.shell.com

**From:** Oaks, Crockett W SHLOIL-CSA
**Sent:** vrijdag 9 september 2016 18:13
**To:** Hall, James WD RDS-CS
**Cc:** Croft, Dana B SOPUS-HRN/AG
**Subject:** U.S. Security Advisor - Update

5

Hello James,

I just wanted to send you a quick note to advise that we have aligned on a candidate for the captioned role; Michael Oliveri, currently serving as our Security Contractor, is the leading candidate. Dana, Bob and I have met this morning and are prepared to move forward in the hire process, but before proceeding I just wanted to ensure your visibility on the matter. Do let us know if you have any questions, enjoy your weekend ahead.

Kind regards,

*Crockett Oaks III*
Regional Security Manager - Americas
Shell Oil Company
910 Louisiana
Houston, Texas 77002

Tel: +1713-241-1629
Mobile: +1281-610-3521
Fax: +1 713-241-0078
Email: crockett.oaks@shell.com
Internet: www.shell.com

6

# EXHIBIT 4

## Oaks, Crockett W SHLOIL-CSA

| | |
|---|---|
| **From:** | Croft, Dana B SOPUS-HRN/AG |
| **Sent:** | Wednesday, September 14, 2016 11:15 AM |
| **To:** | Oaks, Crockett W SHLOIL-CSA |
| **Subject:** | RE: U.S. Security Advisor - Update |

Thanks for sharing Crockett — know that I will not share or forward.
James did respond to my email and mentioned his concerns (female talent and early career) and suggested that we connect Friday. I told him I'd be happy to join a call.

I do think your note below provides additional insights into the diversity that Mike brings to the team. What might also be helpful is for James to understand the gender balance of the candidate pool. I couldn't recall the figures but shared with James the applicant pool was quite large with minimal female applicants and they didn't meet the minimum qualifications.

**From:** Oaks, Crockett W SHLOIL-CSA
**Sent:** Wednesday, September 14, 2016 11:05 AM
**To:** Croft, Dana B SOPUS-HRN/AG
**Subject:** FW: U.S. Security Advisor - Update

Confidential
Do Not Forward

Dana — To ensure your continual visibility.

Kind regards,
CO

**From:** Oaks, Crockett W SHLOIL-CSA
**Sent:** Wednesday, September 14, 2016 11:02 AM
**To:** Hall, James WD RDS-CS
**Subject:** RE: U.S. Security Advisor - Update



Hello James,

I will be glad to set something up with Dana and Klara. Please confirm if you would like for me to be a part of the discussion or not.

I do appreciate you sharing your concerns with me, in fact based on your prolonged silence, I did sense that something was amiss. Based on your shared concerns, I do feel like a bit awkward in that I am now left feeling like I need to defend my principles; primarily my sense of judgment and to a lesser extent Integrity. You entrusted me to facilitate a process to select a US Security advisor, I then empowered Bob to proceed with the selection process, noting the core points highlighted below, i.e. diversity and experience. James, based on various discussions throughout the screening process with Bob and HR, I am sure that we were inclusive in both diversity and requisite experience of applicants. James I know that you are well-verse in your understanding of the laws governing employment rights in the U.S. The relevant law that suggest essentially, "individuals can choose to work for as long as they are able (physically, mentally and willing) to" is the one at play here when considering whether a candidate is "still early in career". The candidate that we have selected fits all of criteria that was previous agreed and is in keeping with the perimeters set forth by matters of employment law. Mike Oliveri brings a diverse background to our CS-USA organization. We have never hired a security professional from the U.S. Courts (Federal), nor have we viewed a decorated U.S. Army Veteran - Colonel (2 tours in

1

Afghanistan – Bronze Star Recipient) serving in the reserves, as qualifying experience for such a role - US Security Advisor. I do feel strongly that this candidate has the pedigree to move throughout this Global organization, caveated that he is left to be measured by his sole abilities and behaviors.

Additionally, I believe that the way in which we viewed Mike's yearlong contract assignment with the Team, was nothing short of innovative. This allowed the Team to have the first hand opportunity to vet something that we rarely have the ability to scrutinize, prior to hiring a candidate externally, their behaviors. The thing that I appreciated the most about this process is that for the first time, key players on this Team felt empowered to comment on Mike's witnessed behaviors over the last year. Moreover that, I take personal pride in the fact that I have led this Team to a point of realizing (and appreciating) that personal behaviors and conduct do matter, irrespective of how 'good' an individual may be perceived...

