# EXHIBIT 15



**Ms. Sarah Skelton**
**HR Account Manager**
**Shell Oil Company**
150 N Dairy Ashford Rd
Houston, TX 77079
United States of America

April 30, 2018

Mr. Joel Lara, Investigator
Equal Employment Opportunity Commission

RE:  EEOC Charge #460-2018-02242

Dear Mr. Lara,

This position statement is in response to the charge of discrimination filed by Mr. Walied Shater against Shell Oil Company ("the Company" or "Shell"), on February 12th, 2018. Mr. Shater's claim that he was discriminated against due to his race and national origin is without merit. The facts provided herein will support that neither Shell Oil Company nor any of its subsidiaries, including Shell Expatriate Employment US Inc ("SEEUS"), have violated Title VII of the Civil Rights Act of 1964 as amended; therefore, this Charge should be dismissed.

**Background Information**

Shell Oil Company is a holding company for various upstream and downstream oil and gas entities in the United States and employs individuals to provide various services (such as HR, Legal, Finance and Security) to the various entities it directly or indirectly owns. Approximately 18,000 employees of Shell and its affiliates are based in the US.  The U.S. headquarters office is located at 150 N Dairy Ashford Road, Houston, TX 77079.

Shell Oil Company is one of America's largest oil and natural gas producers, natural gas marketers, gasoline marketers and petrochemical manufacturers.  Shell's classes of business include the following areas:

- Exploration, which includes exploring for oil and gas both on and off-shore and involves assets such as drilling rigs and off-shore platforms.
- Development & Extraction, which includes developing fields both on and off-shore, producing oil and gas, and extracting bitumen.

1



EXHIBIT
15

- Manufacturing and Energy Production, which includes refining oil into fuels and lubricants, producing petrochemicals, liquefying natural gas by cooling (LNG), converting gas to liquid projects (GTL), upgrading bitumen, producing biofuels, and generating power (wind). Assets in this area include major refineries and chemical plants, and research and development facilities.
- Transportation and Trading, which includes shipping and trading activity, regasifying (LNG), and supply and distribution. Assets in this business include pipelines, tankers, barges, trucking operations, an extensive network of supply / distribution terminals, and trading and sales offices.
- Retail Sales and B2B, which includes extensive consumer retail operations and business to business industrial sales.

The Security function for the Company and its related entities provides strategic advice and assurance to all businesses regarding all aspects of security. The Regional Security Manager - Americas (RSM Manager-Americas) supports and advises a wide range of stakeholders in all security matters across North and South America. The role is to ensure that security activities comply with international and individual country laws, Shell General Business Principles, including the Shell Code of Conduct, and the Shell Group Security Standard.

The Regional Security Manager – Americas oversees staff that are to ensure the security of Shell's personnel, assets, and operations in country. The Country/Cluster Security Managers report directly to this role. In total, the Regional Security Manager – Americas manages an organization of 18 Shell and related entities staff and various security contractors located throughout the region.

**Code of Conduct**

The Shell Code of Conduct (Exhibit A) applies to every employee of the Company and its related affiliates. Shell staff are expected to read, understand, and follow the Code. Should there be a violation of the Code of Conduct, disciplinary action may result, up to and including dismissal. Managers have an additional responsibility outlined in the Code of Conduct. Managers are expected to promote the Company's ethical standards and act as role models for their teams. The Company expects managers to show leadership in following the Code and maintaining a culture of commitment to ethics and compliance, where it is normal to do the right thing and people feel confident about speaking up.

The Company's Code of Conduct is a common reference point for any employee who is unclear about what is expected of them in a specific situation. It provides a definitive statement of the Company's response to many different issues and questions and requires all individuals working on behalf of the Company to comply with all relevant laws for the locations in which we operate. The section on Behaviors, People, and Culture outlines the expectations for ensuring **Equal**

2

**Opportunity** in selection decisions and specifically addresses discrimination prohibited on the basis of race, color, religion, age, gender, sexual orientation, gender identity, marital status, disability, ethnic origin or nationality.

Should an individual have concerns regarding the Code of Conduct, they are informed they can raise them to their line manager, any other senior Shell person, Human Resources, an internal Legal representative or Ethics and Compliance Officer, the Global Helpline (confidential toll-free phone line), or through the Shell intranet via the helpline web link.

**Equal Employment and Anti-Harassment Policies**

Shell Oil Company is an equal opportunity employer that recognizes that a work environment free from discrimination, intimidation, and harassment is absolutely essential to a safe, productive and efficient workforce. To this end, the Company prohibits discrimination based on race, color, sex, national origin, age, religion, disability, sexual orientation, gender identity, veteran status, citizenship, and other protected status under federal, state or local laws. The Company maintains annually-published policies against discrimination and harassment that are conspicuously posted in the workplace (Exhibit B and Exhibit C) and are further communicated to employees via the Company's intranet site.

Employees have several avenues available to them for reporting discrimination, harassment and related complaints, including a confidential hotline.

Shell also has an Equal Opportunity group. The focus of this group is to ensure compliance with US requirements as well as support Shell's Equal Opportunity and Anti-Harassment Policies.

**Summary of Facts**

In January 2017, the Regional Security Manager – Americas role was vacated and the position was posted on the Company's internal job website to which all employees have access. The position was posted from January 27, 2017 through February 6, 2017. Seven employees applied for the position. Mr. James Hall, Vice President of Corporate Security, who was also the hiring manager of this position, reviewed the seven (7) applications and determined that three (3) candidates met the criteria sought in the posting, per the Company's standard internal resourcing process. The three candidates were Mr. Walied Shater (US Nationality), Mr. Wayne Hunt (British Nationality), and Mr. Brian Butcher (US Nationality).  All three candidates were notified that they would receive interviews and were subsequently interviewed for the position. An interview panel was initiated to ensure a diversity of viewpoints and objectivity in the process.  The interview panel was comprised of Mr. Hall (British Nationality), Mr. Andrew Maynor, Human Resources Account Manager (US Nationality) and Ms. Barbara Blakely, External Relations (ER) Manager - Latin America (Mexican Nationality). Mr. Maynor provided

3

HR support to the Corporate Security Staff in the US. Ms. Blakely supports Shell's Businesses in Central and South America. Neither Mr. Maynor nor Ms. Blakely had any prior knowledge of the candidates.

