United States District Court
Southern District of Texas

**ENTERED**

June 01, 2022

Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WALIED SHATER, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:20-CV-1465 |
| | § | |
| SHELL OIL COMPANY, | § | |
| | § | |
| Defendant. | § | |

## ORDER

Pending before the Court is the Motion for Summary Judgment filed by Defendant Shell Oil Company ("Defendant" or "Shell"). (Doc. No. 21). Plaintiff Walied Shater ("Plaintiff" or "Shater") responded in opposition (Doc. No. 22), and Shell replied in support. (Doc. No. 23).

After reviewing the relevant briefing, summary judgment evidence, and applicable law, the Court grants Shell's Motion.

## I.     Background

This is an employment discrimination case. The factual background, according to the Complaint, is summarized in the paragraphs that follow. (*See* Doc. No. 1).

### A.     Background Before Shell

Plaintiff Walied Shater, of Arab/Middle Eastern (Egyptian and Sudanese) race and national origin, has spent over 25 years working as a security professional. (Doc. No. 1 at ¶ 13). From 1995 to 2007, Shater, who is an American citizen, worked as a Special Agent for the United States Secret Service ("Secret Service"). (*Id.*). In 2000, he was assigned to the Presidential Protection Division of the Secret Service as a Special Agent at the White House. (*Id.*). In this capacity, Shater served on the protective detail for two United States Presidents, served as lead agent on various

presidential visits, and acted as an undercover agent targeting suspected terrorists involved in the September 11 attacks. (*Id.*).

In 2007, Shater left the Secret Service to serve as a Regional Security Director for the Middle East and North Africa Business Unit of ConocoPhillips. (*Id.* at ¶ 14).

**B.      Shater Moves to Shell**

In August 2013, Shater was hired by Shell to be a Country Security Manager ("CSM").[1] (*Id.* at ¶ 15). He relocated to Dubai, United Arab Emirates, for this role and reported to the Regional Security Manager ("RSM") for Middle East & North Africa ("MENA"). (*Id.* at ¶ 16). As a CSM, Shater was responsible for security in seven countries, whereas the typical CSM was responsible for a single country. (*Id.*). Shater allegedly excelled in the role, receiving positive performance reviews each year from 2014–2017, including that which purportedly described his performance as "outstanding." (*Id.* at ¶ 17). In January 2017, Shater's supervisor Robert Buss ("Buss") allegedly identified him as "qualified and competitive" for both the RSM–Americas and RSM–MENA roles should they become available. (*Id.* at ¶ 20). The RSM–Americas position oversees securities throughout the Americas region. (Doc. No. 1-8 at 2). Presumably, the RSM–MENA position oversees securities in the Middle East and North Africa.

**C.      The Hiring Process for RSM–Americas Position**

In early 2017, the RSM–Americas position, based out of Houston, Texas, became available after the previous position holder, Crockett Oaks ("Oaks"), was fired by Shell's Vice President of Corporate Security, James Hall ("Hall"). (Doc. No. 1 at ¶¶ 26–27). Shell invited potential applicants to apply for the opening. (*Id.* at ¶ 28). Around this time, Shater alleges two "suspicious" incidents occurred involving Shell colleague Wayne Hunt ("Hunt"), a Security Program Manager

---

[1] In Shater's deposition, this position is referred to as "Cluster Security Manager." (Shater Depo., Doc. No. 22, Ex. P at 56:18–57:10).

based in The Hague, Netherlands. (*Id.* at ¶ 28–29). First, Shater alleges that Hunt was belatedly invited to attend the Americas Security team meeting scheduled to occur in February 2017, despite having never attended the meeting previously nor being a member of the Americas Security team. (*Id.* at ¶ 28). Second, Hunt was assigned three new direct reports in what Shater contends was an effort to bolster his credentials for the RSM–Americas role. (*Id.* at ¶ 29).

On January 31, 2017, while visiting Dubai, Hall allegedly told Shater that he was aware that Shater had applied for the RSM–Americas position, but that Shater should have a "Plan B" because "Shater was so good in his current role" and "there was no replacement for Shater." (*Id.* at ¶ 30). As a result, Shater withdrew his application. (*Id.* at ¶ 31). Shater, however, now believes that Hall's "no replacement" explanation was untrue because Shater's supervisor, Buss, subsequently told Shater that Shell had identified another Shell employee, Andrew Boult ("Boult"), as Shater's likely replacement during succession planning sessions in which Hall was a participant. (*Id.* at ¶ 30). Shortly thereafter, Hall asked Shater why he withdrew his application, and when Shater explained that it appeared to him that Hall had already selected an applicant for the position, Hall told Shater that no selection had been made. (*Id.* at ¶ 31). Shater then reapplied. (*Id.*).

In early February, Shater was informed that he had been selected to interview for the RSM–Americas position. (*Id.* at ¶ 32). Two other Shell employees—Brian Butcher and Hunt— were also invited to interview. (*Id.*). Shater interviewed via phone/Skype with a panel consisting of: Hall, Human Resources ("HR") Manager Andrew Maynor ("Maynor"), and External Relations Manager Barbara Blakely ("Blakely"). (*Id.*).

In March, while awaiting a decision, Buss contacted Shater about an opening in the Business Integrity Division ("BID") in Houston, Texas. (*Id.* at ¶ 34). Though Shater was not

3

interested in the role, Buss continued to approach him about the position, going so far as to discuss Shater's qualifications with the head of BID. (*Id.*). Apparently, by late March, rumors were spreading that Hall had selected Hunt for the position. (*Id.*). Evidently in response, Hall issued a note to Corporate Security staff explaining that no candidate had yet been selected. (*Id.* at ¶ 35).