James I really do not want to make this issue about me per se, it is really about the Team and its dynamics. Bob was selected as the US – CSM because he was the right person for the job at the right time in this department's history. He was already doing 50% of the role, etc. There are several things that you are not aware of when it comes to the various "value drivers" that informed my decision to support Bob in this CSM endeavor; your trust in me is best illustrated when you are empowering for these types of issues.

James it does feel a bit like my judgment and to a lesser extent, my integrity, is under seize with this decision. I support and agree with the selection, but if you cannot offer your support at this time, I will need to work to rectify the situation... Ironically, a variety of things have dramatically improved in the Americas Region. One of the most notable improvements have been the quality and caliber of staff and their trust in Leadership (PULSE 83%). I will stop here, but I do welcome your follow up discussion.

Kind regards,

*Crockett Oaks III*
Regional Security Manager - Americas
Shell Oil Company
910 Louisiana
Houston, Texas 77002

Tel: +1713-241-1629
Mobile: +1281-610-3521
Fax: +1 713-241-0078
Email: crockett.oaks@shell.com
Internet: www.shell.com

From: Hall, James WD RDS-CS
Sent: Wednesday, September 14, 2016 9:29 AM
To: Oaks, Crockett W SHLOIL-CSA
Subject: RE: U.S. Security Advisor - Update

Crockett,

I must be honest, I still don't feel comfortable about this decision. The principle I apply is that my direct reports should be free to choose their own staff, provided they take account of steer I have provided in discussion about broader issues like diversity, talent development, career progression and succession planning.

In this case you consulted me about the CSM role. I agreed to support Bob's appointment so long as we took the opportunity to backfill for Bob by going to the market and hiring someone with the potential for a longer career in Shell

who could potentially move through a series of appointments and be future RSM material. We have also discussed (in the context of other appointments) prioritizing the hiring of female staff. The profile we discussed was ex-government agency, still early career and (based on previous conversations) you knew I would want you to look particularly at female candidates.

I have only seen the shortlist and your final recommendation. I have nothing against the individual, but I struggle to see how your proposed candidate brings fresh perspectives or diversity to your team. In short, I am concerned that we are guilty of a lack of imagination in looking for candidates and have opted for a safe option, at risk of failure to bring some fresh and different talent into Shell.

So before we go ahead, I would like to discuss our options with Dana and Klara. Can you set something up for us please? Friday is a good day for me if that works for others.

Thanks and Regards

James

James WD Hall
VP Corporate Security

Shell International B.V.
PO Box 162, 2501 AN The Hague, The Netherlands
**Tel:** +3170377 1431
**Mob:** +316 296 24 326
**Email:** James.WD.Hall@shell.com
**Internet:** http://www.shell.com

**From:** Oaks, Crockett W SHLOIL-CSA
**Sent:** woensdag 14 september 2016 12:29
**To:** Hall, James WD RDS-CS
**Subject:** FW: U.S. Security Advisor - Update

Hello James,

I am encouraged to proceed on the below, but given that I did not hear directly from you, I would like to have your concurrence/support. Please note that the lead times for these things can be up to 4 weeks before HR clears their screenings etc. we are trying to commence with this role on Oct. 1... Please let me know if you have any more questions.

Kind regards,
CO

**From:** Oaks, Crockett W SHLOIL-CSA
**Sent:** Tuesday, September 13, 2016 8:32 AM
**To:** Croft, Dana B SOPUS-HRN/AG
**Cc:** Hall, James WD RDS-CS; Smits, Klara M SI-HRGF/C
**Subject:** Re: U.S. Security Advisor - Update

All - based on the various thoughts/guidance shared, I am comfortable that we have vetted this candidate, via the recognized processes, to the extent that we can. Are we clear to proceed with the hire process?