Prior to conducting the interviews, the interview panel met and discussed areas of experience that they wanted to focus on in determining who would be the ideal candidate. This resulted in three (3) primary areas of experience that the panel asked the candidates about:

- Experience building and managing a security team
- Experience and understanding of security issues in Central and South America; and
- Connectivity to US Security Agencies

These three areas were selected for emphasis due to the needs of the Americas Regional Security Organization and were captured in the job posting. Experience in building and managing a team was necessary as this organization has had significant organizational changes in a recent period and the successful candidate needed to have sound management experience to navigate this challenge. Experience in Central and South America was necessary due to recent acquisitions and growth plans for Shell and its related entities and the various security challenges presented in this region. Connectivity to US Security Agencies was needed to ensure the Company remained cognizant of threats and risks of which the various Agencies might be aware.

The panel conducted interviews on February 8 and 9, 2017. The panel reconvened on February 13 to discuss all candidates and to select the candidate who could best perform this role.

The panel evaluated the candidates on the criteria stated above. On the first criteria of managerial experience, in his interview, Mr. Shater discussed building and leading teams at a front-line supervisor level.  The approach that he described represented a directive approach to leadership. Mr. Hunt provided examples regarding his experience in building and leading a community, which represented a more collaborative approach to engaging with his team. For example, Mr. Hunt described working as a Liaison Manager in Mexico and having to create a team that had not existed before. In order to build this team, he had to work across cultures by leveraging an established team in Columbia to work with and train his new team in Mexico. The panel determined that Mr. Hunt's leadership experience and style were both preferable for this role.

Regarding having prior experience in Latin America, Mr. Shater has had limited experience, consisting primarily of advanced scouting of locations during his employment in the Secret Service. Mr. Hunt's Master's thesis examined Cultural Differences in Latin American Security teams. He'd also served as a Liaison Officer on behalf of the UK government to Mexico and Colombia, and as such lived and worked in the Latin American region for 6 years. These experiences allowed him to gain a unique understanding of the security challenges in this area. Mr. Hunt is also fluent in Spanish which was listed as a preferred skill on the job description due

4

to more recent growth and risk associated from a security perspective in the region. For these reasons, the panel determined that Mr. Hunt was better prepared to address the security challenges in this area.

The third criteria that was assessed is the connectivity of the candidates to the US Security Agencies. Mr. Shater served for 12 years in the Secret Service. During this experience, he had wide exposure to the US Security agencies. Mr. Shater, as a US citizen, is also able to obtain a Secret-level security clearance while working for the Company which would be useful to the Company. Mr. Hunt did not have the same range of exposure to the various US Security Agencies and would not be able to obtain the Secret-level security clearance; however, he did state that he had experience dealing with the US Security Agencies and personnel on regulatory issues in his current role and security issues during his time as a UK liaison representative. He also shared that he would use US Security Manager, Mr. Robert Schoen (who has the required level of security clearance), to ensure that the appropriate connections took place within the country. For this criterion, the panel determined that Mr. Shater would be better positioned to have the degree of connectivity with the US Security Agencies that was desired for this role.

Given the criteria listed above, the panel unanimously determined that Mr. Hunt would be a better fit for the role. Mr. Hunt demonstrated a style of leadership that was needed for this organization. His experience in Latin America fit well with the desired type of experience for this role. Lastly, while he is not a US citizen and does not have the same degree of connectivity with US Security Agencies as Mr. Shater, the panel felt these gaps could be mitigated through the utilization of another member of the team. As a result, the role was offered to Mr. Hunt. He assumed the role August 1, 2017 after being approved for an L1A VISA.

Mr. Shater continued in his role as the Cluster Security Manager - Middle East through April 2018. There were no changes to his employment terms or conditions during this time and he remained a candidate for future security roles. Further, Mr. Shater was encouraged to apply for a US-based position, Business Integrity Department Manager for the Americas, that would have represented a promotion for him; however, he elected not to apply for this position.

In March 2018, Mr. Shater was encouraged to apply on the Regional Security Advisor – Middle East, North Africa role in the Corporate Security Group. This role was posted and Mr. Shater was the preferred candidate. He was the successful applicant and will begin in this role in May 2018. This role is also a promotion for him with an increase to his overall wages and benefits.

Mr. Shater's race and national origin were not a factor in the Company's employment decision. The decision to employ Mr. Hunt for the RSM – Americas role was based upon the recommendation of the interview panel that identified his work experiences as a better match for the role.

5

Mr. Shater makes further statements around additional roles he was not selected for and discrimination he believes he was subjected to on the basis of his national origin and race throughout his tenure at Shell. The Company's response to each of these allegations is addressed in the remainder of this response.

**Particulars**

Mr. Shater made particular statements in his charge of discrimination # 460-2018-02242**.** Below are the particulars as listed by Mr. Shater and the Company's response to each allegation.

**Particular I:** *In 1993, I obtained a Master of Arts Degree from Rutgers University. In 1995, I went to work as a Special Agent for the U.S. Secret Service (USSS) Newark Field Office (Ex.1). In 2000, I was assigned to the Presidential Protective Division ("PPD") as a Special Agent. Some of my duties and accomplishments as a Special Agent for the USSS were:*

- *5 years assigned to the White House on elite Presidential Protective Division (less than 5% of all USSS agents serve on PPD). I provided protective detail for Presidents Bush and Clinton and the First Ladies.*
- *Designated supervisory lead advance agent on PPD.*
  - *Lead agent for more presidential visits than any agent since January 2001, including:*
    - *One of 6 USSS agents selected to conduct secret Thanksgiving 2003 White House presidential visit to Iraq; and*
    - *2002 White House Presidential visit to Daytona 500; I was the lead USSS agent for the trip, accountable for over 400 federal, state, local and military personnel.*
- *Served as detailee to Department of Homeland Security (DHS), including DHS Energy Infrastructure Department (main US government agency interfacing with US oil sector).*
- *Case agent detailee to FBI on PENTTBOMB investigation following 9/11 attacks; including undercover agent targeting suspected al-Qaeda terrorists (the largest criminal inquiry in the FBI's history).*

*In 2007, I left the Secret Service and accepted employment with ConocoPhillips as a Regional Security Director for Middle East and North Africa Business Unit (Ex. 1).*

**Response:** Mr. Shater's statements regarding his experience appear to be in alignment with the job application he submitted prior to joining Shell. Mr. Shater's extensive background made him a competitive applicant for the RSM – Americas role and the Company is not contending that he was not a qualified applicant. Rather, the Company believed that Mr. Hunt was the more qualified candidate for the role.