On May 1, 2017, Hall called Shater to inform him that another candidate had been selected, but noted that Shater had been the second choice. (*Id.* at ¶ 38). When Shater asked why he was not selected, Hall explained that the chosen candidate, Hunt, had answered a question about leadership better than Shater. (*Id.*). Shater countered, explaining that he was objectively qualified, having all of the competencies outlined in the job description, while Hunt, whom he suspected received the promotion, was not.[2] (*Id.*). Hall is alleged to have responded "sometimes we can't go by competencies." (*Id.*).

## D.    Aftermath of Hunt's Selection

After learning that he had not been selected for the RSM–Americas role, but before Hunt's selection was formally announced, Shater filed an internal complaint against Hall with Shell's HR department. (*Id.* at ¶ 61). Sonja Gonzales, the HR Manager for the Global Functions Group, allegedly reviewed Shater's complaint and told him that a two-week investigation would be conducted. (*Id.* at ¶ 62). Erin Lattin, an HR representative, was initially assigned to the matter, but was subsequently replaced by Katherine Le Denmat, another HR representative. (*Id.*). Shater allegedly provided evidence demonstrating discrimination against him as well as favoritism toward British nationals. (*Id.*). On July 7, 2017, Shater was informed that no further action would be taken

---

[2] According to Shater's Complaint here, the RSM–Americas job description required "Mastery level" competency for the following: (1) Manages Security Risks; (2) Manages the Intelligence Process; (3) Manages Security Incident & Crisis; (4) Manages Security Compliance & Integration; (5) Carry out Health, Safety, Security and Environment & Social Performance Insurance; and (6) Stakeholder Sensing, Engagement & Relationship Building. (Doc. No. 1 at ¶ 42). Shater alleges that he obtained all of these competencies through his CSM position. (*Id.* at ¶ 43).

on his complaint. (*Id.*). Shater alleges this result was unsurprising, claiming that Gonzales has a history of covering up Hall's discriminatory actions. (*Id.* at ¶ 63).

On February 18, 2018, Shater filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging race and national origin discrimination. (*Id.* at ¶ 66). Shater alleges that in its response to the charge, Shell changed its story as to why Hunt was selected over Shater for the RSM–Americas role. (*Id.* at ¶ 67). Specifically, Shell explained in its EEOC response that the interview panel evaluated three criteria for the ideal candidate: (1) experience building and managing a security team; (2) experience and understanding of security issues in Central and South America; and (3) connectivity to United States security agencies. (*Id.* at ¶ 68). Shell's response explains that "[t]he panel determined that Hunt's leadership experience and style were both preferable for this role," while also highlighting Hunt's years spent living in Mexico. (*Id.* at ¶ 69). Eventually, the EEOC issued a Dismissal and Notice of Rights letter. (*Id.* at ¶ 100). Shater then filed the instant action alleging race and national original discrimination, bringing a failure-to-promote discrimination case against Shell pursuant to Title VII.

Shater alleges that he was more qualified than Hunt for the position given his security background and applicable clearances, his experience in South America while in the Secret Service, and the similarities between his CSM position and the RSM–Americas role. (*Id.* at ¶¶ 43–52). Shater also alleges that Hall and Shell have exhibited a pattern of discrimination favoring white British nationals. (*See generally id.* at ¶¶ 53–60). Additionally, Shater claims that Shell downplayed his experience in South America as a Secret Service agent and the value brought by his United States security clearance (a clearance that was preferred for the position, and one that Hunt could not obtain as a British national). (*Id.* at ¶¶ 73–77). Ultimately, Shater concludes that

"he was clearly better qualified than Hunt" and should have received the promotion. (*Id.* at ¶¶ 77-78).

Shell denies Shater's claims and argues in the current motion that Shater's race and national origin discrimination claims fail as a matter of law. (Doc. No. 21).

## II.    Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

## III.    Analysis

### A.    Evidentiary Concerns

Before discussing the merits of the pending motion, the Court notes that in his response, Shater frequently refers to a copy of his Charge of Discrimination filed with the EEOC ("Shater COD") to support his allegations. (Doc. No. 22-1, Ex. A). This charge appears to have been a sworn statement, although the Court has no competent summary judgment evidence that proves that fact or even that establishes that the copy is a true and accurate copy of the charge. Within the Shater COD, Shater offers out-of-court statements from several individuals. (*See generally* Shater COD, Doc. No. 22-1, Ex. A). The document itself, however, while allegedly sworn to under the penalty of perjury, is an out-of-court statement because Shater made the statement to an administrative agency outside of this proceeding. *See* Fed. R. Evid. 801(c)(1). To the extent that the Shater COD is offered for the truth of the matter asserted, the Court finds this document to be inadmissible hearsay. *See Brackens v. Dallas Indep. Sch. Dist.*, No. 3:09-CV-0642-D, 2010 WL 5464823, at *6 (N.D. Tex. Sept. 20, 2010) (stating that "charge of discrimination constitutes hearsay to the extent it is offered to prove the truth of the harm stated therein").

Further, to the extent that the Shater COD refers to statements made by other individuals, those statements would constitute double hearsay, or as it is sometimes described, hearsay within hearsay. While Federal Rule of Evidence 801(d)(2) (admission of party opponent) might get one around the first layer of hearsay, depending on the speaker and the surrounding circumstances, it does not get one around the second layer of hearsay.[3]

---

[3] The Court notes that to prove a statement qualifies as an opposing party's admission, the statement must be made by an individual who was authorized to make such a statement (*see* Fed. R. Evid. 801(d)(2)(C)) or be made by a party's employee on a matter within the scope of that employment or relationship (*see* Fed. R. Evid 801(d)(2)(D)). There must be proof besides the alleged statement to prove these exceptions apply. None was provided here.