Kind regards,

3

CO

Sent from my iPhone

On Sep 12, 2016, at 2:44 PM, Croft, Dana B SOPUS-HRN/AG <dana.croft@shell.com> wrote:

> James,
> While I can appreciate the desire to factor in longer term potential for this role I'm afraid we are beyond the point at which we can do that. The steer I am getting from Recruitment is that we shouldn't be doing a headroom assessment for a JG4 individual contributor role as it would be a clear step out in the US.
>
> With Michael being a contractor within the team currently, we could do a "mock" CEP assessment using the matrix based on performance/behavioral data seen to date but I wouldn't consider it a formal assessment. If we were to complete a headroom assessment on Michael, we would also need to complete on the other 3 applicants to ensure all candidates were assessed similarly.
>
> I am sensitive to your preference here but given US employment guidelines we need to ensure candidates are vetted through the XP hire process for JG4 and the selected candidate is chosen based on job qualifications as described in the job posting.
>
> Regards,
> Dana
>
> **From:** Hall, James WD RDS-CS
> **Sent:** Monday, September 12, 2016 10:18 AM
> **To:** Croft, Dana B SOPUS-HRN/AG
> **Cc:** Oaks, Crockett W SHLOIL-CSA; Smits, Klara M SI-HRGF/C
> **Subject:** RE: U.S. Security Advisor - Update
>
> Dana,
>
> OK, thanks. It is just that Crockett and I had talked about using this position as an opportunity to bring some talent into the organization which could, with development, be credible for senior roles including the RSM Americas. Is there some alternative means to determine his potential?
>
> Regards
>
> James
>
> James WD Hall
> VP Corporate Security
>
> Shell International B.V.
> PO Box 162, 2501 AN The Hague, The Netherlands
> **Tel:** +3170377 1431
> **Mob:** +316 296 24 326
> **Email:** James.WD.Hall@shell.com
> **Internet:** http://www.shell.com
>
> **From:** Croft, Dana B SOPUS-HRN/AG
> **Sent:** maandag 12 september 2016 16:34
> **To:** Hall, James WD RDS-CS

4

**Cc:** Oaks, Crockett W SHLOIL-CSA
**Subject:** RE: U.S. Security Advisor - Update

Hi James,
The headroom assessment is an exercise that we do for roles requiring no less than LC or SEG potential for JG2 and above roles. There have been exceptions for JG3 roles/candidates who will be hired as a JG2 or promoted very soon after hire. Completing a headroom assessment for a JG4 role/candidate would be a deviation from policy. Additionally we would be asking Michael to complete an assessment that no other JG4s have been asked to complete. Regardless of the outcome, I would be concerned with treating Michael differently from others at the same job grade level and would not support a headroom assessment.

Regards,
Dana

**From:** Hall, James WD RDS-CS
**Sent:** Monday, September 12, 2016 9:12 AM
**To:** Oaks, Crockett W SHLOIL-CSA
**Cc:** Croft, Dana B SOPUS-HRN/AG
**Subject:** RE: U.S. Security Advisor - Update

Crockett,

Thanks for taking the time to brief me on the background to your thinking.

Dana: before we proceed, is there an opportunity to give Michael a headroom interview? I have found them to be a valuable validation of individuals and a good source of developmental feedback. Please let me know.

Thanks and Regards

James

James WD Hall
VP Corporate Security

Shell International B.V.
PO Box 162, 2501 AN The Hague, The Netherlands
**Tel:** +3170377 1431
**Mob:** +316 296 24 326
**Email:** James.WD.Hall@shell.com
**Internet:** http://www.shell.com

**From:** Oaks, Crockett W SHLOIL-CSA
**Sent:** vrijdag 9 september 2016 18:13
**To:** Hall, James WD RDS-CS
**Cc:** Croft, Dana B SOPUS-HRN/AG
**Subject:** U.S. Security Advisor - Update

Hello James,

I just wanted to send you a quick note to advise that we have aligned on a candidate for the captioned role; Michael Oliveri, currently serving as our Security Contractor, is the leading candidate. Dana, Bob

and I have met this morning and are prepared to move forward in the hire process, but before proceeding I just wanted to ensure your visibility on the matter.  Do let us know if you have any questions, enjoy your weekend ahead.