**Particular II: My Employment at Shell, And Consistently Outstanding Performance Reviews**

*In August 2013, I began working for Shell Expatriate Employment US Inc. and Shell Oil Company (jointly "Shell") as a Country Security Manager ("CSM"). I was hired as a Houston-based employee, to work in Dubai, UAE. The CSM (Job Group 3) position reports to the Regional Security Manager ("RSM") (Job Group 1). In my case, I reported to the RSM- Middle East & North Africa ("MENA"). Within Shell currently, of the five RSMs in the Company, four of them had been in the CSM role at Shell before becoming an RSM (the only exception is Wayne Hunt, the individual hired over me for the at-issue position in this case). In the CSM role, I was responsible for seven countries, more than any other CSM in Shell. This is unusual, as most other CSMs in Shell only have responsibility for one country. As such, my CSM role was more similar to a RSM role than a typical CSM role.*

*I performed extremely well in the CSM role, as reflected by my performance reviews for 2014, 2015, and 2016, and my Individual Development Plan ("IDP"), all of which are attached as Exhibits 2, 3, 4, and 5. Based on my reviews, I am considered "Top Talent," an official term used to designate top Shell personnel destined for promotion.*

*My 2017 performance review, a copy of which has been sent to me by my supervisor, and to be finalized in February 2018, states: "Walied has put in a strong performance during 2017. Within his cluster of countries he has continued to provide a high level of support to various businesses, leadership, country chairs, regional security team and REAP. GPA targets have been met and additional support provided." In 2017 I received another 1.2 Individual Performance Factor (annual performance rating). This is the third year in a row that I received an outstanding performance rating.*

*My performance reviews are higher than about 95% of all Shell (94,000 staff) and the Company's approximately 75-person security skill pool. I currently maintain a Secret U.S. government (USG) clearance held by DHS, and receive more classified briefings from agencies in the US intelligence community (DHS, FBI, DIA, CIA) than anyone else in Shell Corporate Security. Before joining Shell, while still in the private sector, I served as advisor to the U.S. Senate Committee on Homeland Security and Government Affairs.*

*In early 2017, I was identified in my IDP by my supervisor as qualified and competitive for the RSM-Americas role if and when it opened up (Ex. 5). Specifically, my supervisor stated in writing in my IDP that, "[d]ue to experience, Walied would be a strong contender for both RSM MENA or Americas." (Id.). My IDP also identifies me as having a Current Employment Potential ("CEP") of Job Group 2 or 1, meaning I am currently assessed by my supervisor, Corporate Security, and Human Resources, as having the competency to perform at these senior job group levels (Ex. 5). The RSM − Americas position is a Job Group 1. My last CEP assessment was on May 27, 2016 (Ex. 5).*

**Response:** The statements concerning Mr. Shater's onboarding at Shell are partially accurate. Mr. Shater was hired on August 8th, 2013 as a United States-based employee to work in Dubai, UAE, employed by Shell Expatriate Employment US Inc. Mr. Shater's statement that he was hired into a Country Security Manager role is inaccurate. Mr. Shater was hired to be a Cluster Security Manager, which means he would be responsible for multiple countries rather than a Country Security Manager, who would typically have one country assigned. There are a number of Cluster Security Managers in the Corporate Security organization, each with multiple countries in their remit. While Mr. Shater's statement that the majority of RSMs occupied CSM roles prior to current role is accurate, occupying a Country Security Manager role or Cluster Security Manager role is not a prerequisite. The previous incumbent in the RSM – Americas role, Crockett Oaks, had not served in a Country Security Manager or a Cluster Security Manager role before taking on the RSM -Americas role. Similar to Mr. Shater, Mr. Hunt also had experience operating as a Regional Security Manager externally.

Mr. Shater's statements regarding his individual performance factors and comments his supervisor recorded in his performance write-up are accurate. However, IPFs are reflective of an employee's performance relative to their peers at the current salary grade and are not an indicator of when or if an employee is ready for a promotion. "Top talent" or other qualitative descriptors are not official Shell terms. The successful applicant selected for the RSM - Americas role, Mr. Hunt, had comparable performance history and ratings to Mr. Shater at the time of his selection.

Current Estimated Potential (CEP) was not part of the selection decision for the RSM – Americas role. Further, CEP is not a measure of competency, but an estimate of leadership potential and is subject to change. The decision to select Mr. Hunt for the RSM- Americas role was based upon the recommendation of the interview panel that identified his experiences as a better match for the role (see *Summary of Facts*).

**Particular III:** *James Hall's, And Shell's, Long-Standing Preference For British Employees*

*The head of Shell's Corporate Security is a Vice-President names James W.D. Hall. Mr. Hall is a British citizen working in the Company's Global Headquarters located in The Hague, Netherlands. Mr. Hall is a former British government employee. Mr. Hall has hired a lot of British ex-government/military members to work in the Corporate Security department at Shell. He favors British persons. Among the openings over the past five years in the Corporate Security Department for Job Grade Level 1 or 2 roles (which are the senior level roles), British persons were selected for 82% of the positions (Ex. 6). I am not British. I am an American citizen, and my national origin is Egyptian and Sudanese. I speak Arabic, and some Russian.*

*In July 20, 2016 I was in Houston, Texas, for several days of work, at the request of the then current RSM-Americas, Crockett Oaks. Mr. Oaks, who I barely knew, invited me to Houston to meet with him and his security staff. During that visit, he told me he saw me as his successor when he eventually moved on from his RSM-Americas position. He invited me to Houston to meet*

8

*his staff, and other Shell business leaders and industry peers. Other than me, no one else was invited to visit.*

*During my visit to Houston, two Corporate Security employees I met (Bob Schoen and Andy Thompson), whom I had never met before, asked me "why does Corporate Security hate Americans?" Both Bob Schoen and Andy Thompson are retired veterans of the U.S. military and the Coast Guard.*

*On November 26th, 2016, the Shell Corporate Security Global Threat Analyst, Maria Kuusisto, who was based in The Hague at the time, told me that Mr. Hunt would be selected for the RSM – Americas position whenever it was posted over the next year. Ms. Kuusisto cited Mr. Hunt's close relationship with James Hall, and the fact that "the Brit boys stick together." Ms. Kuusisto thought I was best qualified for the job.*

**Response:** Mr. James Hall is the current Vice President of the Corporate Security organization. The comments regarding his location of employment and citizenship are accurate. As the Company's ultimate parent is a global organization, headquartered out of The Hague, Netherlands, it is reasonable for employees of European nationality to occupy the majority of these more senior level roles. However, the global organization actively works to have strong representation of local national talent in senior leadership positions in each of the countries in which the organization operates, including the United States.

Mr. Shater claims that Mr. Oaks invited him to Houston in July 2016 to meet with his security staff and communicated that he was viewed as his successor for the RSM – Americas role. It is not clear if this took place, but if it did, it appears that Mr. Oaks may have had multiple competitive successors in mind. Andy Thompson, who occupied the Country Security Manager – US role during that time, also recalls having conversations with Mr. Oaks around being a natural successor for the RSM – Americas role.