In *EEOC v. LHC Group., Inc.*, the Fifth Circuit recognized that EEOC charges present hearsay obstacles. 773 F.3d 688, 701 (5th Cir. 2014). At issue in the *LHC* case was the admissibility of statements contained in the plaintiff's EEOC charge. *Id.* To begin its analysis, the Fifth Circuit held that "[t]he EEOC charge is competent for use at summary judgment unless it is inadmissible under the Federal Rules of Evidence or fails to comport with Federal Rule of Civil Procedure 56(c)'s requirements." *Id.* When addressing the pertinent hearsay questions, the Fifth Circuit held:

> Here, although the statements contained in the EEOC charge suffer from two layers of potential hearsay infirmities, they fit comfortably within two hearsay exemptions. First, the statements in Sones's charge were made by LHC employees speaking on behalf of the company; they are therefore not hearsay under Federal Rule of Evidence 801(d)(2). Second, Sones's charge repeating the statement is not hearsay because it is not being offered for the truth of the matter asserted, i.e., for the proposition that Sones was in fact a liability. *See* Fed. R. Evid. 801(c)(2). *Finally, Sones reproduced the statements in a signed, verified document based on her personal knowledge of the conversation, in accordance with Rule 56(c).* See Fed. R. Civ. P. 56(c)(4).

*Id.* (emphasis added). Critically, the statements at issue in the *LHC* case were reproduced, presumably in an affidavit or declaration, before the court, thereby conforming to the requirements of Rule 56(c). This is not true for the Shater COD, which, while allegedly sworn to, was not sworn to before this Court, but before an administrative agency. Moreover, it is unaccompanied by an affidavit or declaration before this Court. Furthermore, whereas the statements in the *LHC* case were not being offered for the truth of the matter asserted, the statements contained within the Shater COD are largely being offered for the truth of the matter asserted and consequently are subject to the restrictions on the use of hearsay.

Nevertheless, out of an abundance of caution, and because neither party has briefed the admissibility of the Shater COD (or the statements therein), the Court analyzes the merits of the motion, taking into consideration the alleged testimony in the Shater COD.[4]

## B.    Proof of a Title VII Claim

Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's *race*, color, religion, sex, or *national origin*." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). "Title VII discrimination can be established through either direct or circumstantial evidence." *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). Where, as in this case, the plaintiff's case is built upon circumstantial evidence, a court relies upon the *McDonnell Douglas* framework for its analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). In *McDonnell Douglas*, the Supreme Court set forth a three-part framework to analyze a Title VII discrimination claim. First, the plaintiff must establish a prima facie case of discrimination. *Id.* If the plaintiff does so, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* If the employer provides a legitimate, nondiscriminatory reason for the employee's rejection, the burden shifts back to the plaintiff to prove that the employer's reason was pretext for discrimination. *Id.* at 804–05.

The Court will evaluate each part in turn, beginning with Shater's prima facie case of discrimination.

---

[4] The Court, in this Order, grants Shell's Motion for Summary Judgment because Shater ultimately did not raise a material fact issue on the Title VII claim. In so ruling, it considered the hearsay contained in the Shater COD. While the Shater COD does not represent the entirety of Shater's evidence, if the Court struck (or did not consider) the Shater COD, Shater would have even less "evidence" in support of his claims than the Court considered, leaving Shater's response fatally lacking.

### C.      Shater's Prima Facie Case of Discrimination

First, Shater must establish a prima facie case of discrimination. Under Title VII, a prima facie case of discrimination based on disparate treatment requires a showing that the plaintiff: (1) is a member of a protected class, (2) was qualified for the position at issue, (3) was the subject of an adverse employment action, and (4) was treated less favorably because of his or her membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances. *Paske v. Fitzgerald*, 785 F.3d 977, 985 (5th Cir. 2015).

In its motion, Shell impliedly concedes that Shater has established a prima facie case of discrimination, as it does not offer any argument on this point. Moreover, it is apparent that Shater has made the necessary showing. The Court, therefore, considers this point to be unopposed and moves to the subsequent prongs of the *McDonnell Douglas* analysis.

### D.      Shell's Legitimate, Nondiscriminatory Reason for Not Promoting Shater Into the RSM–Americas Role

Shell argues that Shater's Title VII claim must fail because Shell has presented a legitimate, nondiscriminatory reason for not promoting Shater. (Doc. No. 21 at 16). "An employer may avoid liability for . . . discrimination . . . by producing evidence tending to show that it had a legitimate, nondiscriminatory reason for its disputed decision." *Patrick v. Ridge*, 394 F.3d 311, 316 (5th Cir. 2004). "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)).

Shell contends that its legitimate, nondiscriminatory reason for not promoting Shater was that he was not the best candidate for the RSM–Americas role. (Doc. No. 21 at 16). Shell supports

this argument in part by detailing its selection process. After narrowing down the applicant pool for the RSM–Americas role to three applicants, Shell explains that it organized a panel consisting of Hall, Maynor, and Blakely, to interview the finalists, which included Shater and Hunt. (Hall Decl., Doc. No. 21-1 at ¶ 10). The panel "was developed to ensure a diversity of viewpoints and objectivity in the interview process" and was "[c]onsistent with Shell's approach to filling vacancies for other leadership roles." (*Id.*). According to Blakely, each candidate was asked the same questions and the questions covered a variety of topics, including "each candidate's leadership experiences and style." (Blakely Decl., Doc. No. 21-6 at ¶ 6). The specific criteria considered by the panel included "leadership and managerial experience," "experience and understanding of security issues in Latin America," and "connectivity of the candidates with the U.S. security agencies." (Hall Decl., Doc. No. 21-1 at ¶¶ 16–18).