Kind regards,

**Crockett Oaks III**
Regional Security Manager - Americas
Shell Oil Company
910 Louisiana
Houston, Texas 77002

**Tel:** +1713-241-1629
**Mobile:** +1281-610-3521
**Fax:**  +1 713-241-0078
**Email:** crockett.oaks@shell.com
**Internet:** www.shell.com

# EXHIBIT 5

# Conflict of Interest  URID-0000142369 submitted by Crockett Oaks

## Entry Details

Submitted by Crockett Oaks

**Unique Request ID**  URID-0000142369

**Date of Submission**  Sep 28, 2016

---

**Business**  Human Resources & Corporate

**Class of Business**  Corporate Security

**Type of Conflict**  Family or personal interest or relationship

**COI Description**

James - Based on recent discussion regarding the US Security Advisor Role, specifically potential perceptions of a conflict of interest that have been shared with you regarding the nature of my relationship with the selected candidate, Michael Oliveri, I would like to address the matter via these means, to promote a transparent and proactive approach. I have known Michael Oliveri, via the US Army Reserve (USAR) for a number of years (approximately 15). Throughout the years we have served in a number of capacities that have required us to work together. It is for this reason that I have acquired historic knowledge of Michael's personal effectiveness as a follower, leader and Team member. Michael currently maintains a more senior rank than I within the USAR, he is a Colonel (O-6) and I am a Lieutenant Colonel (O-5). There is not a reporting relationship between us, nor do we enjoy a social relationship whereby our families are encouraged to interact; i.e. we do not visit each other's home for social engagements. The extent of our historical relationship can best be summed up as "good colleagues".

Over the past year, Michael has work within CS as the Special Events security contractor. This period of time represents the most consecutive opportunity that I have been exposed to Michael. As I explained to you, Michael has availed himself to be a consummate professional that has consistently demonstrated the ability to perform at a high level for the CS organization. The feedback which has come to my attention as well as other CS colleagues has always reflected a high degree of knowledge and professionalism in Michael's actions. He has proactively filled a needed gap within our department, primarily due to vacancies.

The hiring process has been concluded for the U.S. Security Advisor role and as you are aware, Michael was recommended and ultimately selected to fill this vacancy. We do believe that he is the right person for this role, due primarily to the yearlong opportunity that the Team had to observe Michael's behavioral attributes. His professional competencies were sufficient and will only be enhanced with each new opportunity afforded to him. I am particularly keen to address this matter, via these transparent means, as I would hope and trust that should future perceptions



come to your attention regarding Michael Oliveri's hiring and my direct or indirect involvement in the same, this will serve as a clear step in mitigating any perceptions of a conflict of interest. I sincerely do appreciate you bringing this type of issue to my attention. This type of clear dialog only serves to 1) strengthen relationships; and 2) alleviate areas of doubt, i.e. quash the old rumor mill! Do advise if more information is needed, I do want to ensure that both you and I have exactly what is needed to aggressively address such perceptions, should they continue to persist.

**Current Status**          Pending Acknowledgement

# EXHIBIT 6

## Oaks, Crockett W SHLOIL-CSA

| | |
|---|---|
| From: | Oaks, Crockett W SHLOIL-CSA |
| Sent: | Thursday, November 10, 2016 11:54 AM |
| To: | Smidtman, Jasper SI-FA/I |
| Subject: | RE: Military Policy ( AR 600 – 20) and UMR |

Hello Jasper,

I was sitting here reflecting upon my discussion with you last week and I recall the point made to you regarding the issue of precedent. The example that I cited for you was the fact that Bob Schoen, now a retired U.S. Coast Guard Reserve Commander and current CSM – US, worked for Rob Ream, my predecessor and U.S. Coast Guard Reservist, first as a contractor and then eventually as staff while they both served in the same Coast Guard unit (where there was a direct reporting relationship between them). Rob hired Bob as a FTE in 2013. My question for you is as follows:

1) As you stated during the interview, you are of the opinion that a CoI should have been registered regarding the military relationship with Oliveri. Did a CoI get registered in the aforementioned matter; and
2) You also stated that James Hall claims that he was not aware of a military reporting relationship between Oliveri and I, was he also not aware of the aforementioned matter as well; this would have been during his tenure as VP CS?