Andy Thompson and Bob Schoen do not recall ever making the statement "why does Corporate Security hate Americans?"

Lastly, Mr. Shater claims that Shell Corporate Security Global Threat Analyst, Maria Kuusisto, told him that he was the best qualified candidate for the job. However, as a member of the Corporate Security Leadership team during that time, Ms. Kuusisto stated that she felt all applicants had a fair shot for the RSM – Americas position and that there were no predetermined candidates.

**Particular IV:** *Shell's Termination of Crockett Oaks, The Then RSM – Americas, Allegedly For Refusing To Accede To Hall's Desire To Hire Based On Age And Sex, In Violation Of U.S. Law*

9

*In December 2016, Mr. Hall fired Crockett Oaks, the above-referenced RSM-Americas for Shell, who was a former FBI Special Agent before he joined Shell. Oaks is not British. He is an African-American. He was the only minority on the Shell Corporate Security Leadership Team ("CSLT"). Later in December 2016, through his legal counsel, Oaks asserted that Hall fired him because Oaks refused to make hiring decisions based on age and gender, in violation of U.S. laws, as Hall wanted him to do. In January 2017, Oaks filed a Charge of Discrimination with the EEOC's Houston office, making the same allegations (Ex. 7). Oaks had several emails from Mr. Hall to prove his allegations. See, e.g., Ex. 9-1.*

**Response:** The Company filed a response regarding Mr. Oaks' charge with the EEOC on April 6th, 2017. That response can be referenced for additional information regarding that matter. The Company denies the allegations in Mr. Oaks' charge and does not feel that they are relevant to Mr. Shater's allegations.

**Particular V:** *The Posting For Oaks' Old Job As RSM – Americas, And The Predetermined Decision To Give The Job To A British National, Wayne Hunt*

*In January 2017, Shell posted the opening for Oaks' old job as RSM-Americas. A job description for that job is attached (Ex. 8). Oaks had worked out of Houston, Texas, as would his replacement. As mentioned, it is normal for RSM openings to be filled by an individual who has successfully performed the CSM role. The most recently promoted three RSMs – Asia/Pacific, RSM-Europe & Russia/Caspian, and RSM- Middle East & North Africa, had all been promoted while they were CSMs. Indeed, in 2016, Oaks had told me that he saw me as his successor whenever he moved out of the role, as indicated above. I was completely qualified for the job, and my direct supervisor, Robert Buss, the RSM-Middle East & North Africa, had told me that during my performance reviews. In fact, as mentioned above, I was identified in my IDP by my supervisor as qualified and competitive for the RSM- Americas role (Ex. 5). Specifically, my supervisor had stated in writing in my IDP that, "[d]ue to experience, Walied would be a strong contender for both RSM MENA or Amercias." (Id.). The RSM-Americas position would have been a promotion to Job Grade 1, and would have entailed a raise and better benefits. So, I applied for the job.*

*Also, shortly after the RSM-Americas position was posted for potential applicants to apply, in approximately mid-January, something suspicious occurred. Specifically, on November 17, 2016, the invitation for the Americas Security Team meeting to occur on February 14, 2017 was sent out. Wayne Hunt, a Security Program Manager in The Hague, Netherlands, was not originally invited because he was not part of the Americas Security Team and had never before attended this annual meeting. But, on January 30, 2017, approximately two weeks after the RSM-Americas job opening was posted, Wayne Hunt's name was added to the invitation list. Wayne Hunt accepted the invitation on February 2, 2017, and attended the meeting with James Hall in Houston, Texas, along with the rest of the Americas Security Team. In hindsight, this suggests*

*that Mr. Hall had preselected Hunt for the RSM – Americas job from the start and wanted him to travel to Houston to slowly introduce him to the Americas Security Team weeks before the new RSM-Americas was announced, and before any interviews for the position had even taken place. Also around this time, there was an announcement from Corporate Security that Wayne Hunt would be managing three new direct reports. This suggests an attempt to increase the number of direct reports before the RSM – Americas job posting in order for Mr. Hunt to appear he has more significant management responsibilities than he really had (and thus was more qualified for the job than he actually was).*

*On January 31, 2017, Mr. Hall was in Dubai, and he stopped by and talked to me. He told me that he knew that I had applied for the RSM- Americas position, and said that I should have a "Plan B." Mr. Hall said I was so good in my current role that he did not want to lose me. Mr. Hall also said and that there was no replacement for me. This was untrue, as my supervisor, Mr. Buss, had already identified another CSM (of Saudi Arabia), Andrew Boult, a white British national, to replace me if I was promoted to RSM-Americas. When I told Mr. Buss what Mr. Hall had told me about there not being a replacement, he said this was not true and that Mr. Hall knew Andrew Boult had previously been identified as my replacement during succession planning sessions that Mr. Hall participated in.*

*Based on what Mr. Hall told me about needing a "Plan B" (which also, in hindsight, suggests that Mr. Hall had preselected Hunt for the RSM-Americas job from the start), I withdrew my application. Shortly thereafter, Mr. Hall asked me why I had done so, and I told him I had done so based on his comments, as it appeared to me he had already made a selection in his mind. He told me he had not. Despite not believing him, I knew I was clearly the most qualified for the position and then I reapplied.*

*On February 8, 2017, I was notified that I was going to be interviewed for the RSM-Americas position. I was interviewed over the phone by Mr. Hall, an HR Manager, and an External Relations Manager. Brian Butcher, an American and current Shell employee employed in Governmental Relations in Washington, D.C., and Wayne Hunt, also received interviews. I performed extremely well in my interview.*

*On March 23, 2017, the intra-Shell rumors were so strong that Mr. Hall had already preselected Wayne Hunt for the RSM- Americas position that Mr. Hall felt compelled to issue a note to all Corporate Security staff that read in relevant part, "…and I look forward to announcing a new RSM for the Americas. We are a small community in security and I know there has been speculation that a final decision has already been made. I can assure you that it has not, but will advise you as soon as we are ready to move forward."*

*On March 30, 2017, Oaks filed a lawsuit in Houston (Ex. 9), and attached the e-mails in which Hall expressed a desire for him to make hiring decisions based on age and sex, in violation of U.S. law, such as saying, stating, "[l]et's indeed look to backfill Bob's role with some **younger***

*external talent." (Ex. 9-1) (bold added). On April 10, 2017, Oaks and Shell jointly asked the Court to dismiss Oaks' case because it had been resolved. On April 11, 2017, the Court granted the joint motion (Ex. 10).*