With respect to leadership and managerial experience, Hall explained that Hunt's leadership style appeared to be collaborative in nature, whereas Shater's "represented a directive approach." (*Id.* at ¶ 16). During the interview, Hunt detailed his previous experience as a United Kingdom liaison representative working with a team in Colombia and his subsequent reliance on that experience to create a new team in Mexico. (*Id.*). Both Hall and Blakely testified to having been more impressed with Hunt's responses to their questions concerning leadership as compared to Shater's. (*See* Hall Decl., Doc. No. 21-1 at ¶ 16; Blakely Decl., Doc. No. 21-6 at ¶¶ 6–7).

With respect to experience and understanding of security issues in Latin America, Hall testified that Hunt, unlike Shater, had previously lived in the Latin American region for several years and was competent in Spanish. (Hall Decl., Doc. No. 21-1 at ¶ 17). Hunt's application also included information about his master's thesis, "which examined cultural differences in Latin American Security teams." (*Id.*). Conversely, according to Hall, Shater's experience in the region

was more limited, "consisting of primarily advanced scouting locations during his employment with the Secret Service." (*Id.*).

Finally, with respect to connectivity with United States security agencies, Hall determined that Shater was more qualified than Hunt given "his 12 years of service in the Secret Service and his eligibility to obtain secret-level security clearance." (*Id.* at ¶ 18). On this point, Hunt explained in his interview that he had experience dealing with United States security agencies on regulatory issues through his work at Shell, and that to compensate for his lack of clearance, he would use "U.S. security Manager, Mr. Robert Schoen" to ensure all necessary connections took place. (*Id.*).

Shell contends that upon completion of the interviews, both Hall and Blakely believed that Hunt was the right fit for the job, but Maynor was partial to Shater. (*See, e.g.,* Hall Decl., Doc. No. 21-1 at ¶ 20; Blakely Decl., Doc. No. 21-6 at ¶ 8; Maynor Depo., Doc. No. 21-9 at 4). During the panel's subsequent discussion about the interviews, which was now narrowed down to the two finalists, Hunt and Shater, "the panel determined that: (1) Mr. Hunt's leadership experience and style were preferable for the RSM–Americas role; (2) Mr. Hunt had more experience and a better understanding of the security challenges in this area; but (3) Mr. Shater would be better position to connect with the U.S. security agencies." (Hall Decl., Doc. No. 21-1 at ¶ 20).

After balancing the strengths and weaknesses of each candidate, "the panel unanimously determined that Mr. Hunt would be a better fit for the RSM–Americas position—notwithstanding the fact that Mr. Shater was a competitive candidate for the position." (Hall Decl., Doc. No. 21-1 at ¶ 21). Hunt was subsequently selected for the position. (*Id.* at ¶ 22).

Shater impliedly concedes that Shell has satisfied its burden to provide a legitimate, nondiscriminatory basis for its selection of Hunt over Shater, as he fails to offer any substantive arguments to rebut Shell's assertions on this point. (*See* Doc. No. 22 at 30). Moreover, the evidence

establishes that Shell has brought forth a legitimate, nondiscriminatory reason for not choosing Shater for the RSM–Americas position. As such, the Court finds that Shell has met its burden and moves to the third prong of the *McDonnell Douglas* analysis.

**E.    Shater's Evidence of Pretext**

In the third step of the *McDonnell Douglas* analysis, Shater must bring forth evidence to establish a genuine issue of material fact that Shell's legitimate reason is a pretext. It is this issue over which the parties have crossed swords and devoted the vast majority of their arguments. Shell argues that Shater has not and cannot meet his burden to demonstrate that its legitimate, nondiscriminatory reason for hiring Hunt over Shater was pretextual or that Shater's race and/or national origin played a role in its selection of Hunt. (Doc. No. 21 at 17–21). Shater obviously disagrees.

Once the employer satisfies its burden of providing a legitimate, nondiscriminatory reason for the employment decision:

> [T]he onus shifts back to the plaintiff to prove either that the defendant's articulated reason is merely a pretext for race [or national origin] discrimination, or that the defendant's reason, while true, is only one of the reasons for its decision, and another 'motivating factor' is the plaintiff's protected characteristic (the mixed-motives alternative).

*Autrey*, 704 F.3d at 347. As neither party offers much, if any, argument—much less any supporting evidence—as to the mixed-motives alternative, the Court will focus its analysis on the pretext alternative.

"A plaintiff may establish pretext by showing that a discriminatory motive more likely motivated [his or her] employer's decision, such as through evidence of disparate treatment, or that her employer's explanation is unworthy of credence." *Haire v. Bd. of Supervisors of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 363 (5th Cir. 2013); *see also Brown v. Wal-Mart Stores*

*East, L.P.*, 969 F.3d 571, 578 (5th Cir. 2020) ("Pretext can be proven by any evidence that casts doubt on the credence of the employer's proffered justification for the adverse employment action.").

The Fifth Circuit has held some evidence that may be interpreted as evidence of pretext does not preclude summary judgment if that evidence does not raise a "legitimate fact issue as to discriminatory intent." *See Churchill v. Tex. Dept. of Crim. Just.*, 539 F. App'x 315, 320 (5th Cir. 2013). "While [the plaintiff] presented some evidence of pretext, our careful review of the record, viewed in the light most favorable to [the plaintiff's] claim, compels the conclusion that the evidence taken together does not raise a legitimate fact issue as to discriminatory intent." *Id. See also Reeves*, 530 U.S. at 148 (explaining that although a plaintiff may set forth evidence to reject an employer's proffered legitimate, nondiscriminatory explanation as pretextual, the case may still present a circumstance where "no rational fact finder could conclude that the action was discriminatory").