My point in highlighting this issue to you is really to ensure your awareness of the fact that this scenario is not really as unique as you may have original thought. James certainly would have had a previous opportunity to address this exact same scenario and as I previously asserted, I find it suspicious that it is now being exploited in my instance at this time...

It is apparent to me that a Staff feels aggrieved that he was not successful in a competitive hiring process and now is trying to rationalize the matter. I do not believe that any CS staff should be made to feel bad or non-compliant in this matter as it only serves to perpetuate the whole notion of the intentional misuse of the helpline, i.e. complaints made in bad faith...

Kind regards,
Crockett

---

From: Oaks, Crockett W SHLOIL-CSA
Sent: Thursday, November 10, 2016 8:21 AM
To: Smidtman, Jasper SI-FA/I
Subject: Re: Military Policy ( AR 600 - 20) and UMR

Hi Jasper,

The below example is not really a good one given that this transfer was from outside of the current unit. Naturally I would have some email traffic for this, given that I would have an action to follow upon with the "losing unit".

The transfer that I made a few months ago was within the current unit, i.e. Just a Team Change, therefore no action for me to follow up on. Let's see what I have, but do understand that the UMR is the true verification and that is what i am pursuing...

Kind regards,

1



EXHIBIT
6

Crockett

Sent from my iPhone

On Nov 10, 2016, at 7:18 AM, Smidtman, Jasper SI-FA/I <Jasper.Smidtman@shell.com> wrote:

> Hi Crockett,
>
> Thanks for your email. Let's wait to see if you can get clearance to provide the documents.
>
> Erica is not working with me, she only sat in during the interview. I'm sure we can find some kind of solution to verify things.
>
> I was wondering if you would have emails detailing this transfer. I noticed the attached emails with respect to your previous transfer. If you would have something similar that would also be helpful.
>
> Kind regards,
>
> Jasper
>
> **From:** Oaks, Crockett W SHLOIL-CSA
> **Sent:** Thursday, November 10, 2016 1:12 PM
> **To:** Smidtman, Jasper SI-FA/I
> **Subject:** RE: Military Policy ( AR 600 - 20) and UMR
>
> Hi Jasper,
>
> Just a quick note to acknowledge the delay in my production of the verification of the **Date of Assignment to the REPLO position.** The unequivocal verification will come from the Unit Manning Report (or Roster). For reference as to how the UMR is used and what information is contained on the document access this link https://www.part-time-commander.com/unit-manning-report-tips-for-small-unit-leaders/ .
>
> Given the classification of this document, I am delayed in getting a response regarding my need to allow for the verification of a single piece of information ONLY RELEVANT TO MY DATA. I am not able to print, forward or alter the UMR in any way, given the safeguards that are in place for the military IT system and this particular document etc... I will give it until today, if in fact, this document is not able to be provide to you in any format, I will be able to allow someone here to view the document on my military computer for verification of dates, etc. I trust that this will suffice. I assume that Erica Slain, HR is still working with you and will be the suitable person to act in your stead to verify the date of assignment within the document? Please confirm and I can make contact with her later on to agree time/location etc., if needed be.
>
> Kind regards,
> Crockett
>
> **From:** Oaks, Crockett W SHLOIL-CSA
> **Sent:** Tuesday, November 08, 2016 5:57 AM
> **To:** Smidtman, Jasper SI-FA/I
> **Subject:** Military Policy ( AR 600 - 20) and UMR
>
> Hello Jasper,

2

I have taken the liberty to attach the relevant military policy (in excerpt) which sets forth the appropriate guidance relevant to Army Reserve personnel who are engaged in a business relationship (civilian occupation or employment). The relevant sentence that I was referred to by the Army Staff Judge Advocate (JAG), is highlighted within the attached AR 600-20 Extract. The JAG did explain that the scenario involving Army Reservist working with/for each other in a civilian, private capacity is not an unusual scenario, hence the policy which attempts to address this situation... Furthermore, JAG has provided clear advice relevant to the point regarding the existence of a CoI between Mike Oliveri and I due to our business relationship... no conflict.