*Mr. Hall already had a preference for white British nationals. The Oaks situation showed him that he could not count on an American – especially a former federal agent such as Mr. Oaks and me – to blindly and without any questions carry out his wishes. And, in the case of Mr. Oaks, the whole situation had blown up into a public lawsuit. With the Oaks' case now behind him, Mr. Hall no doubt wanted someone he could trust completely, no matter what. From all the circumstances, I believe it is clear that Mr. Hall wanted a fellow British national, like Wayne Hunt, that he could send to Houston, Texas to be the RSM – Americas, despite the fact that Mr. Hunt did not meet the basic qualifications for the position, and, on the other hand, I not only satisfied the basic qualifications for the position, but far exceeded them, and had already been designated as ready to assume that exact position (Ex. 5).*

*Sure enough, on May 1, 2017, Mr. Hall called me on the phone and told me that I was second for the RSM- Americas role, and that another candidate was selected. At that time, he did not provide a name of the candidate, citing HR formalities until there was an official announcement. I asked why I was not selected and Mr. Hall said that the other candidate answered a question about leadership better than I did (which I dispute). I had significant leadership experience in the public and private sectors and had also successfully completed an Executive Education Leadership Program at the Kellogg School of Management at Northwestern University in March 2017 that Shell approved me to attend and paid for. I told Mr. Hall that if he went through all of the listed competencies for the job from the job description, I am objectively qualified for them, and Mr. Hunt – who I suspected he had selected for the job – is not. Mr. Hall did not acknowledge Mr. Hunt was selected but said that "sometimes we can't go by competencies." With Mr. Hunt's selection into the role, all of the current RSMs within Shell are white male non-Americans.*

*A comparative analysis of my current job versus Mr. Hunt's job as a Security Program Manager before he was given the RSM – Americas role is attached as Exhibit 11. As it reflects, the RSM role and my CSM role are almost identical, and Mr. Hunt's job as Security Program Manager was not.*

*Also, the RSM – Americas role includes responsibility for several High Threat countries, such as Columbia, Trinidad & Tobago, Venezuela, Brazil and Mexico. As a CSM, I had managed a large region with multiple countries within Shell as indicated in the job posting, including many High threat countries, including Jordan, Yemen, Algeria, Syria, Lebanon and Israel. I had managed High threat countries so well since joining Shell that I was assigned Israel, Lebanon, Jordan, Algeria and Morocco, which were not part of my remit countries when I was first hired. In contrast, Mr. Hunt was based in The Hague, never managed any countries or regions, and his*

*primary job was to write technical security specifications for Shell on armored cars, fences, alarms, CCTV, etc. He had no experience at all managing High threat countries.*

*I continuously engaged with multiple Shell country heads of business units, governments and internal and external stakeholders, as required on the RSM – Americas job description. I gathered and disseminated intelligence to the business, managed security incidents and gave more than three dozen security awareness briefings to hundreds of staff. I also produced a Situational Awareness video that has had more than 4,000 unique views by Shell staff, making it one of the most viewed security communications ever issued by Shell Corporate Security. In contrast, Mr. Hunt did not engage continuously, if ever, with any Shell country heads of business units, governments, public security, or stakeholders, as required on the RSM – Americas job description. Mr. Hunt never gathered and disseminated intelligence to the business, never managed security incidents and never provided security awareness briefings to any staff.*

*According to the RSM job posting, the following competencies were required at the Mastery level:*

1. *Manages Security Risks – Mastery*
2. *Manages the Intelligence Process – Mastery*
3. *Managers Security Incident & Crises- Mastery*
4. *Manages Security Compliance & Integration – Mastery*
5. *Carry out Health, Safety, Security, and Environment & Social Performance Assurance – Mastery*
6. *Stakeholder Sensing, Engagement & Relationship Building – Mastery*

*I had all of these competencies by virtue of my job as a CSM. All of them are the same competencies for a RSM position. In contrast, Mr. Hunt did not even meet the Skill level, never mind Mastery for the competencies numbered 2, 3, 5, and 6 above, because he never performed these roles in his most recent position. A detailed comparison of my qualifications for the job, and Mr. Hunt's lack of qualifications, is attached hereto (Ex. 13).*

*It is especially bizarre that Mr. Hunt was selected for the RSM – Americas job because over 80% of Shell's assets in the U.S. are regulated by the U.S. Government ("USG"), including U.S. Coast Guard and DHS. Threat information is routinely shared by the USG with Shell and others in the extractives industry. Briefings are also held by members of the U.S. intelligence community (IC) with the private sector on threats to critical and energy infrastructure. To attend these briefings invited attendees must have an active USG security clearance. Non-Americans are not eligible for U.S. security clearances and cannot attend the briefings. This mandates the need for RSMs to be Americans and have access to classified threat reporting, as all previous RSM – Americas had. This makes it especially inexplicable that Mr. Hunt would be hired for the role. The only explanation is Mr. Hall's desire for a fellow British national he could send to*

*America and trust to follow his desires – in contrast to the prior, American, RSM – Americas, Oaks.*

*Additionally, there was no requirement in the RSM – Americas job posting for the need to have, or be able to obtain, a U.S. government clearance, although such a requirement was mandated for a much junior Security Advisor position in Houston that was posted in 2016 (Ex. 12 at 3). Given the interface with the U.S. Government, as indicated in the job posting, it would be natural for the position to include a U.S. security clearance. I believe this was not included because Mr. Hall knew that Mr. Hunt, a British national, does not have a U.S. security clearance. Other positions under the RSM – Americas role such as the CSM Americas, Regional Threat Analyst Americas and Security Advisor Americas, all have a U.S. security clearance. It is illogical that all the positions under the RSM – Americas can obtain classified information but cannot disseminate or discuss with the RSM – Americas, their ultimate superior. Furthermore, under certain rules of the Maritime Security Act of 2002, company information about critical national infrastructure cannot be shared with non-Americans, which again renders Mr. Hunt's selection for the role unexplainable on legitimate, non-discriminatory, grounds.*

*Another telling fact is that Spanish was listed as a preferred qualification for the RSM – Americas position (Ex. 8). This is because Mr. Hunt speaks Spanish and Mr. Hall inserted this to make Mr. Hunt appear more qualified since he lacked so many of the Core Security Competencies listed in the RSM – Americas job posting. This further demonstrates that Mr. Hall had preselected Hunt for the RSM – Americas job from the start. There has never before been an RSM position posted in Shell in which a language requirement was listed. This includes the most recent RSM positions posted for:*

- *RSM Asia – Pacific; covers all Asian countries and no language listed in job posting.*
- *RSM Europe & Russia/Caspian; covers all Europe/Russia/Caspian and no language listed in job posting.*
- *RSM Middle East & North Africa; covers all Middle East and North Africa and no language listed in the job posting.*