To prove pretext in a failure-to-promote case, a plaintiff may show either (1) that the employer's proffered explanation "is false or unworthy of credence" or (2) that the plaintiff is "clearly better qualified than the person selected for the position." *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 412 (5th Cir. 2007). The Court addresses each prong in turn.

### A. *Was Shell's Proffered Reason False or Unworthy of Credence?*

"An employer's explanation is false or unworthy of credence if it is not the real reason for the employment action." *Id.* Shell argues that Shater cannot show that its legitimate, nondiscriminatory reason to promote Hall rather than Shater is false or unworthy of credence because the decision was based on a thorough evaluation following an application period and a round of unbiased interviews. (Doc. No. 21 at 20). Pointing to the declarations of both Hall and

Blakely, Shell contends that the hiring decision was based on a fair and objective process in which Shater's qualifications were carefully considered and balanced against Hunt's. (*Id.*; *see also* Hall Decl., Doc. No. 21-1 at ¶¶ 16–19; Blakely Decl., Doc. No. 21-6 at ¶¶ 6–7). Shell further notes that even Shater denied being treated in a discriminatory or offensive fashion during the interview. (Shater Depo., Doc. No. 22, Ex. P at 90:19–91:7).

Shater responds by offering two arguments. First, Shater alleges that there is proof that Hall secretly preselected Hunt for the position and took steps to manipulate the process against Shater. Shater offers no direct proof but argues that the circumstantial evidence supports his conclusion.[5] As previously mentioned, Shater contends that Hall: (1) gave Hunt the earlier-mentioned direct reports to bolster Hunt's credentials; (2) sought to convince Shater to accept a role in BID despite Shater's lack of interest; and (3) added a Spanish language preference to the job description. (Doc. No. 22 at 31). Shater further alleges that he was told by Buss that Hall, in anticipation of Shater taking action as a result of the hiring decision, had "covered his tracks." (Shater COD, Doc. No. 22-1, Ex. A at 7).[6] Shater concludes that Hunt was preselected and that the process was a sham. (Doc. No. 22 at 31).

In *Riney v. Lockheed Martin Corp.*, the Fifth Circuit analyzed a similar "preselection argument" in a Title VII gender discrimination case. 831 F. App'x 698 (5th Cir. 2020) (per curiam). As in this case, the plaintiff in *Riney* alleged that the chosen candidate was "'preselected' for the position even before interviews began" and argued that the alleged preselection constituted pretext. *Id.* at 702. In evaluating the plaintiff's evidence, which included organizational charts listing the

---

[5] While not a fatal blow to Shater's pretext argument, Shater never explains why, if Hunt had been preselected, Hall encouraged Shater to reapply (or at least made a point to inquire about Shater's withdrawn application), for the RSM–Americas position once he had withdrawn his application. (*See* Hall Decl., Doc. No. 21-1, Ex. 1-4).

[6] That statement is actually triple hearsay. At trial, the "evidence" Shater cites would never be admissible in its current form, as he cites a statement allegedly made by Buss to an unnamed colleague about a separate conversation between Buss and Hall. Shater does not have personal knowledge of either conversation.

selected candidate's name in the sought-after position prior to the interview stage, the Fifth Circuit held that "'preselection, in and of itself, does not establish pretext unless the preselection was motivated by discriminatory animus.' Riney offered no evidence suggesting that [the employer's] alleged preselection was so motivated." *Id.* (quoting *Hiner v. McHugh*, 546 F. App'x 401, 407 (5th Cir. 2013)).

On this preselection point, the Court finds that Shell prevails. First, as Shater himself testified, he was treated with respect during the interview process, recounting that there was no indication of discriminatory motive from the panel during his interview. Second, Shater provides no evidence suggesting that Shell's alleged actions that he claims demonstrate preselection were motivated by discriminatory animus. Based on the evidence before the Court, it is entirely plausible that Shell's actions that Shater argues amount to "preselection" were business decisions made for any number of nondiscriminatory reasons. For example, choosing someone who speaks Spanish to fill a post covering Mexico and Central America over someone who does not would make sense to any number of people. As the *Riney* decision makes clear, it is not enough for Shater to demonstrate pretext based on a handful of alleged actions that may suggest preselection, absent evidence that the alleged preselection was motivated by discrimination. Shater's claim fails on the preselection point.

Shater's second argument is that Shell allegedly changed its story about the basis for the selection. Specifically, Shater alleges that when he initially asked Hall why he was not selected for the RSM–Americas position, Hall responded that "sometimes we can't go by competencies." (Shater Depo., Doc. No. 22, Ex. P at 155:17–22; Shater COD, Doc. No. 22-1, Ex. A at 5).[7] In its

---

[7] The Court notes that neither Shell nor Hall admits that Hall responded in this manner. Nevertheless, Shell does not deny nor address this alleged quotation in either its Motion for Summary Judgment or its reply in support. (Doc. Nos. 21, 23).

position statement to the EEOC, however, Shell stated that Hunt was chosen because he was better qualified than Shater. (Doc. No. 22-8 at 5–6). Shater contends that these "shifting explanations" suggest pretext. (Doc. No. 22 at 32).[8]

In response, Shell first notes that in his COD, Shater explained that when he asked Hall why he was not selected, Hall also stated that "the other candidate answered a question about leadership better" than Shater. (Shater COD, Doc. No. 22-1, Ex. A at 5). Shell explains that this explanation is entirely consistent with the testimonies of Hall and Blakely, as well as its position statement with the EEOC. (Doc. No. 22-9 at 5–6; Hall Decl., Doc. No. 21-1 at ¶¶ 15–21; Blakely Decl., Doc. No. 21-6 at ¶¶ 5–9).