As it relates to the verification of the REPLO assignment, I am in the process of seeking guidance on the most suitable way to achieve this, i.e. release the document. Understand that the Unit Manning Roster (UMR) that will contain this information, is full of PII and SSI information of fellow Soldiers, that must be addressed prior to my release of information. I will be able to provide verification, however I do need to obtain guidance on the best way to provide information (redaction should be an option). At a minimum, I will be able to allow the HR person (that was present for the interview) to verify the document, with particulars, from my military PC. She can look at my screen and take notes, if necessary. Let's wait and see, I should be able to advise later on today. Thanks

Regards,
Crockett

---

**From:** Oaks, Crockett W SHLOIL-CSA
**Sent:** Monday, November 07, 2016 10:51 AM
**To:** Smidtman, Jasper SI-FA/I
**Subject:** RE: Congratulations and Thank You!

Hello Jasper,

I trust that your trip back to NL was uneventful. I will send you the documentation this evening (US time). My military computer is at home. Thanks

Kind regards,
Crockett

---

**From:** Smidtman, Jasper SI-FA/I
**Sent:** Monday, November 07, 2016 7:05 AM
**To:** Oaks, Crockett W SHLOIL-CSA
**Subject:** RE: Congratulations and Thank You!

Hi Crockett,

Hope all is well. Thank you for the email you forwarded. I will include the content in the report.

I do have an additional question: you mentioned you recently (3-4 months ago) transferred out of Mike's unit (SEPLO) into the regional unit (REPLO). How can I verify this and/or can you provide emails or letters to confirm this?

Many thanks in advance.

Kind regards,

3

Jasper Smidtman

---

**From:** Oaks, Crockett W SHLOIL-CSA
**Sent:** Friday, November 04, 2016 12:04 AM
**To:** Smidtman, Jasper SI-FA/I
**Subject:** FW: Congratulations and Thank You!

Hello Jasper,

As discussed, please do let me know if you have additional questions.

This email does clearly illustrate the transparency in the relationship with Mike. If James or anyone else, needed to better understand the nuances of the role and relationship that Mike and I had, this email should have perhaps triggered a discussion, if one was necessary. From a historical perspective, the details of my reserve obligation has not extended past an acknowledgement of their being an ability to affect a financial position between Shell and the Department of Defense. If I felt that the relationship that I had with Mike, in the Reserves, constituted a CoI for Shell then it surely does not feel correct that I would send such an email or invite a Shell colleague to speak at a military event. I do not feel that I ever had anything to hide, hence we did not have any guilty intent on this matter...

Regards,

*Crockett Oaks III*
Regional Security Manager - Americas
Shell Oil Company
910 Louisiana
Houston, Texas 77002

Tel: +1713-241-1629
Mobile: +1281-610-3521
Fax: +1 713-241-0078
Email: crockett.oaks@shell.com
Internet: www.shell.com

---

**From:** Powell, Billy J SEPCO-UAS/R/E
**Sent:** Sunday, December 06, 2015 8:26 PM
**To:** Newberry, Derek SERC-UAS; Oliveri, Michael SHLOIL-CSA; Smith, Philip B SERC-UAS/R
**Cc:** Oaks, Crockett W SHLOIL-CSA; Hall, James WD RDS-CS
**Subject:** RE: Congratulations and Thank You!

Good evening,

I'd like to thank you all for the recognition. I truly enjoyed giving the presentation, and it was a great opportunity to the meet the Emergency Preparedness Liaison Officers for FEMA Region VI. It was an excellent opportunity to share Shell's preparedness and response capabilities, and the presentation fit in well with FEMA's interest in engaging and working with the Private Sector during emergencies.

Please let us know if we can be of assistance in the future.

Best Regards,

4

Billy J. Powell
Manager, Shell Americas Emergency Management (UA/DS)

150 N Dairy Ashford A0464-E
Houston, Texas 77079
Tel: (832) 337-3468
Fax: (832) 337-5032
Mobile: (281) 352-1798
E-mail: billy.powell@shell.com

---

**From:** Newberry, Derek SERC-UAS
**Sent:** Sunday, December 06, 2015 11:58 AM
**To:** Oliveri, Michael SHLOIL-CSA; Smith, Philip B SERC-UAS/R
**Cc:** Oaks, Crockett W SHLOIL-CSA; Powell, Billy J SEPCO-UAS/R/E; Hall, James WD RDS-CS
**Subject:** RE: Congratulations and Thank You!