*Further, Crockett Oaks, the immediately prior RSM – Americas, did not speak Spanish, and neither did his predecessor, Rob Ream. And, the current most senior executive vice president for all Shell Americas does not speak Spanish, and he meets with South American senior government reps frequently. Additionally, the business language of Shell is officially English.*

*As indicated on my RSM – Americas application, I had significant experience managing risks and threats in South/Latin ("S/L") America. Examples I cited on my application were as follows:*

- *Conducted several White House presidential advances in S/L America as a senior US Secret Service agent.*

14

- *Participated in several White House visits to S/L America as a junior US Secret Service agent.*
- *Conducted investigations as a US Secret Service agent into counterfeit US currency originating in S. America ("Super note" case) financial fraud case with US national security implications involving state and non-state actors).*

*On May 18, 2017, my immediate manager, Mr. Buss said to a coworker that Wayne Hunt "should be embarrassed for getting that position." That same day, during the meeting with me in the Dubai office, Mr. Buss told me that I was the most qualified candidate for the RSM – Americas position given a number of factors. Mr. Buss told a coworker, however, that if I was preparing an appeal, James Hall had properly documented his selection of Mr. Hunt and covered his tracks.*

*Also, after I was not selected, Andrew Boult, the previously mentioned CSM of Saudi Arabia, complained to Mr. Buss (who is also his supervisor) that selecting Mr. Hunt over me was unfair and that Mr. Hunt did not have the qualification to be an RSM, because he had never been a CSM, and lacked certain competencies needed for the RSM role. Mr. Boult repeated these claims during a Shell People Survey Results conference call on November 2, 2017, that was heard by several others. Mr. Boult again repeated this claim directly to Mr. Hall during a Regional Workshop in Dubai on November 26, 2017. Others from Corporate Security also complained about Mr. Hall's selection of Mr. Hunt as RSM – Americas, including Vanessa Helayal, Dominic Taylor and Andrew Choong. They all cited favoritism towards British nationals and questioned Mr. Hunt's qualifications for the RSM position given that he was never a CSM, like the other individuals in RSMs roles had been, and never lived or worked in the United States.*

*In addition, following Mr. Hunt being appointed RSM – Americas, Maria Kuusisto was very vocal to other Shell staff that I never had a chance for the position and it was destined for Mr. Hunt all along because of his British nationality.*

*In June 2017, another member of the Corporate Security team based in The Hague, Jo Gacheru, told me that it was known Mr. Hunt would be appointed RSM – Americas as he had lobbied for the job and had a close relationship with Mr. Hall and James Lorge, deputy VP of Corporate Security, and also a British national. Marga Mulder, another member of the Corporate Security team based in The Hague had told me the same thing in April 2017.*

*Interestingly, in March 2017, while I was awaiting a decision on whether I would be awarded the RSM – Americas position, my supervisor, Mr. Buss, contacted me about a possible position within the Business Integrity Division ("BID") in Houston, Texas. I was not interested and despite this, Mr. Buss approached me four or five more times and told me that he and James Hall had a conference call with the head of BID to discuss my qualifications and that she was interested in me applying. All this for a job that I told Mr. Buss from the very start I was not interested in. I believe they pushed me to that position because, as stated by Ms. Kuusisto, Mr.*

*Gacheru and Ms. Mulder, and proven by a mountain of evidence, Mr. Hall knew he would give the RSM – Americas position to Mr. Hunt from the start, and he wanted me out of the way, so that I could not make the legitimate discrimination claim I am making now.*

**Response:** The RSM-Americas role was posted in January 2017. Mr. Shater's statement that it is 'normal' for RSM roles to be filled by individuals who performed the CSM role is fair based on prior precedence; however, occupying a Country Security Manager role or a Cluster Security Manager role is not a prerequisite for the RSM role. For example, the previous incumbent in the RSM – Americas role, Crockett Oaks, had not served in a Country Security Manager or Cluster Security Manager role before taking on the RSM – Americas role. As stated in the response to Particular III, Mr. Shater's statements around his supervisor's comments in his Individual Development Plan (IDP) are accurate.

Mr. Shater states that Mr. Hunt attended the Americas Security Team meeting in Houston with Mr. Hall and suggests this action demonstrates he had been pre-selected for the role. This statement is false. Mr. Hall did not travel to Houston to attend this meeting. Mr. Hunt did attend the meeting as he was invited to provide an update on a specific system being implemented at Shell. He was the Security Programs Manager at the time and was part of the central team, supporting sites through the development of technical security systems. It is standard practice for members of the central team to attend regional workshops as the central team's role is to support the regions.

Mr. Shater claims that the addition of three direct reports to Mr. Hunt's remit was done intentionally to increase his competitiveness for the RSM – Americas role. This statement is inaccurate. The decision to move three direct reports under Mr. Hunt was driven by a business need to align employees assigned to a specific project, with a security focus, under the Security Program Manager, Wayne Hunt. The decision to change the reporting lines benefited the business and was a decision made by several leaders, both inside and outside of Corporate Security. The decision was made in October 2016, well before it became clear that the RSM - Americas role would need to be filled.

Mr. Shater also claims that during the resourcing process for the RSM – Americas role, Mr. Hall informed him that he should have a "Plan B." This is a true statement, however, Mr. Hall also had a similar conversation with the successful candidate, Mr. Hunt. Mr. Hall viewed both candidates as competitive and not being aware of how the interview process would conclude, he encouraged both to consider multiple career options out of support for the development of his staff in the Corporate Security Group. Both Mr. Hall and Mr. Buss confirmed they would not have had concern in securing a backfill for Mr. Shater (in his Cluster Security Manager role) if he had been the successful applicant on the RSM – Americas role.

Mr. Shater claims, "the intra-Shell rumors were so strong that Mr. Hall had already pre-selected Wayne Hunt for the RSM – Americas position that Mr. Hall felt compelled to issue a note to all

Corporate Security staff" addressing the selection. Mr. Hall did send an announcement out to Corporate Security staff on March 23rd, in which the delay in the announcement of the RSM – Americas position was addressed. However, this announcement was sent after the interview process for the RSM – Americas position had concluded and was sent with the intent to address the delay in providing the outcome. The delay in announcement was due to factors outside of the selection panel's control.

Mr. Shater claims that his manager, Mr. Buss, made a number of comments regarding the selection of the RSM – Americas role. Mr. Buss denies making any of the statements Mr. Shater claims he made.