The *Riney* court, evaluating a similar "story shifting" argument, noted that "'proof of an employer's reasons becoming more detailed as the dispute moves beyond the initial notice to an employee and enters into adversarial proceedings is insufficient to create a jury question regarding pretext absent an actual inconsistency.'" *Riney*, 831 F. App'x at 703 (quoting *Minnis v. Bd. of Sup'rs of Louisiana State Univ.*, 620 F. App'x 214, 220 (5th Cir. 2015)).

Upon a review of all the evidence presented, the Court finds that Shater has not presented evidence that Shell's allegedly "shifting explanations" for its hiring decision were inconsistent. Shater has not demonstrated a genuine issue of material fact that Shell's proffered reasons for its decision to promote Hunt rather than Shater were false or unworthy of credence.

### B. *Was Shater Clearly More Qualified Than Hunt?*

As Shell points out, Shater devotes a larger portion of his Complaint to argue that he was better qualified than Hunt for the RSM–Americas position. (*See generally* Doc. No. 1). The Fifth

---

[8] The Court notes that these explanations are not mutually exclusive. While one person might be quite competent at one position, another might be better qualified for it due to certain intangibles such as leadership qualities or familiarity with the relevant country or customs.

Circuit has held that "a plaintiff may establish pretext by demonstrating that he was 'clearly better qualified' such that 'the qualifications are so widely disparate that no reasonable employer would have made the same decision.'" *Martinez v. Texas Workforce Comm'n–Civil Rights Div.*, 775 F.3d 685, 687 (5th Cir. 2014) (quoting *Moss v. BMC Software, Inc.*, 610 F.3d 917, 923 (5th Cir. 2010) (further explaining that "the bar is set high for this kind of evidence") (cleaned up)). Proof that two candidates are similarly qualified does not establish pretext. *Hypolite v. City of Houston*, 493 F. App'x 597, 605 (5th Cir. 2012) (citing *Price v. Federal Exp. Corp.*, 283 F.3d 715, 723 (5th Cir. 2002)).

Shell argues that Shater cannot meet his burden on this point. First, Shell highlights that Shater, in a letter to the Texas Workforce Commission, previously asserted that he "was at least equally qualified for the position." (Doc. No. 21-10 at 2).[9] Shell reasons that even if Shater was equally qualified, this does not demonstrate that he was *clearly better* qualified, nor that Shell was discriminatory in its decision to promote Hunt. (Doc. No. 21 at 19). As it relates to Hunt's qualifications, Shell notes that in his interview, Hunt detailed his "substantial knowledge about and professional work experience in Latin America." (*Id.* at 19–20). Hunt's qualifications also include having "served as a government liaison officer on behalf of the U.K. government to Mexico and Colombia," previous experience living in Latin America for six years, and fluency in Spanish. (*Id.*). Moreover, as earlier noted, Hunt's master's thesis "examined cultural differences in Latin American Security teams." (Hall Decl., Doc. No. 21-1 at ¶ 17). Comparatively, Shell explains that Shater does not speak Spanish, nor does he have nearly the amount of work experience in Latin America. (*Id.* at 20). Finally, Shell notes that the interview panel determined

---

[9] The Court notes that while these two positions are not mutually exclusive, this letter could be construed as "story shifting" on the part of Shater, who now argues that he was "clearly better qualified" than Hunt as opposed to "at least equally qualified."

that Hunt's leadership style was more suited to the position. (*Id.*). Taken together, Shell contends that Shater cannot show that he was "clearly better qualified" than Hunt for the RSM–Americas position.

Shater counters by pointing first to the similarities between his CSM role and the RSM–Americas position. Shater argues that through his CSM position, he obtained all the necessary competencies required in the RSM–Americas job description, including engaging with heads of business units, government stakeholders, and gathering/disseminating intelligence to the business. (Shater COD, Doc. No. 22-1, Ex. A at 5; *see also* Shater Depo., Doc. No. 22, Ex. P at 156–57). Conversely, Shater contends that "Hunt did not engage consistently, if ever," with heads of business units or government stakeholders, nor did Hunt gather and disseminate intelligence or manage security incidents. (Shater COD, Doc. No. 22-1, Ex. A at 5–6). Shater reasons that Hunt could not have reached "Mastery level" for four of the six listed competencies "because he never performed these roles in his most recent position." (*Id.*). Shater also notes that he is a United States citizen—a preferred qualification for the position—whereas Hunt is not. (Shater Depo., Doc. No. 22, Ex. P at 181–82).

Secondly, Shater identifies four Shell colleagues who allegedly believed that Shater was the most qualified candidate for the RSM–Americas role or expressed opinions that Shell harbored a preference for British nationals. (Shater COD, Doc. No. 22-1, Ex. A at 7–8).[10] The opinion of four colleagues who favor one candidate over another from a worldwide work force comprised of tens of thousands of employees, without more, is hardly suggestive of discriminatory animus.

---

[10] As earlier mentioned, these statements are hearsay, or perhaps double hearsay, as Shater has provided no evidence or argument that any hearsay exception applies. Specifically, Shater alleges that Shell colleague Maria Kuusisto and Corporate Security staff members Vanessa Helayal, Dominic Taylor, and Andrew Choong all expressed that Shell and/or Hall exhibited "favoritism towards British nationals" to other Shell colleagues. Shater also alleges that Buss expressed to colleagues (and Boult expressed to Hall) that Shater was the most qualified person for the RSM–Americas role. Shater does not claim that any of these statements were made to him or in his presence.