Billy,

Thank You for representing Shell so excellently in an external setting.

Cheers,
Derek

---

**From:** Oliveri, Michael SHLOIL-CSA
**Sent:** Sunday, December 06, 2015 9:48 AM
**To:** Smith, Philip B SERC-UAS/R
**Cc:** Oaks, Crockett W SHLOIL-CSA; Powell, Billy J SEPCO-UAS/R/E; Hall, James WD RDS-CS; Newberry, Derek SERC-UAS
**Subject:** Re: Congratulations and Thank You!

Just to pile on even further. We have a military workshop every six months in a different host city. Billy has definitely set a new bar which will be difficult to replicate for the next event.

Thank you!


Michael G. Oliveri
Corporate Security-Americas

**Shell Oil Company**
910 Louisiana Street
Houston, Texas 77002
Mobile: +1 281-216-6595
Office: +1 713-241-4327
Email: michael.oliveri@shell.com


my iPhone

On Dec 6, 2015, at 9:39 AM, Smith, Philip B SERC-UAS/R <phil.b.smith@shell.com> wrote:

5

Crockett, glad it went well and thank you for the invite. When emergencies occur, I do consider the military and corporate security as key partners - all one family in working to minimize impacts.

Billy, thanks for your time and carrying the message.

Regards,

Phil Smith
GM - Emergency Management & Deepwater Regulatory
Shell Energy Resources Company
O: +1 504.425.4252 | M: +1 504.606.4252

-----Original Message-----
From: Oaks, Crockett W SHLOIL-CSA
Sent: Sunday, December 06, 2015 9:23 AM
To: Powell, Billy J SEPCO-UAS/R/E
Cc: Smith, Philip B SERC-UAS/R; Oliveri, Michael SHLOIL-CSA; Hall, James WD RDS-CS
Subject: Congratulations and Thank You!

Hello Billy,

I just wanted to follow up with you regarding yesterday's briefing. The manner and style in which you presented Shell's process and methodology for delivering emergency management services was exceptional, to say the least. In fact, presenters that came after you continued to reference elements of your presentation as an example of "best in class" for private sector capability and response.

Billy and Phil, thank you both so much for your willingness to support me and the U.S. Military Service Members serving as Emergency Preparedness Liaison Officers (EPLOs). We really benefited from hearing about the "Shell Experience" for emergency management and I do believe that Billy's presentation has set a new standard for our workshops going forward. Thank you very, very much!

Kind regards,
Crockett Oaks III
Regional Security Manager -Americas, Shell Oil Company Office +1713-241-1629 Mobile +1281-610-3521

This message was sent from a Blackberry, please excuse any typos! Thank you
<Example transfer email.pdf>

JS 44   (Rev. 08/16)
Case 4:20-cv-01059  Document 1-97  Filed on 04/24/20 in TXSD  Page 81 of 81
Case 4:17-cv-00579  Document 19-7  Filed in TXSD on 03/30/17  Page 31 of 31

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a)  PLAINTIFFS

CROCKETT OAKS, III

### (b)  County of Residence of First Listed Plaintiff   Harris
*(EXCEPT IN U.S. PLAINTIFF CASES)*

### (c)  Attorneys *(Firm Name, Address, and Telephone Number)*
MARK J. OBERTI
OBERTI SULLIVAN PLLC
712 MAIN, SUITE 900, HOUSTON, TEXAS 77002

## DEFENDANTS

SHELL OIL COMPANY

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☐ 2  U.S. Government
Defendant

☒ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury  - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 840 Trademark | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | **LABOR** | **SOCIAL SECURITY** | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | Relations | ☐ 864 SSID Title XVI | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | Leave Act | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
Proceeding

☐ 2  Removed from
State Court

☐ 3  Remanded from
Appellate Court

☐ 4  Reinstated or
Reopened

☐ 5  Transferred from
Another District
*(specify)*

☐ 6  Multidistrict
Litigation -
Transfer

☐ 8  Multidistrict
Litigation -
Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq
Brief description of cause:
This is a case of willful retaliation under the Age Discrimination in Employment.

## VII. REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S)
IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE

SIGNATURE OF ATTORNEY OF RECORD
s/ Mark J. Oberti

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____