The remaining statements made in this section have to do with the selection of Mr. Hunt over Mr. Shater for the RSM – Americas position. Many of the statements are speculative in nature and do not accurately reflect Mr. Hunt's qualifications for the RSM – Americas role. While Mr. Hunt had not previously occupied a Country Security Manager or Cluster Security Manager role at Shell, he had experience operating as a Regional Security Manager externally. During his time at Shell, Mr. Hunt had also gained experience working with senior leaders, including engaging with a Country Chair while completing a scope of work in Venezuela. Mr. Shater also comments that it is illogical for the RSM – Americas role not to have US Security Clearance listed as a job requirement on the posting. However, when Mr. Oaks, who is an American, became Regional Security Manager, obtaining US Security Clearance was listed as a preference and not listed as a job requirement.

Please reference the previous 'Summary of Facts' section for the Company's full response regarding the selection decision.

**Particular VI:** *Mr. Hall And Shell's Pattern of Discrimination, and My Complaint To Shell HR in Houston, Texas, Which Was Swept Under The Rug*

### 1.   Mr. Hall And Shell's Pattern Of Discrimination

*In early 2013, before I joined Shell, Shell posted an external position for the RSM- Middle East & North Africa. This position was posted on the Shell external website. Previously, Shell had attempted to recruit internally for the position but no candidates were deemed qualified, and the company went to the outside. I applied for the position and received confirmation that my application had been received. I met or exceeded all the position qualifications. I was: (a) already living and working in Middle East for ConocoPhillips as a Regional Security Director for Middle East and North Africa Business Unit; (b) managing a region very similar or the same countries as the Shell position; (c) had the same Regional Security title and had qualifications not in the Shell RSM posting, such as Arabic language, a college degree and a master's degree. Shortly after applying I received notice that my application had been withdrawn, and no reason was given. The position was later given to Mr. Buss, a British white male Shell staff member who had been with Shell for only 8 months, had no prior private sector experience, no previous oil*

17

*and gas experience, no local language and no college degree. Mr. Buss is now my supervisor. Mr. Hall was the hiring manager.*

*In May 2014, while working for Shell, I applied for the RSM-Europe and Russia/Caspian. I met all the qualifications, had covered Russia/Caspian for three years with my previous employer, ConocoPhillips, traveled to multiple countries in the region more than twenty times, and spoke basic Russian. The position was given to a white British male, and ex-British government member, who had been with Shell for only 8 months, had no prior private sector experience, no previous oil and gas experience, no local language and only four to five years' experience in the UK government, in a similar UK government agency where Mr. Hall had previously worked before joining Shell. Mr. Hall was the hiring manager.*

*In May 2015, Corporate Security announced a position for Iraq Country Security Manager. The posting identified a "Preferred Candidate", meaning there was already a selected candidate, dissuading me and others from applying. The position was subsequently given to a British white male. A Deputy Country Security Manager position was also posted. The position was subsequently given to a British white male. Both positions had previously been held by British white males. With the exception of a white South African male, all the senior and mid-level Shell Iraq security positions are held by British white males, almost all of whom have served together in the British military.*

*In September 2016, while working for Shell, I applied for the RSM equivalent position of Strategy and Assurance Manager based in The Hague. I met all the qualifications. In my Individual Development Plan (attached as Ex. 5) my supervisor had noted I would be a strong candidate for the position. At that time, I had conducted more security assurance activities (conducting Security Risk Assessments, writing Country Security Plans, writing Facility Security Plans, writing Country Security Threat Assessments) than all the RSMs combined (note: Wayne Hunt has never conducted one of these assurance activities). Despite this, I was not even selected for an interview. The position was given to a British white male with less experience than me in the private sector, government sector and oil and gas industry. Mr. Hall was the hiring manager.*

*In September 2016, a senior security position (Job Group 1), General Manager, Nigeria was opened. The job was not posted for staff to apply. Instead, Mr. Hall selected 3 candidates, all British males, to be considered for the position. Although I had covered Nigeria previously for US oil company, ConocoPhillips, and traveled to Nigeria, including the oil capital of Nigeria, Port Harcourt, and to the dangerous Niger Delta, frequently for 3 continuous years, had worked with the Nigerian military battling local militants, and understood the security dynamic of the country very well, I was not even selected to be considered or interviewed for the position. The position was given to a British white male.*

*In September 2017, Shell announced it would exit the Majnoon project in Iraq. Following that announcement, a meeting was held in my office in Dubai to discuss how to handle any protests*

*by staff in Iraq or Dubai, as all Iraq expatriate staff reside in Dubai and work in the Shell Dubai office. Mr. Hall participated in the meeting, as well as my supervisor, Mr. Buss, a British male. Also in attendance were two managers from the Shell Iraq team, both British males. In addition, two other members of the Corporate Security team, Dan Jones, based in London, and Simon Cutler, based in The Hague, were invited. Both are British males. Mr. Jones and Mr. Cutler had been with the company less time than me. Neither Mr. Jones nor Mr. Cutler had ever been to Shell Dubai, to Shell Iraq, or to any Shell location in the Middle East. Neither speaks Arabic or has any familiarity with Dubai or Iraq based Shell staff. Although I was based in the office which would be impacted by any protest activity (Shell Iraq expatriate staff are based in Dubai in my office), I spoke Arabic, and had been to Iraq more than twenty times in my career, I was not invited to the meeting. Further, I had managed a similar asset sale in Jordan where Shell staff were let go and managed this difficult situation which included protests outside the Shell office, Jordan parliament members protesting, and media coverage including Aljazeera. Despite this, my two Europe-based British counterparts were selected to handle the Majnoon exist assignment instead of me.*

*In September 2017, Corporate Security created the first ever Regional Security Advisor position. The position was a job group 2, one higher than my job group 3. The position was based in London, the most stable region (Europe) with the least High Threat countries of any region. The position was given to a white male British national who had approximately 2 years with the company, and no previous oil and gas experience.*

*There is a Staff Announcements page kept by Corporate Security that goes back to 2012. Approximately 95% of all promotions to job group 1 or 2 (management) have gone to white male persons, 82% of those to British nationals. The current Shell Corporate Security Leadership Team is made of up 100% white males, almost all British nationals. There has never been an RSM whose nationality is Asian, African, Middle Eastern or Spanish/Latin American.*

**Response:**

Mr. Shater expresses concern regarding the selection of applicants on roles that were resourced in Corporate Security and outside the Corporate Security group between 2013 and 2017. None of these roles are Shell Oil Company positions. All of the roles were located outside of the US where US laws generally do not apply. Below is the Company's response on each of the positions in question.

- Regional Security Manager – Middle East & North Africa: The decision was made to select an internal applicant, who had relevant experiences given his current employment within the Corporate Security group. It is common practice within the Company to consider internal talent prior to considering talent in the external market.