Thirdly, Shater contends that the "overall scenario" and "big picture" support the conclusion that Hall wanted a white British national for the RSM–Americas position. (Doc. No. 22 at 35). Specifically, Shater points to Oaks, who allegedly "embarrassed" Hunt by refusing to execute Hunt's "illegal orders." (*Id.*). According to Shater, Oaks was terminated by Hall for refusing "to make hiring decisions concerning an older applicant for a job at Shell . . . based on age, in violation of U.S. laws, as Hall had wanted him to do." (Doc. No. 22 at 13) (citing Shater COD, Doc. No. 22-1, Ex. A at 3; Oaks's Original Complaint, Doc. No. 22-1, Ex. A-9 at ¶¶ 22–53; Hall Depo., Doc. No. 22-6, Ex. F at 188–89). Oaks subsequently filed a Charge of Discrimination with the EEOC. (Doc. No. 22 at 13) (citing Oaks COD, Doc. No. 22-1, Ex. A-7).[11] Interestingly, Shater, in his COD, concluded from these facts that Hunt was hired instead of Shater not because of race or national origin, but because Hall wanted someone he could "trust completely." (Shater COD, Doc. No. 22-1, Ex. A at 5).

In support of his reliance on the "overall scenario," Shater points to *Donaldson v. CBD Inc.*, 335 F. App'x 494, 503 (5th Cir. 2009), and *Starnes v. Wallace*, 849 F.3d 627, 634 (5th Cir. 2017). To the extent that by "overall scenario," Shater is referring to Shell's alleged pattern of discrimination, neither of these cases is applicable.

In *Donaldson*, the Fifth Circuit explained that when evaluating a hostile-work-environment claim (which Shater does not allege), courts should consider the "totality of the circumstances" when determining whether the alleged conduct amounted to creating a "severe or pervasive" hostile-work-environment. 335 F. App'x at 503. This is because "[d]isaggregating the claims 'robs the incidents of their cumulative effect.'" *Id.* While it follows that a court should consider the

---

[11] With respect to Oaks COD, the Court notes the same hearsay concerns previously mentioned when discussing the Shater COD.

"overall scenario" to determine whether a work environment could rightfully be described as "severe or pervasive," *Donaldson* offers no indication that the same analysis is necessary, or even relevant, for a failure-to-promote claim.

As for *Starnes*, a Fair Labor Standards Act retaliation case, Shater relies on a discussion about the causation element of a prima facie claim of discrimination[12] in which the Fifth Circuit notes "the big picture is that both the 'causal link' of the prima facie case and the pretext inquiry are aimed at the ultimate question in a retaliation case: 'whether the defendant discriminated against the plaintiff *because* the plaintiff engaged in' protected conduct." *Starnes*, 849 F.3d at 635 (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996)). Specifically, the Fifth Circuit was analyzing whether temporal proximity—more than a year—between an employee's participation in a protected activity and an adverse employment action is dispositive of causation. *Starnes*, 849 F.3d at 634–35. The Fifth Circuit explained that if other evidence before the court tends to establish causation such that a jury might find a retaliatory motive for the adverse employment action, temporal connection may not be dispositive. *Id.* The Court does not find this case to be factually analogous and does not find the Fifth Circuit's ruling in *Starnes* to be controlling in the instant case.

Certainly, neither *Donaldson* nor *Starnes* suggest that a court should consider unrelated lawsuits involving different parties when evaluating whether an employer's proffered reason for the employment decision was pretextual. As such, the Court is not persuaded by this argument.

Next, Shater seeks to introduce statistics to demonstrate that Hall preferred to hire white British nationals for leadership positions. (Doc. No. 22 at 36). In support of this contention, Shater

---

[12] "The first question is whether Starnes has made a prima facie showing of: (1) participation in a protected activity under the FLSA; (2) an adverse employment action; and (3) a causal link between the activity and the adverse action." *Starnes*, 849 F.3d at 631–32.

points to both his COD as well as a document purporting to list Corporate Security Management appointments from 2012–2017. (Shater COD, Doc. No. 22-1, Ex. A at 10; Doc. No 22-1, Ex. A-6). Critically, the Court has no evidence before it to discern the authenticity or admissibility of the proposed statistics offered by Shater.

While Shater includes an exhibit (Doc. No. 22, Ex. A-6) as the basis for his statistical argument, he offers no affidavit or sworn testimony attesting to either the accuracy or, more importantly, the admissibility of this list or data included therein. In addition to the hearsay problem, there is an open question as to the authenticity of the document. *See* Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."); *see also BP Expl. & Prod. Inc. v. Cashman Equip. Corp.*, No. H-13-3056, 2010 WL 1387907, at *3 (S.D. Tex. Apr. 8, 2016) ("Circumstantial factors can also authenticate documents: for example, firm logos, letterheads, pre-printed addresses, dates and telephone numbers can help establish authenticity."). Shater has provided no evidence in support of authenticity. There is also no intrinsic was to verify the document or the figures therein. For example, the list contains no logo, letterhead, or contact information to suggest that it is a document that belongs to Shell. As such, the Court finds that this evidence is inadmissible on summary judgment.

Even if the Court were to consider the proffered statistics, the Court notes that "statistical evidence usually cannot rebut the employer's articulated nondiscriminatory reasons." *EEOC v. Tex. Instruments Inc.*, 100 F.3d 1173, 1184 (5th Cir. 1996) (citing *Walther v. Lone Star Gas Co.*, 977 F.3d 161, 162 (5th Cir. 1992)) (explaining that statistics are generally not enough to rebut an

employer's legitimate, nondiscriminatory employment decision).[13] Furthermore, "statistical evidence is only probative of intent when combined with other evidence specifically rebutting the defendant's legitimate, nondiscriminatory reasons." *Pickney v. Diamond Offshore Servs. Ltd.*, No. H-18-4545, 2022 WL 889035, at *13 (S.D. Tex. Mar. 25, 2022). The *Texas Instruments* opinion further explains that the use of statistical evidence to demonstrate pretext is viewed skeptically by other circuits. 100 F.3d at 1185 (citing *LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 848 (1st Cir. 1993); *Barnes v. GenCorp., Inc.*, 896 F.2d 1457, 1469 (6th Cir. 1990)).