- Regional Security Manager - Europe and Russia/Caspian: This role was originally posted internally in 2014 and Mr. Shater was one of the applicants. James Lorge was selected due to his experience in the region. Mr. Shater did not have the required depth of experience nor the demonstrated understanding of threats in the region. In 2016, the Regional Security Manager – Europe and Russia/Caspian role was vacated upon Mr. Lorge's move to another position and the role was subsequently posted internally. The successful applicant and current incumbent is of German Nationality.

- Iraq Country Security Manager: Mr. Shater did not apply for this role. While the posting did indicate that there was a preferred candidate for the role, this disclosure is intended to inform applicants that there is a competitive candidate in mind and is done in the interest of transparency. This disclosure does not indicate a pre-determined selection as hiring managers are required to complete a thorough resourcing process. It is not uncommon for managers to select an applicant other than the preferred candidate upon review of the full candidate slate.

- Deputy Country Security Manager – Iraq: Mr. Shater did not apply for this role.

- Strategy and Assurance Manager: This role was posted internally in 2016. Mr. Shater's statements that he applied and was not selected for an interview are accurate. Strategy was not viewed as a strength for Mr. Shater relative to the shortlisted candidates who occupied more senior positions at the time of the posting and brought more experience in this space. The selection panel, comprised of leadership from the Real Estate business, HR and Mr. Hall, conducted interviews to select the successful applicant, James Lorge. This role is based in The Hague, Netherlands.

- General Manager – Nigeria: This role is not housed within the Corporate Security organization; however, Mr. Hall did provide input on the Corporate Security talent being considered. Mr. Shater's name was not put forth as he did not possess the same level of experience and proven track record of delivery in challenging Corporate Security roles, in comparison to the considered candidates. The candidates put forth occupied more senior positions than Mr. Shater and were members of the Corporate Security Leadership team at the time.

- Majnoon Project – Iraq: Mr. Shater states that Shell announced the decision to exit the Majnoon project in September 2017 and he claims that he was not included in the subsequent meetings. This is an accurate statement. As the matter concerned Iraq, it would fall to the remit of the Iraq Corporate Security Team and Majnoon Security Managers to address. Mr. Shater was not consulted given the project did not fall within the remit of his role.

- Regional Security Advisor – Europe, CIS, SSA: Mr. Shater did not apply for this role.

**Particular VII:** *My Complaint To Shell HR in Houston, Texas, About James Hall Which Was Swept Under the Rug, Which Is In Telling Contrast To How Shell Treated Crockett Oaks*

*After I did not get the RSM-Americas job I filed a complaint with Shell's HR Department on May 1, 2017 in Houston, Texas, and sent them a lot of information. In fact, I told HR in writing that Wayne Hunt would be selected for the RSM- Americas position before his selection was formally announced on May 4, 2017.*

*Sonja Gonzales, HR Manager for the Global Functions Group, allegedly reviewed my complaint. She told me an investigation would be conducted which would take two weeks. Erin Lattin from HR was assigned my case. At one point, Ms. Lattin told me I had supplied a lot of evidence in support of my claim. After that, Ms. Lattin was removed from my case and replaced by Katherine Le Denmat from HR. I continued to supply evidence demonstrating discrimination towards me, including discriminatory and anti-Arab comments made by senior Corporate Security staff, as well as favoritism towards British nationals in promotions. I was informed by phone on July 7, 2017, that no further action would be taken on my complaint. In the end, although professional in their dealing with me, Ms. Gonzales and Shell did nothing. On the one hand, Shell did nothing to rectify this situation even though I supplied HR with overwhelming proof that the RSM-Americas hiring process was dishonestly rigged from the start to hire Mr. Hunt. Yet, on the other hand, from the sworn allegations in his lawsuit (Ex. 9), and its attachments, it appears that Shell launched an international BID investigation, and then fired Crockett Oaks, after he refused to follow Mr. Hall's desires to hire using age and gender, based on no evidence that Oaks had done anything to rig the at-issue hiring process in that situation.*

*Mr. Hunt began working in his role in Houston, Texas, as the RSM-Americas in August 2017. In the meantime, I have stayed in my same role in Dubai.*

*I believe based on my overwhelming evidence that I have provided, that Shell discriminated against me based on my national origin and race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.*

**Response:**

On May 1, 2017, Mr. Shater raised a complaint through the Company's HR department to Sonja Gonzales, HR Manager – Global Functions, alleging that he had been subjected to discrimination resulting from the selection decisions on several roles in the Corporate Security department. The complaint was assigned to Erin Lattin, HR Account Manager – Global Functions, to investigate initially, before being re-assigned to Katherine Le Denmat, HR Team Lead – Global Functions.

The investigation was reassigned due to Ms. Lattin's departure from the group to take a new role within the Company.

Following the investigation and a thorough analysis of the criteria used to evaluate the candidates and selection decisions for the roles, the claims of discrimination were not substantiated. In his complaint, Mr. Shater also provided his written account of examples of anti-Muslim comments made to him or overheard in the workplace. However, when asked, he would not provide Ms. Le Denmat with any names of individuals who made the alleged comments or witnesses to what he alleges was said.  This made it difficult to effectively investigate his claims.

In March 2018, Mr. Shater was encouraged to apply on the Regional Security Advisor – Middle East, North Africa role in the Corporate Security Group. The Regional Security Advisor – Middle East, North Africa role is one of four Regional Security Advisor roles in the Corporate Security organization. This role was posted with Mr. Shater as the preferred candidate, recognizing he had recently taken on additional scope in his Cluster Security Manager role. Mr. Shater was the successful applicant and he will begin the role in May 2018. This role is a promotion for him with an increase to his overall wages and benefits.

**Conclusion**

Mr. Shater alleges he was discriminated against due to his race and national origin, but this is not true. The decision to employ Mr. Hunt for the RSM – Americas role was based upon the recommendation of the interview panel that identified his work experiences as a better match for the role. Mr. Shater's race and national origin were not a factor in the Company's employment decision. Mr. Shater remained a candidate for future security roles and was encouraged to apply on US based positions that would have represented a promotion for him. In March 2018, Mr. Shater was encouraged to apply on the Regional Security Advisor – Middle East, North Africa role and was the successful applicant. He will begin the role in May 2018. This role is a promotion for him with an increase to his overall wages and benefits.

For these reasons, the Company has met all of its obligations under Title VII of the Civil Rights Act of 1964 as amended, and this charge should be dismissed.

Sincerely,

Sarah Skelton
Human Resources Account Manager
Shell Oil Company

Exhibit A: Shell Code of Conduct
Exhibit B: Shell in the US Equal Opportunity Policy
Exhibit C: Shell in the US Anti-Harassment Policy