Additionally, as Shell explains, most cases in which statistical evidence is offered to demonstrate pretext involve a reduction-in-force (presumably involving a much larger employee sample size), and Shater does not identity any instance where statistical evidence has been used to demonstrate pretext in the failure-to-promote context.[14] Moreover, the Court does not find the statistical evidence to be probative because Shater has not offered any other evidence suggesting discriminatory animus to rebut Shell's legitimate, nondiscriminatory reasons. Taken together, the Court finds that even if it were admissible, Shater's statistical evidence is not probative as to the issue of pretext.

In his response, Shater also points to the deposition of Marga Mulder ("Mulder"), an employee of Shell's Corporate Security Global Functions group, and the declaration of Jo Gacheru ("Gacheru"), a former Shell employee. (*See* Mulder Depo., Doc. No. 22, Ex. U; Gacheru Decl., Doc. No. 22, Ex. V.). Neither of these pieces of evidence are sufficient to create a genuine dispute of material fact. First, the declaration of Gacheru relies entirely on conclusions and opinions.

---

[13] "The probative value of statistical evidence ultimately depends on all the surrounding facts, circumstances, and other evidence of discrimination." *Tex. Instruments*, 100 F.3d at 1185. The Court is not persuaded that the statistics offered by Shater are probative of pretext when considering the surrounding facts and evidence.

[14] Notably, Exhibit A-6 does not include any information as to race. (Doc. No. 22-1, Ex. A-6).

(Gacheru Decl., Doc. No. 22, Ex. V). Second, Mulder's deposition is at best inconclusive as to any favoritism toward white British nationals. In fact, Mulder identifies multiple non-white and non-British individuals in Shell's Corporate Security Group. (Mulder Depo., Doc. No. 22, Ex. U at 41:18–42:24).

Based on the record before the Court, the Court finds that Shater has not presented evidence "from which a jury could conclude that no reasonable person, in the exercise of impartial judgment, could have chosen" Hunt over Shater for the RSM–Americas position. *Moss*, 610 F.3d at 923. Hunt is fluent in Spanish, has previously lived and worked in Latin America, completed a master's thesis concentrated on security in Latin America, and presented a more collaborative leadership approach during his interview.[15] While Shater clearly feels that he was equally or better qualified for the RSM–Americas position—and indeed he has some attributes that Hunt does not—that is not the test.

It is true, of course, that on a motion for summary judgment, the Court must draw all reasonable inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 248. This does not mean, however, that the Court must interpret all facts in the *same* light that the nonmoving party interprets them. Any individual is likely to be disappointed any time he or she

---

[15] While not relevant to the immediate issues, Shater fails to mention that in his response he also included Shell's position statement to the EEOC, and in that that statement, Shell explains that in March 2018, Shater was encouraged to apply for the RSM–MENA position after being designated "the preferred candidate." (Shell's Position Statement to EEOC, Doc. No. 22, Ex. H at 22). Shater was apparently selected for the position and was slated to begin his new role (which included an increase in wages and benefits, and presumably put him on equal footing with Hunt) in May 2018. (*Id.*) (*But see* Mulder Depo., Doc. No. 22, Ex. U at 29:18–20). Based upon the evidence here, this choice is not surprising, as many of the same factors that led to Hunt being selected for the RSM–Americas position apply to Shater in this position. Shater had spent years living and working for Shell in the region, was presumably familiar with the location and business contacts. Additionally, he had previously spent six years in this region as the Regional Security Director in MENA for ConocoPhillips. (Doc. No. 22 at 11). Though the parties do not address whether Shater actually assumed this role, it appears clear that Shater was qualified for the position given his breadth of experience working in the region and his apparent ability to speak some level of Arabic. (Shater Depo., Doc. No. 22, Ex. P at 44-45). While Shell's Position Statement is also hearsay evidence without an accompanying affidavit supporting admission, if the information contained therein is true, Shater's own evidence seems to contradict his position that Shell exercised a strict, rigid favoritism for white British nationals in its Corporate Security Group.

fails to receive a promotion for which they believe they are qualified and/or entitled, and is bound to attribute the decision to any number of reasons. Occasionally, that individual may conclude the decision was made for discriminatory reasons. To overcome a motion for summary judgment on a Title VII claim, though, that individual must provide evidence demonstrating that the employer's decision was motivated by discriminatory intent. *See Riney*, 831 F. App'x at 703. On the record before the Court, despite Shater's interpretation of the circumstances surrounding Shell's employment decision, there is no actual summary judgment evidence from which the Court can conclude that a genuine issue of material fact exists as to whether Shell's decision not to promote Shater into the RSM–Americas role was motivated by discriminatory intent.

The Court finds that, even when considering the hearsay evidence Shater frequently relies upon, Shater has not raised a genuine dispute of material fact as to whether Shell's legitimate, nondiscriminatory reason for its hiring decision was pretextual. Certainly, the Court would reach the same conclusion if it did not consider the hearsay evidence, as Shater would have even less support from which to create a genuine dispute of material fact. Therefore, the Court grants Shell's Motion for Summary Judgment.

<u>**Conclusion**</u>

For the foregoing reasons, the Court hereby **GRANTS** Shell's Motion for Summary Judgment. (Doc. No. 21).

Signed at Houston, Texas, this 31st day of May, 2022.

Andrew S. Hanen
United States District Judge